UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

_____

United States of America, ex rel. Andrew Ellis,
Harriet Ellis, Michael W. Blodgett,

               Plaintiffs

**FILED UNDER SEAL**

**DO NOT PLACE ON PACER**

**DO NOT PLACE IN PRESS BOX**

**VERIFIED COMPLAINT**

v.

Court File No. _____

City of Minneapolis, a municipal corporation;
City of St. Paul, a municipal corporation;  Metropolitan
Council (for the Twin Cities metro region) all as an entity
requesting and receiving HUD CDBG, HOME and other federal
funds; John and Jane Does; individually, jointly and severally;

               Defendants

**JURY TRIAL DEMANDED**

_____

**False Claims Act Complaint and Demand for Jury Trial**

1

## INTRODUCTION

This is a qui tam action to recover on behalf of the United States of America for false claims made by the various Defendants, as to Federal Fair Housing Funds in the false claims period, totaling in excess of US $100,000,000. True and correct copies of Exhibits are attached and attached by reference and incorporated into this Complaint. As named, each participating jurisdiction ("PJ") City is liable.

1. Plaintiffs bring this Verified Complaint under the False Claims

Act, 31 U. S. C.§§ 3729 *et seq.* (the "False Claims Act"), to recover damages sustained by, and penalties owed to, the United States as the result of Defendants, individually,  jointly and severally, from in or about 2000 through 2010, having knowingly presented or caused to be presented to the United States false claims to obtain federal funding for housing and community development, as more specifically detailed infra;  and to seek, pursuant to 42 U. S. C. § 5311(b) and other authority, appropriate remedies including mandatory or injunctive relief, for Defendants' non-compliance with community development requirements during that time period. And so as to enforce Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U. S. C. §3601 – 3619 ("The Fair Housing Act"), and specifically under § 3604, 3613 and 3617, including

2

the affirmatively furthering fair housing requirements of Section 104(b)(2) thereof [42 U. S. C. § 5304(b)(2)].

2.    Relators have discovered and submit that they are original sources by virtue of independent investigation, interviews, research and monitoring of the Twin Cities region - and specifically each individual Defendant entity is engaged in a continuing and ongoing pattern and practice of:

Non- compliance with one or more of the key ministerial duties imposed on each Defendant to Affirmatively Further Fair Housing ("AFFH") so as to *not* cause what HUD and the Federal Courts' define as "disparate impact"; including *inter alia*, fraudulent certifications submitted each year to HUD stating that each Defendant was complying with their legal duties to Affirmatively Further Fair Housing, while in fact each Defendants was causing disparate impact by falsely, pre-textually and illegally demolishing under heightened illegal police power codes and code enforcement standards, without due process many dwellings that were grandfathered in as safe and affordable housing by the State Building Code, causing many hundreds of protected class tenants to lose their access to safe, affordable housing; failure of each Defendant to keep proper records mandated by HUD so as to allow HUD or any citizen to determine if each Defendant was in

3

compliance with their ministerial duties to not cause disparate impact; failure to honor federal fair housing conflict preemption; failure to honor subject matter preemption, as to "repair or rehabilitation" of older affordable housing stock, as required by the Minnesota State Building Code; failure to report to the public and to HUD certain legal actions occurring inside each PJ; meetings constituting illegal agreements to violate Federal Fair Housing, between one or more Ramsey County judges and upon information and belief one or more Hennepin County judges and the City Councils and City Attorneys of St. Paul and Minneapolis, to control, pre-determine or otherwise deny due process of law to landlords and others, who were forced into quasi-judicial proceedings before housing courts and City Councils of Defendant Cities of St. Paul and Minneapolis without being able to protect their dwellings which were rented to members of protected classes.

Such errors and omissions have and continue to cause disparate impact and undermine racial integration in housing, and in reducing the protected classes' access to otherwise safe, affordable housing within each Defendant PJ and thus implicates the annual false claims made by each Defendant on HUD as well as reveal a long standing pattern of civil rights violations taken under color of law or official right, that they were honoring FHA and were AFFH.

4

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the claims brought herein pursuant to

28 U. S. C. § 1331 and § 1345, 31 U. S. C. § 3729 et seq. (the "False Claims Act")

including § 3730(b) (1) and § 3732(a), and 42 U. S. C. § 5311(b), as well as

pursuant to this Court's general equitable jurisdiction. *See, Rockwell Int'l Corp. v.*

*United States,* 549 U. S. 457 (2007).  As to § 3730(e)(4)(A), (B) Relators have

upon information and belief, as original sources satisfied *Rockwell Id. at 473* in

that the statement by Relators to the United States refers to the Relators'

allegations based on direct and independent knowledge of the information on

which the allegations are based, and not any publicly disclosed allegations, if any

public disclosures have occurred, and Relators have independently and voluntarily

provided the informational statement under § 3730(e)(4)(B), prior to filing this

Complaint, to the United States Attorney's Office that contains information

materially different from any information publicly disclosed. *See also, U. S. ex rel.*

*Duxbury v. Ortho Biotech Products,* 579 F. 3d 15, 26 (1st Cir. 2009) (collecting

cases, addressing duty of relator not to provide information to government *prior* to

public disclosure, but only *prior to filing* of qui tam suit).

4.     Venue is proper in this District pursuant to 31 U. S. C. § 3732(a), because the conduct prescribed by the False Claims Act and complained of herein took place in this District, and is also proper pursuant to 28 U. S. C. § 1391(b) and § 1391(c), because the acts and omissions complained of herein occurred in this District, and because at all times material and relevant, Defendants resided in and transacted business in this District. *See, Cook County, Illinois v. United States ex rel. Chandler,* 538 U. S. 119, 125 ff. (2003) (county liable as person for damages under FCA).

5.     As provided by 31 U. S. C. § 3130(b)(2), Relator(s) have offered to and have provided to the United States Attorney for the District of Minnesota a statement of material evidence and information that Plaintiff Relators possesses regarding this Complaint prior to filing this Complaint under seal. Because the statement includes actual or potential attorney work product or attorney client privileged communications, and was submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in this litigation whether or when should Relators obtain counsel, Plaintiff Relators understand this statement and information supplied to be confidential as prepared in anticipation of

6

or for actual litigation. Relators have also offered to be and will make themselves available to be interviewed by the United States Attorney's Office.

6.      Congress by statute and HUD by administrative rules and regulations, and by the Code of Federal Regulations, Executive Orders and HUD rules, provided guidance or regulations that have the full force of law, that prescribed ministerial duties on each participating jurisdiction "PJ" from around the nation, including participating jurisdictions inside the Metropolitan Region served by the Defendant Metropolitan Council here in the Twin Cities. These rules and regulations imposed such ministerial duties, that did not and do not involve setting policies, but which allow for no discretion in their performance which is intended to protect certain members of "protected classes" as defined by Congress and HUD, as to those protected classes access to "dwellings" in safe, affordable housing in either public or private rental markets. These protections were extended by amendments in 1988, to include protections for those associating with protected classes as to such rental dwellings. Federal Fair Housing 42 U. S. C. §§ 3601 – 3617 *et seq*, provides for conflict preemption whenever any state or local ordinance, code or law conflicts with Congressional intent as written within Federal Fair Housing laws, rules or regulations ("FHA"). Such guidance as to

7

ministerial duties of each Defendant was also contained in the *FAIR HOUSING PLANNING GUIDE* ("*PLANNING GUIDE*") issued by HUD prior to the *2001 Analysis of Impediments*, with the *PLANNING GUIDE* actually timely received and relied upon by each Defendant.

The *PLANNING GUIDE*, as attached or attached by reference contains many statements by HUD of the ministerial duties each Defendant had no choice but to honor. This Verified Complaint also attaches true and correct copies or by reference incorporates such copies, of: *2001 Analysis of Impediments; 2005 CAPER for the City of Minneapolis; 2005 CAPER for the City of St. Paul; 2005 CONPLAN for the City of Minneapolis; 2005 CONPLAN for the City of St. Paul; 2006 CAPER for the City of Minneapolis; 2006 CAPER for the City of St. Paul; 2006 CONPLAN for the City of Minneapolis; 2006 CONPLAN for the City of St. Paul; 2007 CAPER for the City of Minneapolis; 2007 CAPER for the City of St. Paul; 2007 CONPLAN for the City of Minneapolis; 2007 CONPLAN for the City of St. Paul; 2008 CAPER for the City of Minneapolis; 2008 CAPER for the City of St. Paul; 2008 CONPLAN for the City of Minneapolis;  2008 CONPLAN for the City of St. Paul; 2009 Analysis of Impediments; 2009 CAPER for the City of Minneapolis; 2009 CAPER for the City of St. Paul; 2009 CONPLAN for the City of*

8

*Minneapolis' 2009 CONPLAN for the City of St. Paul; 2010 CAPER for the City of*

*Minneapolis; 2010 CAPER for the City of St. Paul; 2010 CONPLAN FOR THE*

*City of Minneapolis; 2010 CONPLAN for the City of St. Paul; 2010 CONPLAN for*

*Hennepin County Consortium; various Executive Orders, HUD regulations, Code*

*of Federal Regulations as referenced in the adopted or attached materials; the*

*HUD Fair Housing Planning Guide  Volumes I – III;* all documents submitted or

prepared by the Metropolitan Council relevant to the claims period, as relied upon

by HUD to reach funding decisions as to any or all Defendant entities, including

communications sent to, considered by or received by the Fair Housing

Implementation Council ("FHIC"); *Unites States v. City of Black Jack, MO.* 508 F.

2d 1179 (Eighth Circuit 1974, re-hearings denied Jan. 20, 1975); *Gallagher et al v.*

*City of St. Paul,* 619 F. 3d 823 (Eighth Circuit, 2010); *City of Minnetonka v. Mark*

*Z. Jones* 236 N. W. 2d 163, 165 (Minn. 1975) and *City of Morris v. SAX*

*Investments* 749 N. W. 2d 1 (Minn. 2008); copies of expert or other reports

submitted by Don Hedquist to either Defendant Minneapolis or Defendant St. Paul

as to Defendants' violations of the subject matter preemption of the State Building

Code as to the subjects of repair and/or rehabilitation; and subject to discovery

such documents for potential defendants and also for each actual or potential

defendant, their accounting, journals, ledgers(paper or electronic) of all their

9

receipts of and disbursements or draw downs of all CDBG and HOME funds during the claims period. Based on information obtained by Relators, Defendant Minneapolis obtained approximately US $78,000,000 in CDBG, plus other HOME funds and an additional US $ 25,000,000 in the false claims period. Defendant St. Paul obtained in CDBG and HOME funds, approximately US $60,000,000 in the false claims period, for an approximate total of funds falsely claimed and received in excess of US $ 150,000,000 among both Defendants.

## PARTIES

7.    Relator Andrew Ellis is a natural person residing in Hennepin County, at 5201 Belmont Ave. S. Minneapolis, MN 55419  and was the owner of one or more parcels or properties of real estate located within the City of Minneapolis, State of Minnesota from 2001 through the present.

8.    Relator Harriet Ellis is a natural person who co-owns such properties and is the spouse of Andrew Ellis.

9.    Relators Ellis' have provided otherwise safe, affordable dwellings for rent to protected class members for more than 30 years inside the City of Minneapolis with most of their dwellings located inside areas identified by CHAS

10

data as disproportionately low income, disproportionately African American and/or otherwise containing older housing stock.

10.    Relator Andrew Ellis was previously a paid housing inspector for the Defendant City of Minneapolis and had frequent occasions to learn about and address the State Building Code and its differences from and with Codes passed by and/or enforced by the Defendant City of Minneapolis.

11.    Relator Andrew Ellis has repeatedly and persistently challenged, questioned, or informed Minneapolis City officials, including the Minneapolis City Attorney's Office of his concerns over actual conflicts between the City's housing standards and the State Building Code.

12.    Relators Ellis' have on multiple occasions challenged the City of Minneapolis before the City's committees, before the City Council and in Hennepin County Courts and/or Minnesota State Court of Appeals on cert. as to the validity of Defendant Minneapolis City's Codes and Code enforcement actions as arguably under or in regards to the State Building Code and due process. Relators Ellis' have also belonged to a group of Twin Cities' landlords and exchanged information with other members for a number of years.

13.    Relator Michael W. Blodgett has resided in and around the Metro Area, was born in and raised in and around the Chicago IL area and had first hand

11

experience with the large HUD complexes on the near north side and the south side of Chicago that were later torn down and/or subject to Federal Fair Housing claims or other civil rights claims.

14.    Relator Blodgett also worked in public or private education in the Bronx, on the West Side of Chicago the year Dr. Martin Luther King was killed, and in the Metro Area including as an assistant principal in the Bryant, Ramsey, Phillips Junior Highs and Marshall University High School when all four schools were experiencing desegregation, unusual amounts of violence and racial conflicts and striving for integration, and were receiving significant annual local, state. and/or federal funds for such purposes.

15.    Relator Blodgett also was involved in annual grant preparation and submissions for such funds, including application of Performance Evaluation Review Techniques ("PERT"), the collection of data similar to the current CHAS data and evaluation and monitoring of actual performance or the lack thereof.

16.    After leaving public education Relator Blodgett was involved in business and later became involuntarily educated as to laws involving misconduct of government entities, attorneys or personnel, where his focus on such frauds or attorney or government misconduct continues to this day.

12

17.    In approximately 2004, Relator Blodgett was introduced by an attorney, Greg Troy to attorney John Shoemaker, who had filed the first Complaint in what became the *Gallagher & Steinhauser* actions against the City of St. Paul, and Blodgett at that time or within a year after meeting Shoemaker, indicated to and informed Attorney Shoemaker and attorney Greg Troy that Blodgett because of his background and experiences including growing up around Chicago, suspected that racism in Minnesota was much more under the surface and might not show up in any depositions or other discovery, but might have to be proven up by inference or by data as to disparate impact such as was referenced in *United States v. City of Black Jack, MO.*, 508 F. 2d 1179 (Eighth Circuit 1974, re-hearings denied Jan. 20, 1975).

18.    Relator Blodgett starting in 2004, worked primarily on his own time to investigate the facts and circumstances within the seven-county Metro Area as to FHA, AFFH, and disparate impact.

19.    Despite his best efforts to obtain something called the *2001 Analysis of Impediments ("AI")*, no Defendant would then provide it to him. Blodgett found an article written by a law professor, as to regional approach to Analysis of Impediments here in the Metro Area, and tracked down that law professor and was fortunate to obtain the assistance of that law professor who mailed out to Blodgett

13

in approximately 2004 – 2005 the actual copy she used to write her article, of the
*2001 Regional Analysis of Impediments* which none of the current Defendants was
then willing or able to provide to Blodgett despite timely requests.

20.    After noticing that there were no then current references, in about
2005 to any new AI since the 2001 AI, by Defendants despite HUD's requirement
that a new AI be prepared and referenced every *three to five years* Blodgett
suspected that such failure to prepare or reference a new AI could be a badge of
fraud, but had little or no idea why or how any Defendant had a motive or intended
to accomplish defrauding HUD as to such omission.

21.    Blodgett then contacted an employee for the State of Minnesota, in
2005 – 2006 to see if the State might have any information about the absence of a
new AI since the 2001 AI and its implications for any sworn or other submissions
by one or more of the PJ Defendants.

22.    The State employee informed Blodgett that the absence of any new AI
could be or was a badge of fraud and could raise very serious concerns about the
validity of any local PJ's sworn submissions to HUD, and that the Fair Housing
Implementation Council ("FHIC") might be playing a central role in these matters.
She also informed Blodgett that the State played little or no role in overseeing the
Metropolitan Council or any of the now City Defendants.

14

23.     Blodgett thereafter informally interviewed Denise Beigbeiter at FHIC,
who informally confirmed the potential significance of no new AI since 2001 as
related to potential problems for the local PJ's. Blodgett sought out Beigbeiter
because when Blodgett was reviewing many of the documents submitted within the
jurisdictions belonging to the FHIC sphere of influence, almost all thanked Ms.
Beigbeiter repeatedly for her coordination, training and participation in the
preparation of CAPER, CONPLAN or other annual sworn submissions Defendants
made to HUD to obtain CDBG or HOME funding each year. However, Beigbeiter
was not under oath at that time.

24.     Blodgett on his own also learned about and contacted the attorneys
handling the qui tam claims in Westchester County NY, *sub nom United States ex
rel Anti-Discrimination Center of Westchester County NY, v. Westchester County,
case 1.06-cv-02860-DLC (S. D. N. Y. 2006 - 2010)* to clarify an understanding
about qui tam out there and potentially out here in Minnesota. *See, Cook County,
Illinois v. United States ex rel Chandler,* 538 U. S. 119, 125 ff. (2003) (county
liable as person for treble damages under FCA).

25.     Blodgett also contacted a HUD investigator from Chicago and
independently and also once or twice with Shoemaker on the phone started to
inform HUD of Defendant St. Paul's situation here in Minnesota.

26.     That HUD official directed Blodgett and Shoemaker to the local HUD office, to which Blodgett and Shoemaker jointly *and* independently tried to present concerns over false claims by St. Paul to HUD.

27.     Blodgett also contacted local attorney Jack Cann whom Blodgett had known from college and introduced Cann to Shoemaker, and thereafter Cann directed Blodgett as to how to locate, compile and present CHAS and other data as to disparate impact. Blodgett shared that direction with Shoemaker.

28.     Blodgett also interviewed Defendant St. Paul employees and/or Defendant Minneapolis employees, as to why their City Attorneys either refused or were unable to make their City employees honor Temporary Restraining Orders ("TRO's") issued by their respective District Courts, or honor Federal Fair Housing laws or the subject matter preemption of the State Building Code.

29.     Shoemaker, in the *Gallagher & Steinhauser* litigation against the City of St. Paul discovered with Blodgett's suggestions and encouragement , that Ramsey County District Court Judge Thomas Mott had assembled, orchestrated, conducted or otherwise planned or condoned "secret" meetings with a few Ramsey County judges, members of the St. Paul City Council, City officials and City Attorney's Office, to pre-plan and pre-determine the outcomes of what otherwise would or could have been landlord Federal Fair Housing or State Building Code

16

complaints, by forcing such complainants into dealing without due process with Defendant City of St. Paul hearing examiners and City Council, and then into housing court, and then on to cert. before the Minnesota Court of Appeals.

30.    Those pre-planned or pre-determinations insured that on cert., little or none of the relevant evidence would be in the City Council's records, few if any witnesses could actually be called, little or no cross examination was allowed, and there was no meaningful opportunity to confront the City employers who had made the false or illegal code enforcement determinations that violated the subject matter preemption of the State Building Code as to the subjects of repair or rehabilitation of dwellings protected by the State Building Code and by FHA and AFFH,  thus denying much if any chance for meaningful review by the Minnesota Court of Appeals.

31.    Only a small number of Ramsey County judges convened with Judge Mott and St. Paul officials such as Andy Dawkins. Other judges refused to participate. Other evidence to be supplied to the Unites States Attorney's Office indicates that the same people convening with Andy Dawkins and Judge Mott also were in touch with Hennepin County judges and the City Attorney of Minneapolis.

32.    On occasion City or private attorneys directed Blodgett to request TRO's from one or more Ramsey County District Court judge, and Blodgett did do

clearly stating that he was not an attorney and that the respective City Attorney
personnel or private attorneys were unwilling or afraid to make such requests.

33.    On other occasions, Blodgett interacted with Ramsey District Court
judges whom Blodgett later learned had refused to attend or participate with Judge
Mott in pre-determining federal fair housing or other landlord claims. Blodgett also
coordinated submissions by building expert Don Hedquist for several attorneys,
which were provided under oath to City Defendant Minneapolis and City
Defendant St. Paul in hearings on demolitions, or in court proceedings.

34.    After Shoemaker ran into difficulty with the dismissal of Steinhauser
et al's complaint against the City of St. Paul by federal Judge Joan Ericksen,
Shoemaker requested the emergency assistance of Blodgett as to redrafting the
final brief and also drafting Shoemaker's oral argument for submission to the
Eighth Circuit.

35.    Blodgett prepared a revised draft focusing on disparate impact, and a
script for Shoemaker for oral argument and preserved those documents in
electronic form.

36.    Later Shoemaker reported and Blodgett independently confirmed that
Shoemaker had utilized both the major portions of the revision and most all of the

18

script, before the Eighth Circuit focusing on disparate impact, making Blodgett an independent source for such disclosures.

37.    After those experiences with Shoemaker, Blodgett was introduced to Relators Andrew Ellis and Harriet Ellis, who were fully informed about Blodgett's background and experiences.

38.    At their request, Blodgett started to focus for them on federal fair housing, fraud on the court claims and possible attorney fraud or public corruption and thereafter possible qui tam. With the Ellis' Blodgett contacted the Taxpayers Against Fraud ("TAF") regarding qui tam claims and provided that feedback to the Ellis'.

39.    At the request of the Ellis', and with their assistance as to analysis and documentation, the Ellis' and Blodgett has assembled, prepared and herein present jointly with the Ellis the summation and Complaint of qui tam and as to federal fair housing violations and other civil rights violations by the Defendants during the false claims period.

40.    When or before Relators were attempting to formulate the claims submitted herein, the Eighth Circuit at oral argument indicated its concerns over the dismissal of disparate impact by Judge Ericksen in the lawsuit against the City of St. Paul exactly as predicted for Shoemaker by Blodgett and by common sense

19

and scripted by Blodgett due to his prior life experiences. And in their subsequent

published opinion, the Eighth Circuit affirmed District Court Judge Joan Ericksen

on most of the dismissed claims, *but for* disparate impact which was remanded for

discovery and trial, arguably with the directions that Shoemaker who had *never*

stated any claims under subject matter or field or conflict preemption could amend

to state such claims. The full text of that opinion is attached or attached by

reference, as *Gallagher et al v. City of St. Paul,* 619 F. 3d 823 (Eighth Circuit,

2010) (see esp. sections on disparate impact and on remand as to amend as to State

Building Code).

  41. The Eighth Circuit opinion in *Gallagher & Steinhauser et al v. City of*

*St. Paul* was issued December, 2010, and published as *Gallagher et al v. City of St.*

*Paul,* 619 F. 3d 823 (Eighth Circuit, 2010). Relators have learned that the City of

St. Paul hopes to overturn the Eighth Circuit at the United States Supreme Court

and that amicus briefs may be requested from or filed by other Defendants or their

proxies from inside or from outside Minnesota, including some who participated in

the briefing and arguments involving the Minnesota Supreme Court's decision in

*City of Morris v. SAX Investments* (Minn. 2008).

  42. The Eighth Circuit consolidated *Gallagher & Steinhauser* opinion

which Defendant St. Paul hopes to overturn, referenced *Unites States v. City of*

20

*Black Jack, MO.* 508 F. 2d 1179 (Eighth Circuit 1974, re-hearings denied Jan. 20,

1975) which was the exact same reference as stated in the 2001 AI, as first

referenced by Blodgett as to these matters, on pages 5-6 as the controlling legal

authority over all Defendants as to disparate impact. *See, United States v. City of*

*Black Jack, MO.,* 508 F. 2d 1179 (Eighth Circuit 1974, re-hearings denied Jan. 20,

1975) and page 6 of the 2001 AI.

43.    Although not determinative of actual original source status and

standing, Relators decided that to be able to file any qui tam action in any timely

manner, they would cooperate in such matters because it was the unique

combination of experience and analysis that could support original source

jurisdiction.

44.    The *Gallagher & Steinhauser* opinion detailed that Shoemaker

evidently *never* made any claims under subject matter preemption of the State

Building Code nor conflict preemption under FHA or AFFH. *See Gallagher et al v.*

*City of St. Paul,* 619 F. 3d 823 (Eighth Circuit, 2010). *See, Rockwell Int'l Corp. v.*

*United States,* 549 U. S. 457 (2007). Relators, if any such public disclosures have

occurred, have independently and voluntarily provided an informational statement

to the United States Attorney's Office that contains information materially

different from any information publicly disclosed, prior to the filing of qui tam.

21

45.     Defendant the City of Minneapolis is a municipal corporation organized under the laws of the State of Minnesota, with offices located at City Hall and 350 S. 5th St. Minneapolis, MN 55415 Ph. 612.673.2001.        .

46.     Defendant the City of St. Paul is a municipal corporation organized under the laws of the State of Minnesota with offices at 25 W. 4th Street, St. Paul, MN 55102 Ph. 651.266.1634.

47.     Defendants Cities have no more police or other powers than those given or delegated to them by the State of Minnesota.

48.     Both Defendant Cities have adopted the State Building Code.

49.     In the State Building Code, the State Legislature subject matter preempted any contrary city code or ordinance as to the subject matters of repair and/or rehabilitation, where the State Legislature explicitly made a compromise so as to preserve dwellings constituting older housing stock, as to only be subject to building codes "as and when built" so as to not overly cost burden the supply of otherwise safe, affordable housing stock inside the State of Minnesota. Specifically, no city code can change, alter or amend let alone apply or impose heightened code standards to require inspections to or compliance with current codes when the subject matter is repair or rehabilitation.

50.     The Minnesota State Supreme Court has twice interpreted the

22

plain language of the State Building Code, in two cases:   *City of Minnetonka v.*

*Mark Z. Jones* (Minn. 1975) and *City of Morris v. SAX Investments*  (Minn. 2008).

*See, City of Minnetonka v. Mark Z. Jones,* 236 N. W. 2d 163, 165 (Minn. 1975)

clearly found "grandfathering" and that the Code cannot be altered or amended by

a City [where the Code specifically addresses a particular subject matter]; see also,

a ruling from the Minnesota Supreme Court in 2008 *City of Morris v. SAX*

*Investments, Inc.,* A06-1188 was filed on May 15, 2008. *SAX* re-affirmed *Mark Z.*

*Jones,* holding that under the State Building Code Minn. Stat. § 16B.62, subd, 1

(2006) a "municipal licensing ordinance regulating components or systems of a

residential structure covered by the State Building Code is invalid where the

municipal ordinance imposes different requirements than the State Building Code".

51.    Relators have documented multiple and ongoing violations of the

subject matter preemption by multiple Defendants in the enactment and/or

enforcement of heightened code standards, to current codes when such codes

and/or enforcements could only be to 'as and when built' under the subject matters

of repair or rehabilitation as preempted by the State Building Code.

52.    In an exact number unknown to Plaintiffs but known to Defendants, in

a substantial number of instances, the otherwise safe and affordable older housing

stock was demolished by City Defendants' knowing and intentional, or with

23

reckless disregard for truth pre-textual enforcement of heightened code standards, without providing the required 180 days for landlords to cure by repair or rehabilitation, and without allowing as and when built standards, and without due process.

53.     To the best of Relators knowledge and belief, these hundreds of demolitions of otherwise safe and affordable dwellings was not timely or accurately reported, or analyzed as disparate impact in any annual CAPER, CONPLAN or other sworn submission, by any Defendant for any year within the claims period. *See, e.g., FY 2008 Minneapolis HUD Consolidated Plan*, statements of City Defendant Minneapolis as to an increase in Vacant and Boarded Housing:

"This dramatic rise in foreclosures mirrors a sharp increase in vacant and boarded structures. According to statistics maintained by the Minneapolis Inspections Division, in 2000, the City had no vacant and boarded homes. In 2006, there were 212 vacant and boarded homes; 145 condemned and boarded structures, and 7 condemned homes. One hundred and ninety-seven (197) housing units were demolished in 2006."

As to the 2007 – 2010 CAPERS AND CONPLANS OF DEFENDANT CITY OF MINNEAPOLIS:

"In the 2000 Census, 30,379 Minneapolis households were at or below 30 percent MFI (median family income).

"The geographic distribution of individuals and families with very low incomes shows the highest concentrations of very low-income individuals and families are located in the near southern and northern areas of the City.

24

These areas of the City also contain the oldest and most deteriorated housing stock."

*The 2009 Regional Analysis of Impediments:*

"At the time of the 2000 census, 4,415 housing units were without complete kitchen facilities and 4,041 housing units were without complete plumbing facilities as noted in Table II.16. These problems were most often noted in Minneapolis and St. Paul."

"Additionally, more than 137,000 households experienced a cost burden in the FHIC region and 75,841 households experienced a server cost burden."

See also all Exhibits attached or attached by reference, as incorporated herein.

54.     These hundreds of such demolitions of otherwise safe, affordable dwellings which occurred in both City Defendants were an illegal application of police powers not given to any Defendant by the State.

55.     These hundreds of demolitions were in violation of the subject matter preemption of the State Building Code.

56.     In the False Claims Act claims period, these hundreds of demolitions caused disparate impact on hundreds if not thousands of protected class members, primarily African Americans with low incomes, and interfered with the ability of landlords who were associating with members of the protected classes, such as Relators Ellis' by demolishing under pretext and illegal police powers, the dwellings owned by and rented by those landlords.

57.    Defendants City of Minneapolis and City of St. Paul never kept the records necessary under their ministerial duties to HUD, FHA and to AFFH, but at all times material in the claims period Defendant Cities filed annual sworn submissions with HUD that they were FHA and AFFH.

58.    Such demolitions, disparate impact and heightened code enforcement standards were listed as impediments in both the 2001 AI and again in the 2009 AI.

59.    By omitting any and all accurate or true statistics as to such hundreds of demolitions and the disparate impact caused by such demolitions, without any timely or any one for one replacements, Defendants have fraudulently induced HUD, whom Defendants knew or should have known would rely on Defendants' annual sworn submissions, to fund Defendants to the tune of, upon information and belief, an aggregate of more than $ US 150,000,000 in the False Claims period.

60.    Potential defendant County of Hennepin is organized under the laws of the State of Minnesota with offices located at 417 N. Fifth St. Minneapolis, MN 55401 Ph. 612.348.2199.

61.    Potential defendant County of Ramsey is organized under the laws of the State of Minnesota, with offices at 15 W. Kellogg St. Paul MN 55102 Ph. 651.266.8025.

26

62.    Both potential County defendants adopted the State Building Code and also fund and administer County Court systems purportedly handling claims involving the subject matter of this qui tam complaint. No City Defendant has yet admitted that their City Attorney's Offices have an actual conflict of interest in these matters when appearing in those Ramsey or Hennepin County Courts or if they appear herein.

63.    During the claims period, both potential County defendants prepared, filed, submitted, received HUD CDBG and other funds annually and annually disbursed such HUD CDBG and other funds, by means of sworn annual LOCAL GRANTEE CERTIFICATIONS.

64.    Upon information and belief the annual potential County defendants' CAPER, CONPLAN and other sworn LOCAL GRANTEE CERTIFICATIONS, during the claims period were false when prepared, false when submitted and when the funds received from HUD were disbursed, evidenced fraud and false certifications as the County defendants failed to accurately report on their pre-textual demolitions using heighted code standards which produced disparate impact, on the amount of disparate impact on the protected classes, or that the demolitions actually made no progress at all as to FHA or AFFH. Potential

defendant Counties also were on actual notice, or should have known but turned a blind eye towards the City and Metropolitan Council's false claims.

65.    Defendant the Metropolitan Council, with offices at 390 Robert Street. St. Paul, MN 55102 Ph. 651.602.1000 was an entity authorized and organized under the laws of the State of Minnesota, and as a Defendant herein conspired with, directed, controlled, or otherwise directly or indirectly encouraged, directed, reviewed or controlled the preparation, compilation, certifications of each and every annual CAPER, CONPLAN, sworn LOCAL GRANTEE CERTIFICATIONS, of the 2001 and 2009 AI's, for one or more Defendants PJ, by and through the Fair Housing Implementation Council ("FHIC") where the Defendant Metropolitan Council knew of or should have known of the falsity, by commission or by omission of any and all such annual documents and sworn submissions and the involvement of its own FHIC, and that no new AI was prepared after 2001 until 2009.

66.    The United States of America provides housing related funding to a variety of state and local governmental entities. Receipt of the funds relevant to this action is contingent on certifications that the recipient local PJ's will meet a variety of fair housing obligations. All such Defendants applied for and/or received and disbursed or draw down such funds in each year in the claims period. None of

28

the Defendants or potential defendants has any immunity under *Cook County,*

*Illinois v. United States ex rel Chandler,* 538 U. S. 119, 125 ff. (2003) (county

liable as person for damages under FCA); *Monell v. New York Dept. of Social*

*Services,* 436 U. S. 658, 687-88 (1978) (city liable as person under civil rights

claims).

FACTS

**I.      Background Facts as to the Parties**

67.    Throughout the period of these false claims act claims, which is pled

relating back to 2000 but which for standing purposes dates from the date of the

filing of this SEALED VERIFIED COMPLAINT NAMELY  February/*16*, 2011,

back six years to February *16*, 2005, the Metro Area has been significantly

segregated with such segregation occurring in tandem with other CHAS factors

related to race, ethnic group, familial status, affordability of rental dwellings, low

income, and the existence or absence of kitchen and bathroom working facilities in

such rental housing and the concentration of older housing stock in certain

geographic areas of City Defendants.

68.    CAPER, CONPLAN AND CHAS data confirm that such segregated

housing patterns occur more  often inside the Defendants' City of Minneapolis,

29

City of St. Paul and Hennepin and Ramsey Counties than in other metro jurisdictions.

69.     Each and every Defendant was aware of, knew or should have known of the housing segregation and the repeated violations of the subject matter preemptions of the State Building Code within their own jurisdiction and within the jurisdictions of the other Defendants, by themselves or by other Defendants or potential defendants, or turned a blind eye to such established law and facts.

70.     Throughout the false claims period each Defendant was aware that the supply of affordable housing within its jurisdiction and within the other Defendants' jurisdictions, was inadequate to meet the needs of the protected classes, and that illegal demolitions further reduced the supply of affordable housing.

71,     Defendants each was aware during the false claims period that the lack of safe, affordable housing contributed to the pattern of disparate impact and was exacerbated by the demolitions of otherwise safe affordable housing by pre-textual code applications or heightened code enforcement by Defendants, without compliance with the State Building Code.

72.     Each and every Defendant knew or should have known that it was falsely preparing, submitting and swearing to the accuracy of its annual CAPER,

30

CONPLAN or LOCAL GRANTEE CERTIFICATIONS to AFFH, when it was not AFFH and in fact, had no new AI after 2001, until 2009.

73.   Each and every Defendant upon information and belief as to the two potential County defendants but upon actual knowledge of Relators as to the two City Defendants, failed at all times material during the claims period under their ministerial duties to keep records sufficient to meet the requirement of HUD.

## II.   Seeking and Receiving Funding

74.   Throughout the false claims period, both City Defendants applied each year for federal funds on behalf of itself, as coordinated by and through the FHIC. These applications included but were not limited to applications for Community Development Block Grant ("CDBG") funds and Housing Opportunity Made Equal ("HOME") Funds.

75.   A material requirement of eligibility for such funds was each Defendant's certification that it would affirmatively further fair housing ("AFFH") and comply with each and all of the provisions of the Fair Housing Act ("FHA").

76.   More specifically, each Defendant represented that it would conduct an analysis of impediments ("AI") to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified

31

through that analysis, and maintain records reflecting that analysis and those actions.

77.     In submitting each application, each Defendant renewed and incorporated the previous certifications that it had acted in compliance with the requirements set out in paragraphs ¶¶ 74 - 76 above.

78.     In addition each Defendant obligated itself to comply with all provisions of the Fair Housing Act, including the obligations to AFFH, and with analogous requirements of the CDBG program, and obligated itself to make certain that any involvement with the Metropolitan Council Defendant were all in compliance with AFFH, any AI, FHA, and their ministerial duties under such.

79.     Each Defendant made claims for grant funds from HUD during the false claims period.

80.     Each request for grant funds made by each Defendant during the false claims period, was fraudulent as each Defendant knew or should have known that its certifications omitted the demolitions of otherwise safe, affordable dwellings in violation of the subject matter preemption of the State Building Code and the disparate impacts caused by such illegal demolitions, among other things.

32

III.   **Failure to Conduct a New AI after 2001 until 2009**

81.   Each Defendant knew or should have known that after 2001's AI, a new AI was needed no later than 2004-2005.

82.   Each and every Defendant acquiesced or otherwise knew that no new AI was prepared or utilized after 2001, until 2009 and knew or should have known of the *Hollman v. Cisneros* consent decree, attached by reference, and the materiality of accurate, annual accounting for the supply of safe, affordable housing to federal fair housing, to AFFH and to any AI.

83.   Each Defendant knew or should have known that the 2009 AI explicitly stated that the City of Minneapolis and the City of St. Paul had not kept records in any year sufficient to comply with their ministerial duties under the 2001 AI owed to HUD. But that 2009 AI never addressed any accurate accounting for the quantity of such demolitions or the disparate impact such demolitions caused.  Neither the Metropolitan Council Defendant nor the FHIC asked or directed that any Defendant or potential defendant so account.

84.   While the 2001 AI and the 2009 AI explicitly referenced local codes and heightened code compliance as impediments to the supply of safe, affordable housing, no Defendant accurately or truthfully detailed the number of demolitions it conducted in violation of the subject matter preemption of the State Building

33

Code during the false claims period nor the disparate impact such illegal demolitions caused on protected classes, both in violation of FHA and AFFH.

85.     In said informal interviews with Denise Beigbeiter, with HUD investigator from Chicago, and with HUD personnel in Minneapolis and with other City employees or County employees, those persons implied or Relator(s) reasonably inferred that no new AI was conducted after 2001, because any new AI could or would have revealed exactly what the 2009 AI revealed as to material violations to AFFH, of the FHA and as to omissions of Defendants' violations of the subject matter preemption of the State Building Code and the magnitude of disparate impact proximately caused by same. Defendants never revealed to HUD what was omitted falsely in their annual sworn submissions.

86.     The Metropolitan Council by and through FHIC by speech, actions or omissions thus implied or admitted its concerns over any reasonable inferences as to what any new AI would reveal.

87.     None of the communications by or with HUD, by or with the FHIC, by or with employees of the City Defendants or the potential County defendants, were publicly disclosed, and/or if they were publicly disclosed one or more of Relators herein were the original source(s). The Defendant City attorneys and the Defendant County attorneys knew or should have known that they have multiple

34

duties and a heightened duty to the public because of their government positions,

such that said attorneys have an actual conflict of interest in these matters and are

or are likely to be or actually can be expected to be material witnesses as to how,

when, what they knew at the time and why they approved any or all of the

Defendant's false claim filings submitted to HUD.

## IV.    Defendants' performance and knowledge

88.    Each Defendant's or potential defendant's performance of its

statutory, regulatory, certification-based and grant-based obligations in respect to

affirmatively furthering fair housing and its ministerial duties was so deficient or

non-existent as to constitute the provision of worthless services.

89.    In respect to all the certifications and requests for payment based on

supposed performance of its obligations, each Defendant acted with knowledge

that its certifications were false and the basis for receipt of payments was false.

90.    In the alternative it is alleged that each Defendant acted in reckless

disregard for the truth or falsity of its certifications it made, in order to secure

payments from the United States and/or to keep the lid on racism and the steadily

declining supplies of affordable housing in the metro area caused by false code

enforcements in violation of the subject matter preemption of the State Building

35

Code or in violation of conflict preemption of FHA, AFFH and as contrary to the sworn LOCAL GRANTEE CERTIFICATIONS.

**V.    Damage to the Federal Government**

91.    As a result of each Defendant's false certifications, and their failure to self-report or report violations of other Defendants or potential defendants, and as a result of seeking payments based on the false promise that it had complied with the various fair housing obligations it had undertaken, each Defendant has improperly received US $ millions of dollars in federal funds, exact total not yet known by Relators.

CAUSES OF ACTION

92.    Plaintiff Relators repeat and re-allege the allegations set forth in paragraphs ¶¶ 1 – 91 above.

93.    On each occasion that each Defendant made a certification of the type described herein, as attached or attached by reference during the false claims period herein, the total dollar amount and the total number of which is not currently known to Plaintiffs, and on each occasion that any Defendant otherwise requested, demanded, drew down such funds from the federal government or from its own banking accounts where the original source of such funds were as described herein, based on having supposedly complied with its ministerial duties

36

under FHA, to AFFH and in reference to any AI, said Defendant committed a

separate violation of the False Claims Act, 31 U. S. C. §§ 3729 *et seq.*

## DEMAND FOR JUDGMENT

Plaintiffs Relators respectfully request this Court to enter judgment against

Defendants, each or all, jointly or severally, as follows:

(a) That the United States be awarded damages in the amount of three times

the damages sustained by the United States because of all the false claims

alleged within the Complaint, as provided by the False Claims Act, 31 U.

S. C. §§ 3729 *et seq.* and under *Cook County supra.*.

(b) That civil penalties of $10,000 be imposed for each and every false

claim that Defendants' presented to the United States, including draw

downs;

(c) That the Court find that the Metropolitan Council conspired with the

Defendant Cities to submit false claims to HUD each year in the claims

period;

(d) That pre- and post-judgment interest be awarded, along with reasonable

costs and attorney fees, and expenses which the Plaintiff Relators

necessarily incurred or will incur in commencing and prosecuting this

case;

(e) That the Court grant permanent injunctive relief to prevent any recurrence of the violations of the False Claims Act for which redress is sought in this Complaint;

(f) That the Plaintiff Relators be awarded the maximum amount of the proceeds allowed pursuant to the False Claims Act;

(g) That the Plaintiff Relators be awarded its reasonable attorney fees and costs; and

(h) That this Court award such other and further relief as it deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Relators on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

Dated:        February 16, 2011

Minneapolis, Minnesota

I declare under penalty of perjury that the Complaint is true and correct

under § 1746 and that the attached exhibits and exhibits attached by reference are

also true and correct copies.

| Andrew Ellis | Harriet Ellis | Mike Blodgett |
|---|---|---|
| 5201 Belmont | 5201 Belmont | 3604 E. 85th |
| Minneapolis MN 55419 | Minneapolis MN 55419 | Inver Grove Hts. 55076 |

612.825.6283                                    612.801.0570

## FILED UNDER SEAL

Any and all documents used by Defendants, prepared by or for Defendants,

including but not limited to each annual *2000 - 2010 CAPER, CONPLAN, CHAS,*

*LOCAL GRANTEE CERTIFICATIONS, the 2001 Analysis of Impediments, the*

*2009 Analysis of Impediments* or any other such documents and the financial draw

down records of the expenditures by each Defendant in the claims period, are

attached as true and correct copies and incorporated by reference.

Specific exhibits attached as excerpted from the exhibits attached by

reference include those listed as attached:

39

**True and Correct Copies of Excerpted Exhibits Attached or Attached by Reference to Qui Tam Complaint against City Defendants Minneapolis and St. Paul**

**{To be filed under SEAL February 2011}**

<u>Exhibit #</u>                     <u>Exhibit Description</u>

1.  *2001 Regional Analysis of Impediments*

2.  *2001 Regional analysis of Impediments* Participating Jurisdictions

3.  Pages 5-6 of *2001 Regional Analysis of Impediments*

4.  *Excerpts as to 2001 Duties of Participating Jurisdictions as to AFFH*

5.  *Duties of Participating Jurisdictions as to AFFH*

6.  [*There was no new AI between 2001 – 2009*]

7.  *2009 Regional Analysis of Impediments*

8.  *2009 Regional analysis of Impediments* Participating Jurisdictions

9.  *Excerpts as to 2009 Actual Impediments*

10.  *Excerpts as to 2009 Actual Impediments*

11.  *Excerpts as to 2009 Duties of Participating Jurisdictions as to AFFH*

12.  *2009 Excerpts as to Defendant City of Minneapolis and Defendant City of St. Paul failures to keep sufficient records*

1

13. Transcript of Tom Deegan before Defendant Minneapolis City Committee and City Council

14. Copy of Agenda for Ellis' four-plex at same Minneapolis City Council session as Amendments to Minneapolis Code § 249

15. Copy of State Building Code

16. Copy of decision by Minnesota Supreme Court in *City of Minnetonka v. Mark Z. Jones* (Minn. 1975)

17. Copy of decision by Minnesota Supreme Court in *City of Morris v. SAX Investments* (Minn. 2008)

18. Copy of M. S. A. § 326B.121

19. Copy of **Minn. Administrative Rules R. 1300.0120 "PERMITS"**

20. Copy of Protected Classes under Federal Fair Housing

21. Copy of 42 U. S. C. Section 3613

22. Copy of 42 U. S. C. Section 3615

23. Copy of 42 U. S. C. Section 3617

24. Copy of HUD as to Consolidated Planning using CHAS Data

25. Copy of HUD as to CAPER submissions and legal duties

26. Appendix A page 122 NO. 4 from 2001 AI

27. Page 105 from 2001 AI

2

28.     Page 39, 2001 AI

29.     Copy of *2009 ANALYSIS OF IMPEDIMENT S TO FAIR HOUSING CHOICE*, attached by reference and specific portions attached

30.     Copy of letter(s) From Elim to City of Minneapolis re: demolitions

31.     Copy of 2010 Minneapolis City CAPER & CONPLAN

32.     Copy of St. Paul 2010 City CAPER & CONPLAN

33.     Copy attached or attached by reference of all sworn Local Grantee Certifications submitted by Defendant Cities 2001 – 2010, to HUD as to CDBG, HOME or other funds (several samples attached)

34.     Copy of Eighth Circuit decision in *Gallagher & Steinhauser (consolidated appeal) v. City of St. Paul* (8th Cir. 2010)

35.     Copy of *Hollman v. Cisneros*

36.     Copy of media reports of problems in enforcing City Defendant Minneapolis duties under *Hollman*

37.     Copy of Minneapolis City web page re: 2001 – 2010 materials submitted to HUD

38.     Copy of 2003 MPR media reports quoting attorney Patricia Whitney as to code enforcement problems involving affordable housing

39.    Copy of deposition transcripts from Andy Dawkins as to Ramsey County

Judge Mott, meetings and "kitchen cabinet" in St. Paul

40.    Ledgers, draw-downs, expenditures of both St. Paul and Minneapolis

City Defendants as to  HUD CDBG and HOME funds each year between

2000 – 2010

41.    Copies of transcripts of Ramsey County Judge Mott ruling that state

courts did not have jurisdiction over federal fair housing complaints

42.    Copies of transcripts of Hennepin County Judge Reilly ruling that state

courts did not have jurisdiction over federal fair housing complaints

43.    Defendant City of St. Paul Municipal Codes §§ 18 & 19, 32 – 54, and 5

regarding the City Attorney

44.    Defendant City of Minneapolis Municipal Codes §§ 249, 504 and those

addressing the City Attorney

## HISTORY OF DATA AND CERTIFICATIONS BY CITY DEFENDANT MINNEAPOLIS 2006 – 2010

45.  **Selected statements of facts from 2001 to 2010 taken from the materials attached by reference.**

**Certain ¶¶ are included as part of this confidential statement submitted to the United States Attorney Under Rule 4 and represent the analysis of Relators Ellis' and Blodgett.**

### AS TO 2006

46.  *City of Minneapolis 2006 CAPER* **Approved by HUD April 2008:**

47.  "Over the past year, the City has attempted to address the priorities, goals and strategies expressed in the 2005-2009 Consolidated Plan strategy."

48.  "In summary, the City sought to expand economic opportunities to benefit its low and moderate income citizens, preserve and create decent, affordable housing opportunities, address the needs faced by those who are homeless or are threatened with homelessness, provide accessible public services for vulnerable populations, affirmatively further fair housing, and leverage its federal HUD funding with other funds to make significant, sustainable change in the community".

49.  "Certainly, the City can point to its efforts as success. However, great need still exists in the community, especially for those at the lowest of incomes.

5

Housing costs in the city have continued to rise at a rate greater than personal income."

50.    "Even though for the entire market, rental vacancies are high, units that are priced at the most affordable levels and exhibiting quality still incur great demand. An active housing market does not translate positively for those at the bottom incomes."

51.    "The City of Minneapolis considered existing policies designed to minimize displacement in the CDBG program when developing the Consolidated Plan."

52.    "These policies limit displacement by using land inventories, available vacant land and substandard vacant structures."

53    "*Consolidated Plan Resources Made Available:* The City of Minneapolis received the following 2006 Consolidated Plan amounts: CDBG $13,851,146."

54.    Letter contained within 2006 Consolidated plan from elimth@quest.net "Vacant/Boarded/Distressed Housing: The City of Minneapolis consistently utilizes these funds to board housing, tear down units and sell the property for redevelopment with no requirement for long term use of the property as affordable

6

housing." Sincerely, Sue Watlow Phillips, M. A. Executive Director, Elim

Transitional Housing." [See Exhibit 31].

55.    "There has been an increased budgeting commitment to allocating CDBG

resources to the preservation and creation of affordable housing units at or below

50 percent of median family income to support the City's affordable housing

policy. Unfortunately, due to the deep subsidy required, preservation of existing

units is easier than creation of new units. It is a continuing challenge to the City to

leverage enough resources to meet this commitment. However, preservation

activities are just as important in holding an inventory of available, affordable

housing units."

56.    **"Summary of Specific Annual Objectives for 2005-2006 Consolidated
Plan (Through the 2006 annual performance report).**

57.    "DHI.1  Finance and administer programs for development of affordable

and mixed-income rental housing. Source of funds CDBG. Percent completed 21%

2006."

58.    **"g) Other Housing Goals   Goal H-3  Provide for Safe, Affordable**

**Housing...**Over the next five years, all rental-housing units in the city are planned

for inspections."

59.    "With the past year, the city has instituted a problem properties task force."

60.    "This group is a cross-departmental group that works with housing properties in targeted areas that consume many city resources in the areas of inspections and public safety. The Problem Properties Unit (PPU) identifies the worst properties in the city and develops strategies to reduce or eliminate problems. Solutions can include up to securing buildings with boards or demolish buildings under the provisions of Chapter 249 on the city's code of ordinances."

61.    "With the 2006 CDBG program year, the City is in its second year implementing the Problem Properties Unit. Regulatory Services used its portion of CDBG allocation to preserve and enhance the safety of Minneapolis Neighborhoods through the prompt board-up of vacant property found open to trespass."

62.    ""Refer to the CDBG Summary Activity report in the appendix for further information on 2006 accomplishments for this program activity."

### Additional 2006 Data and Content

63.    **"h) Summary of Consolidated Plan Expenditures on Housing Production Numbers in 2006 (by Strategy):**

64.   "Affordable Housing **2006 IDIS Expenditures** $205,906   Total of 6 housing units made available for occupancy; 4 new and 2 rehabbed units."

65.   *"XII) Affirmatively Furthering Fair Housing* The City acts through its Consolidated Plan to affirmatively further fair housing in its jurisdiction."

66.   " a) **Analysis of Impediments to Fair Housing**  **[2006]**   HUD requires its recipients of Consolidated Plan funding to conduct an analysis of Impediments to Fair Housing for each five-year Consolidated Plan strategic plan. For the 2000 Consolidated Plan the City joined with other metropolitan area entitlement jurisdiction to conduct a metro area Analysis of Impediments to Fair Housing."

67.   The City in 2001 – 2002 joined in forming a Fair Housing Implementation Council ["FHIC"], using CDBG funds.

68.   "Representatives from the City's Civil Rights Department and Office of Grants & Special Projects sit on the Fair Housing Implementation Council (FHIC). Since 2003, the Fair Housing Implementation Council has approved a variety of action plan items for which metro jurisdictions are implementing."

69.   *"Impediment # 4 – Local demolition and redevelopment activities have resulted in displacement of protected class members and in reduction of amount of available affordable housing."*

9

70.   " CPED requires any developer who plans to demolish existing housing to proved a relocation plan, as well as the HUD one-for –one replacement requirement as well as meeting the City of Minneapolis' affordable housing policy. No city-sponsored demolition resulted in any displacement and the City met its annual goal of producing more new units in both impacted and non-impacted areas than the City removed from the housing inventory."

71.   "The institutional structure through which the City carries out its housing and community development plan consists of public, private and nonprofit partners."

72.   "The city works with these partners to design programs that effectively work to better the conditions present in the City. However, gaps in program delivery still occur whether thorough funding shortfalls, differing timetables, and contrary regulations."

73.   "*XVI) Addressing Barriers to Affordable Housing* Goal H-6   **Remove or ameliorate any barriers to affordable housing.**"

74.   "In the area of regulatory controls, the city has administratively reformed its licensing and examining boards to ensure objectivity and eliminate unnecessary regulation in housing development. The city continues to update unnecessary regulation in housing development."

10

75.    "In response to other regulatory controls and life safety issues that may affect the cost of affordable housing, the city housing agency continues to work with various regulatory department to cancel special assessment and outstanding water charges on properties during the acquisition process. The city adopted a more lenient code for remodeling older homes. The Minnesota Conservation Code has been included as part of the State Building Code. The City has been active this past year to amend it at a state level as part of a 1311 committee to be more user friendly and allow for specific interpretation."

76.    "The (ISG) group considers the stabilization needs of existing housing units in a comprehensive and coordinated manner, working directly with owners to accomplish goals. This approach deals directly with the problems of existing units to make sure they remain affordable. Comprehensive funding solutions are provided for the physical and financial stabilization of distressed and at-risk affordable rental properties."

77.    "Minneapolis has reinstituted a joint city and county Vacant and Boarded Housing Task Force. The task force has the responsibility of coordinating city and county efforts to bring vacant residential property back on the market as soon as possible."

11

78.   No such coordination occurred, or if any did occur it was insufficient to meet the City's duties to AFFH and to not file false annual certifications, which falsity the City Attorney and/or the Office of Civil Rights knew or should have known, as to being false when certified and false when submitted to and relied upon by HUD.

79.   **A Pattern of Misrepresentations Under Oath by the City for 2006**

Statements contained in each of the annual sworn certifications were false when made, as they misrepresented what the City was doing or omitted what the City actually did or actually knew, as to: A. the fire department negligence, B) as to disparate impact, C) as to violations of the State Building Code, D) as to the omissions or failure to report accurately on the impediments listed in the AI's, or to why there was no new AI from 2005 - 2009, E) as to the City's actual pattern or practice of violating ministerial duties under FHA and AFFH, F) as to CHAS data and/or CAPER and/or CONPLAN being and were falsely certified then or later, and were relied upon by HUD to approve and provide millions of dollars in federal funding to the City, where the City knew HUD would so rely.

80.   Each of the sworn certifications by the City, filed annually with or in

12

the falsely certified submissions to HUD between 2006 to 2010, was false when so certified, because:

81.   The City was not AFFH at least as to disparate impact.

82.   The City was not considering disparate impact in its decisions to demolish private rental dwellings.

83.   The City was violating the State Building Code by imposing heightened code and code enforcement standards, not as and when built, for the subject matters of repair and rehabilitation.

84.   The City was not following its own or HUD's policies as to "one for one replacement".

85.   The City was pushing landlords and Plaintiffs into cert proceedings knowing that it was violating multiple duties to AFFH, regarding disparate impact analysis, and illegally demolishing multiple private rental properties in violation of the State Building Code under the pretext of Code § 249 or other City police powers.

86.   The City was not coordinating the training or work of its multiple agencies, agents, employees or department to conform with Federal Fair Housing law or the State Building Code, despite receiving federal funds precisely for such purposes.

13

87.    The City was not utilizing a trained and certified building inspector regarding demolitions and permitting, as required by the State Building Code Minn. R. 1301.0300, and/or the persons involved in permitting or demolition decisions were not following the State Building Code., or were not made by a person trained as required by the State Building Code.

88.    City attorneys and their assistant City attorneys, despite being on actual notice of disparate impact, duties to AFFH, and the subject matter preemption of the State Building Code, repeatedly misrepresented those duties and concealed the City's violations of those duties in court proceedings.

89.    City attorneys and other City employees such as Tom Deegan kept the truth from the City Council as to these matters and City attorneys acted in violation of statutes, without any good faith belief in the legitimacy of their actions, errors or omissions.

90.    The letter contained within 2006 Consolidated plan from elimth@quest.net  stated: "Vacant/Boarded/Distressed Housing: The City of Minneapolis consistently utilizes these funds to board housing, tear down units and sell the property for redevelopment with no requirement for long term use of the property as affordable housing." Sincerely, Sue Watlow Phillips, M. A. Executive Director, Elim Transitional Housing" *or* a variation thereof was also attached or

14

incorporated in multiple years of additional sworn submissions to HUD, after 2006

and was material to this Complaint and to the defrauding of HUD.

**Pattern of Misrepresentations by Defendant City of Minneapolis to HUD
Continues to This Day and Provide Further Evidence of Disparate Impact**

91.   **Years 2007 – 2010 as to CAPER and CHAS submissions of City:**

92.   The 2007 CAPER, CHAS and CONPLAN were virtually identical to

2006 as to all points stated above, except as to amount of CDBG funds, attached

and/or incorporated by reference.

93.   2006 – 2010 documents submitted to HUD by the City contained as and

when required, a Local Grantee Certification that all of the submissions

"Affirmatively Further Fair Housing" were true and correct under penalty of

perjury, as attached herein or attached by reference for 2006 – 2010 Exhibits.

94.   In the 2000 Census, 30,379 Minneapolis households were at or below 30

percent MFI (median family income).

95.   The geographic distribution of individuals and families with very low-

incomes shows the highest concentrations of very low-income individuals and

families are located in the near southern and northern areas of the City. These areas

of the City also contain the oldest and most deteriorated housing stock.

96.    Concentrations of low-income and minority persons is being defined as in

the *Hollman v. Cisneros* case as reflected in the consent decree in that case, in

which the City was a defendant and in which the City Attorney's Office

participated, and under information and belief which resulted in the Office of Civil

Rights and/or funding for its activities.

97.    In the FY 2008 Minneapolis HUD Consolidated Plan the City stated

under oath as to an increase in Vacant and Boarded Housing:

98.    "This dramatic rise in foreclosures mirrors a sharp increase in vacant and

boarded structures. According to statistics maintained by the Minneapolis

Inspections Division, in 2000, the City had no vacant and boarded homes; one

condemned and boarded homes; and two condemned homes. In 2006, there were

212 vacant and boarded homes; 145 condemned and boarded structures, and 7

condemned homes. One hundred and ninety-seven (197) housing units were

demolished in 2006."

99.    In 2010, the Local Grantee Certifications for the City were sworn to and

submitted to HUD, by the City, as signed by Steven Bosacher on 4/15/2010, in like

manner to those submitted by the City each year between 2001 – 2005, including

2006 – 2009. [See Exhibit 33].

16

100.    No new AI was completed or referenced between 2001 to 2009 in violation of HUD/FHA AFFH rules and regulations until the 2009 AI was completed.

101.    At all times material, the City knew or should have known that it was producing disparate impact on the protected classes, and damaging the Plaintiffs and did so without referencing the damages caused as pled herein in any of its sworn filings and submissions to HUD.

102.    **Disparate Impact Due to City's Violations of Ministerial Duties**

103.    The City prepared and submitted, with sworn certifications, documents and applications for funding from HUD each year, called CHAS and/or CAPER and/or CONPLAN submissions.

104.    The City knew or should have known, based on its own selected CHAS and CONPLAN and CAPER filings each year between 2006 – 2010, that the data it utilized and submitted along with its annual certifications as to affirmatively furthering fair housing, provided actual notice to the City disparate impact resulted from negligently or fraudulently allowing the demolition of the four-plex, and hundreds of other privately owned rental properties as cited on pages 6 of the *2001 Regional Analysis of Impediments*.

17

105.  After 2005, the City knew or should have known those CHAS data and/or CONPLAN or CAPER documents, and the sworn certifications were required to reference a new "AI", not just the 2001 AI, but they did not reference any new AI as no new AI existed.

106.   The City knew or should have known that it did not have any new AI since 2001, until 2009.

107.   The City knew that some of its constituents had complained in writing to the City, over a number of years that demolition of affordable, safe housing units was resulting in disparate impact, and that such demolitions were outstripping the replacement of affordable housing for protected class members. [See Exhibit 31] letters from Elim to City employee Matt Bower, and Bower's responses, in multiple years attached or attached by reference].

## 2009 Analysis of Impediments to Fair Housing Choice

108.   The *2009 [Regional] Analysis of Impediments to Fair Housing Choice [October 27, 2009 as adopted by City] Implicates City in Ongoing Violations of Disparate Impact, Violations of AFFH, and Omits any references to Plaintiffs' Facts.*[1]

109.   The 2009 Executive Summary said:

---

[1]   Attached or attached by reference in full.

18

"Entitlement jurisdictions are required to submit to the U. S. Department of Housing and Urban Development (HUD) certification of affirmatively furthering fair housing. This certification has three elements, which require that government entities:

1.  Complete an Analysis of Impediments to Fair Housing Choice;

2.  Take actions to overcome the effects of any impediments identified through the analysis; and

3.  Maintain records reflecting the analysis and actions taken."

110.   The City never properly maintained such records as required by HUD, despite having a ministerial duty to do so between the years 2001 to 2010.

111.   "An Analysis of Impediments to Fair Housing Choice (AI) is an examination of the impediments or barriers to fair housing that affect protected classes within a geographic region. HUD defines impediments to fair housing choice in terms of their applicability to state and federal law."

112.   "In Minnesota, this would include: * any actions, omissions, or decisions taken on the basis of race, color, religion, sex, disability or handicap, familial status, national origin, creed, sexual or affectional orientation, marital status, and receipt of public assistance which restrict housing choices or the availability of housing choice. * Any actions, omissions, or decisions which have

19

the *effect* of restricting housing choices or the availability of housing choice on the basis of the protected classes listed previously." (*emphasis added*)

113.  "The FHIC region had a number of housing units with housing problems at the time of the 2000 census. For example, 18,360 units were overcrowded and another 17,386 units were severely overcrowded."

114.  "The areas with the highest levels of overcrowding were Minneapolis and St. Paul cities and Dakota and Hennepin counties."

115.  "At the time of the 2000 census, 4,415 housing units were without complete kitchen facilities and 4.041 housing units were without complete plumbing facilities, as noted in Table II.16. These problems were noted most often in Minneapolis and St. Paul."

116.  "Additionally, more than 137,000 households experienced a cost burden in the FHIC region and 75,841 households experienced a severe cost burden."

117.  Plaintiffs' rental affordable housing, including the four-plex at all times material had complete kitchens and complete plumbing facilities.

118.  **{2009} IDENTIFIED IMPEDIMENTS TO FAIR HOUSING CHOICE.**

119.  "The 2009 AI for the FHIC uncovered several issues that can be

20

considered barriers to affirmatively furthering fair housing and, consequently, impediments to fair housing choice; These are as follows *(specific items selected)*:

    3.    While some protected classes, or a portion of some protected classes, have avenues for advocacy, there is currently insufficient system capacity to address the level of prospective demand for fair housing services regionwide (*sic*);

    5.    Lack of understanding of what qualifies as a fair housing issue, particularly as it relates to landlord/tenant disputes and affordable housing production;

    6.    Policies and practices have contributed to concentrations of protected classes in selected areas of the region;

    11.    Discrimination and harassment in the rental markets;

    13.    Poor documentation of fair housing activities, especially enforcement activities, such as processing and responding to fair housing complaints or lack of sufficient detail in tracking complaints;

    15.    Some local government housing actions and/or policies may not be in the spirit of affirmatively furthering fair housing."

120.    "These regionwide (sic) impediments to fair housing choice can be

21

isolated as occurring more frequently or to a higher degree in particular areas of the FHIC region."

121.   "...This is particularly evident in Minneapolis and St. Paul, as the respective cities were unable to provide housing complaint data that is consistent with HUD reporting formats."

122.   "To enhance the possibility of encouraging local government actions that are more in the spirit of affirmatively furthering fair housing, the FHIC should: c. Research prospective best practices in affirmatively furthering fair housing at the local government level, and d. Summarize public policy examples that attain these ends."

123.   **Table II.4  Population by Race.**  Details the disproportionate data concerning concentrations of African Americans in Minneapolis and St. Paul.

124.   "As **Maps II.1 and II.2** on the following pages illustrate, several census tracts within the region had concentrations of black population that exceeded 50 percent...The areas with very high disproportionate shares, those exceeding 16.1 percent, tended to be located in Minneapolis and St. Paul...**Map II-2** represents a detailed zoom-in map of the central cities of Minneapolis and St. Paul."

125.   **"Map II.10  Poverty Rate Census Tract Detail Map"** attached or

22

attached by reference.

126.   **"Table II.16 Disposition of Vacant Housing Units"** attached or attached by reference.

127.   "Minneapolis had 2,533 For Rent vacant units as of the 2000 Census tract data."

128.   "However, there were a number of units that were vacant but not available, listed as "other vacant". This term usually describes a housing unit that is unlikely to become available to the housing market and is often abandoned and further contributes to a blighting influence. There were nearly 3,000 these units in the FHIC region, with more than one-third of this total located in Minneapolis."

129.   **"Lack of affordable housing.** Many comments were seen to indicate that access to affordable housing is a major problem in the area. Respondents indicated that they feel that housing costs are too high for the average wages earned in the area, and too often a lack of affordable housing production and planning is certainly a community issue."

130.   "Rental markets with fair housing problems were cited in: -- St. Paul and Minneapolis cities;…"

131.   **"IDENTIFIED IMPEDIMENTS TO FAIR HOUSING CHOICE [2009]"**.

23

132.   "These regionwide (sic) impediments to fair housing choice occurred more frequently or to a higher degree in particular areas of the FHIC region. The geographic breakdown of these findings are presented in TableVI.1…"

133.   **Table VI.1** attached and attached by reference detailing multiple impediments specific to Minneapolis or St. Paul, as impediments identified by Entitlement. {Minneapolis is an entitlement jurisdiction}.

134.   6.     "The FHIC should support landlord participation in all rental assistance programs".

135.   7.     "The current fair housing system lacks sufficient quantitative documentation related to activities undertaken with fair housing resources…This is particularly evident in Minneapolis and St. Paul, as the respective cities were unable to provide housing complaint data that is consistent with HUD reporting formats."

136.   Minneapolis as a City has proximately caused disparate impact on an ongoing basis, by commission and by omission in violation of its ministerial duties to Affirmatively Further Fair Housing, to have required a new AI before 2009, by misrepresentations in its annual sworn certifications as to what impediments existed and its progress or lack thereof as to such impediments, and has damaged

24

Plaintiffs and tenants as a result, and members of protected classes or those associating with protected classes, including other landlords.

## Data and Analysis for Defendant City of St. Paul Parallels the Minneapolis Data and Analysis

137.   Defendant St. Paul has concealed its heightened and illegal code enforcement standards in similar fashion, not acknowledging they are subject matter preempted by the State Building Code and further that they are operating a 'bait and switch' shell game using their hearing examiner as planned, upon information and belief by Judge Mott and the City Attorney and City Council members dating back to when Andy Dawkins was the key manager for inspections and demolitions.

138.   St. Paul's shell game almost never lets landlords actually submit evidence, cross examine City employees, call witnesses, preserve testimony or records of the heightened code enforcement, or obtain due process to the standards required under the Fifth, Fourteenth and Seventh Amendments.