UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| United States of America, ex rel.,<br>Andrew Ellis and Harriet Ellis, | Case No. 11-cv-416 (PJS/TNL) |
| Plaintiff-Relators, | |
| vs. | SECOND AMENDED COMPLAINT<br>OF RELATORS ANDREW ELLIS<br>AND HARRIET ELLIS |
| City of Minneapolis, a municipal<br>corporation, and City of Saint Paul,<br>a municipal corporation, | |
| Defendants. | Demand for Jury Trial |

_____

Relators Andrew and Harriet Ellis hereby state and allege the following as the Second Amended Complaint:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the claims brought herein pursuant to 28 U.S.C §§ 1331 and 1345, 31 U.S.C. § 3730(a), and the Court's general equitable jurisdiction.

2.     Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 31 U.S.C. § 3732(a), because Defendants are located and do business in this District, and the acts complained of herein took place in this District.

3.     There has been no "public disclosure," as defined by the False Claims Act and amendments, of the allegations contained in this Complaint.  In

the event that a "public disclosure" has occurred, Plaintiff-Relators are the original source of all such allegations.

4.      As required by 31 U.S.C. §3729, *et seq*., Plaintiff-Relators have, prior to filing the Complaint, made comprehensive disclosures to the United States containing substantially all of the allegations made herein, as well as supporting documents.    Plaintiff-Relators have also pursuant to such statutory provision provided the Government with a confidential disclosure statement and served the Government with the Complaint.

**PARTIES**

5.      Relator Andrew Ellis is an individual resident of the City of Minneapolis, Minnesota.

6.      Relator Harriet Ellis is an individual resident of the City of Minneapolis, Minnesota.

7.      Relators are owners of low-income housing and have for decades provided affordable housing in Minneapolis to "protected class" members, as federal law defines.    Andrew Ellis served Minneapolis and his community for decades as a housing inspector.

8.      Relators are original sources of the allegations set forth herein.

9.      Minneapolis is a municipal corporation as defined by the laws of Minnesota.

10.     St. Paul is a municipal corporation as defined by the laws of Minnesota.

11.     The United States of America provides housing-related funding to state and local governmental entities, including to Defendants through the False Claims Act period, as defined below. Receipt of these funds relevant to this action are contingent on and directly conditioned on certifications that the funding recipient has to meet a variety of legal obligations.

12.     Minneapolis, as a federal funding Entitlement Jurisdiction, is a direct "recipient" of Community Development Block Grant ("CDBG") funding, Neighborhood Stabilization Program ("NSP") funding and other federal funding received from the United States through the Department of Housing and Urban Development ("HUD").

13.     St. Paul, as a federal funding Entitlement Jurisdiction, is a direct "recipient" of CDBG funding, "NSP" funding and other federal funding received through HUD.

14.     During the False Claims Act (relevant) period, namely February 18, 2005 through February 18, 2011, Defendants acted in concert with each other in committing, and they were aware of, the acts complained of herein, and each of the Defendants is jointly and severally liable.

## FACTS

### HUD Funding and the Obligation of Minneapolis and St. Paul to Affirmatively Further Fair Housing

15.     The allegations contained in paragraphs 1-14 above are hereby incorporated as if set forth herein.

16. During the relevant period, and continuing to present, Defendants applied annually and at times more often, to HUD for federal funding, including, but not limited to, "CDBG" funds, "NSP" funds and other federal housing funds.

17. Defendants made claims for and received payments of such grant funds from the United States during the False Claims Act period referenced above.

18. Minneapolis received approximately $125 Million in CDBG, NSP and related funding from the United States during the relevant period.

19. St. Paul received from the United States approximately $75 Million in CDBG and related funds and almost $50 Million in NSP funding during the relevant period.

20. After reasonable opportunity for further investigation and discovery, Relators will be able to establish the exact amounts Defendants obtained in federal funding and the exact dates they each received such funds.

21. As a condition to receipt of federal funding, Defendants were each required to certify to the United States that they met a variety of fair housing obligations, including the obligation to "affirmatively further fair housing" ("AFFH") and that Defendants would not violate the Fair Housing Act and other federal statutory and regulatory laws.

22. Defendants, as grant recipients were required to make "Local Grantee Certifications" to HUD annually and at other relevant times, that "the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair

4

housing." See 42. U.S.C. § 5304 (b)(2).

23.    From 1996 through the commencement and duration of the False Claims Act period, including at the time of all applications and at receipt of all federal funding referred to herein, Defendants were fully aware of their AFFH and other obligations.

24.    A material requirement of Defendants' certifications provided to the United States for receipt of such federal funding was that Defendants would comply with their AFFH obligation and other obligations expressly stated within their certifications.

25.    As part of the HUD Consolidated Plan funding process, Defendants submitted written "Action Plans" to the United States on an annual basis during the relevant period and "Consolidated Housing Plans" every five years (2005 and 2010) that included applications for funding as well as the express certifications by Defendants that they would AFFH. See 24 C.F.R. §§ 91.220, 91.225, 91.420, and 91.425.

26.    As part of the Consolidated Plan process, during the relevant period, Defendants each submitted annually a written "Consolidated Annual Performance Evaluation Report" ("CAPER") to the United States.

27.    Minneapolis and St. Paul were required by HUD regulations to report in each yearly CAPER the implementation of the Analysis of Impediments to Fair Housing Choice by summarizing the impediments each City identified in the analysis and describing the actions taken by each city to overcome the effects

of the impediments identified through the analysis.

28.     Minneapolis, in submitting its applications for said federal funding during the False Claims Act period, and thereafter to present, provided its annual and more frequent written certifications to the United States, including its Local Grantee Certifications signed by its City Coordinator John Moir on April 11, 2005 and by its City Coordinator Steven Bosacker on April 13, 2007, April 15, 2008, December 1, 2008, April 15, 2009, June 5, 2009, April 15, 2010 and February 16, 2011.

29.     Minneapolis made other similar certifications during 2005 through 2011 and thereafter, and after reasonable opportunity for further investigation and discovery, Relators will be able to establish all of the certifications made by the City during the False Claims Act period.

30.     St. Paul, in submitting its applications for said federal funding during the False Claims Act period, and thereafter to present, provided its annual and more frequent written certifications to the United States, including its Local Grantee Certifications signed for the Mayor of St. Paul each year, including by City Deputy Mayor Dennis Flaherty on April 11, 2005, and by Deputy Mayor Ann Mulholland on April 14, 2006, April 14, 2007, April 16, 2008 and April 16, 2009. The Mayor of St. Paul or his designee also signed St. Paul's Local Grantee Certifications on or about in April 16, 2010.

31.     St. Paul made other similar certifications during 2005 through 2011 and thereafter, and after reasonable opportunity for further investigation and

discovery, Relators will be able to establish all of the certifications made by the City during the relevant period.

32.     Defendants submitted numerous other said funding certifications to the United States during the False Claims Act period; Defendants have possession of said certifications with dates each was executed by the Cities with identify of said signatories.

33.     Each of the Local Grantee Certifications of Defendants as described above state that "*the jurisdiction certifies that: Affirmatively Further Fair Housing – This jurisdiction will affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard.*"

34.     Each of the Local Grantee Certifications, including CDBG Certifications of Defendants as described above state further that, "*The Entitlement Jurisdiction certifies that … Compliance With Anti-discrimination laws – The grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and implementing regulations.*"

35.     Defendants, in requesting millions of dollars annually from the United States, and receiving approximately $250 Million during the False Claims Act period, engaged in a course and pattern of knowingly fraudulent conduct

during the False Claims Act period, and to present, in submitting knowingly false claims for payment to or approval by the United States, by *inter alia*, knowingly falsely representing every year through the Local Grantee Certifications, Actions Plans and CAPER filings and other statements and submissions, including their individual Consolidated Housing Plan submissions, made to the United States, that Defendants were in compliance with federal laws and regulations requiring Defendants to AFFH, which is the core prerequisite to eligibility for the CDBG and NSP funds, and other funds from the United States.

36.    At all times during the False Claims Act period Defendants had actual knowledge that they were not complying with their AFFH and other obligations, that their certifications, statements and representations to the United States of their compliance were false, and that Defendants therefore were during the entire False Claims Act period submitting false or fraudulent representations of compliance, in order to obtain the federal funding described herein.

37.    In the alternative, Defendants have acted with deliberate indifference and/or reckless disregard for the truth or falsity of the claims.

38.    Each of Defendants received prior to February 18, 2005, and/or had access to, a copy of HUD's Fair Housing Planning Guide ("HUD Guide," "FHPG"). The HUD Guide was first issued and available to Defendant Cities in 1996. *See* U.S. Dept. of HUD, Fair Housing Planning Guide (1996).

39.    The HUD Guide provides guidance to help Defendants as grantees meet their "fair housing requirements" of formula grants such as the CDBG.

40.    Defendants were required to undertake three tasks to meet their obligations to affirmatively further fair housing ("AFFH") during the relevant period: (a) Defendants must conduct an "analysis of impediments ["AI"] to fair housing choice" within their jurisdiction; (b) take appropriate actions to overcome the effects of any impediments identified through that analysis; and (c) create and maintain records reflecting the analysis and actions in this regard.  See 24 C.F.R. § 91.425(a)(1)(i).  These three obligations of a recipient are also specifically set out within Defendants' Local Grantee Certifications, other certifications, and Actions Plans, CAPERS and Consolidated Housing Plans.

41.    Since 1996, HUD has defined a legitimate "Analysis of Impediments ["AI"] to Fair Housing Choice" as a comprehensive review by each Entitlement Jurisdiction of their own laws, regulations, administrative policies, procedures and practices to determine how they affect the availability, location and accessibility of housing and an assessment of public sector actions affecting fair housing choice for all protected classes.

42.    "Impediments to Fair Housing Choice" is defined by HUD and federal law as:

(1) Intentional Discrimination: Any actions, omissions, or decisions taken because of race, color, religion, sex, disability, familial status, or national origin which restrict housing choices or the availability of housing choices; or

(2) Disparate Effect or Impact: Any actions, omissions, or decisions which have the effect of restricting housing choices or the availability of housing choices on the basis of race, color, religion, sex, disability, familial status, or national origin.

9

43.     HUD's Guide states that "*policies, practices, or procedures that appear neutral on their face but which operate to deny or adversely affect the provision of housing to persons of a particular race, color, religion, sex, disability, familial status, or national origin may constitute such impediments*." FHPG, Section 4.2, p. 4-4.

44.     HUD's Guide provides that impediments to fair housing choice include actions or omissions in the "Public Sector" that are "counterproductive to fair housing choice." FHPG, Section 4.2, p. 4-4.

45.     HUD defines a legitimate "AI" to include an analysis of all housing within a jurisdiction; the "AI" should not be limited to housing assisted or subsidized by the Federal, State or local jurisdictions. FHPG, Section 4.2, p. 4-5.

46.     The HUD Guide, Section 4.3AI, pgs. 4-5 to 4-6, provides that local government laws, policies and actions that must be analyzed by such Entitlement Jurisdictions, including Minneapolis and St. Paul, include:

(1) "local building, occupancy, and health and safety codes that may affect the availability of housing for minorities, families with children, and persons with disabilities."

(2) "Public policies and actions affecting the approval of sites and other building requirements used in the approval process for the construction of public and private housing such as:

Building codes;

Demolition and displacement decisions pertaining to assisted housing and the removal of slums and blight (e.g., relocation policies and practices affecting persons displaced by urban renewal, revitalization, and/or private commercialization or

10

<u>gentrification in low-income neighborhoods</u>).

(3) The administrative policies concerning community development and housing activities, such as:

Multifamily rehabilitation;

<u>Activities causing displacement</u> (e.g., revitalization of neighborhoods, property tax increases, and demolition of subsidized housing) <u>which affect opportunities of minority households to select housing inside or outside areas of minority concentration or individuals with disabilities to select housing that is accessible and is in accessible locations</u>.

FHPG, Section 4.3AI, pgs. 4-5 to 4-6 (emphasis added).

47.     During the False Claims Act period,  Defendants were aware of their AFFH obligations to analyze and take appropriate actions to overcome "Public Sector" impediments to fair housing choice as defined by federal law, including within the HUD Guide.

48.     Defendants knew at all times during the False Claims Act period that they had an AFFH obligation to analyze whether any of their own laws, policies and/or actions could be or were impediments and to honestly identify those impediments, take appropriate actions to overcome the effects of those impediments, as well as to create and maintain all records regarding those actions.

49.     Prior to and during the False Claims Act, Defendant's officials and employees having responsibility for the administration of the federal grants associated with Defendants' CDBG, NSP and other funding programs, were provided with HUD-sponsored training materials and tools concerning their AFFH and other funding obligations and the proper preparation of an "AI".

50.     Defendants were obligated to conduct the HUD defined "AI" on an ongoing basis during the False Claims Act period.

51.     Defendants conducted two "AIs" since 1996: a 2001 Regional Analysis of Impediments; and a 2009 Regional Analysis of Impediments ("Regional AIs").   The 2001 and 2009 "AIs" were regional in the sense that the Twin Cities Entitlement Jurisdictions in a consortium called the Fair Housing Implementation Council ("FHIC") agreed to prepare a Twin Cities Metro-wide "AI" in order to meet their individual federal certification obligations.

52.     During the relevant period, Defendants knowingly failed to conduct the "AIs" related to their own laws, policies and actions but instead intentionally used as cover for their fraudulent conduct, the 2001 and 2009 Regional AIs that analyzed the Twin Cities Metro wide fair housing issues.

53.     Even though Defendants continued to apply and receive said federal funding and continued to make and present false certifications and other false statements and records to HUD during 2002 through 2008, Defendants knowingly failed to comply with their AFFH duties, including failing to complete the preparation of an "AI" as defined by HUD.

54.     In Minneapolis and St. Paul during 2002 through mid-2009, Defendants knowingly failed for over eight years to conduct the required "AI," failed to take appropriate actions to eliminate impediments that existed and should have been identified and addressed, and failed to create and maintain AFFH and AI records.

55.     Even though Defendants were required to update their AIs on a continual basis during the 2002 through 2008 funding period, Defendants falsely stated to HUD during the 2005 Five Year Consolidated Housing Plan process that Defendants had not identified any new impediments to fair housing choice since the 2001 Regional AI had been completed, published and referred to in Defendants Action Plans, CAPERs, and Consolidated Housing Plan submissions to HUD during 2002 through 2005, and subsequently during 2006 through 2008.

56.     Defendants knowingly failed to conduct a legitimate "AI" as defined by HUD during 2002 through 2008 as to each City's laws, regulations, administrative policies, procedures and practices, and how those "Public Sector actions" affected the availability, location and accessibility of housing, including assessment of public sector actions affecting fair housing choice for all "protected classes".

57.     During 2002 through 2008, Defendants knowingly failed to analyze their own "local building, occupancy, and health and safety codes that may affect the availability of housing for minorities, families with children, and persons with disabilities".

58.     During 2002 through 2008, Defendants knowingly failed to analyze "demolition and displacement decisions pertaining to assisted housing and the removal of slums and blight (e.g., relocation policies and practices affecting persons displaced by urban renewal, revitalization, and/or private commercialization or gentrification in low-income neighborhoods)".

59.     During 2002 through 2008, Defendants knowingly failed to analyze, "Activities causing displacement (e.g., revitalization of neighborhoods and demolition of subsidized housing) which affect opportunities of minority households to select housing inside or outside areas of minority concentration or individuals with disabilities to select housing that is accessible and is in accessible locations."

60.     In 2009, Defendants updated the 2001 Regional AI through a contract with a third party "AI" vendor, Western Economic Services, LLC ("WES").

61.     Defendants, in working together with WES as their "2009 AI" contractor for preparation of the "AI" Regional Report, were obligated to follow the HUD Guide and all other federal requirements to meet their certifications to the United States so that a legitimate "AI" would be created for the benefit of their communities, including low-income and moderate income residents, members of "protected classes," their advocates and housing providers in those specific communities.

62.     During the False Claims Act period, Defendants knew of their obligation to focus their "AIs" on their own individual laws, policies, practices, or procedures affecting housing within their cities, where those public sector actions may affect the availability of housing for minorities, families with children, and persons with disabilities, including the Cities' local building, occupancy, and health and safety codes, demolition and displacement decisions, and relocation

policies and practices affecting persons displaced by urban renewal, revitalization, and/or private commercialization or gentrification in low-income neighborhoods.

63.     Defendants knowingly failed to include any reference in the 2009 AI to the laws, regulations, administrative policies, procedures and practices ("Public Sector actions") of each Defendant City.

64.     In the 2009 AI, Defendants knowingly failed to include analysis of the subjects set forth immediately *infra*, that according to the HUD Guide must be analyzed in a legitimate "AI" as a condition of payment under the above-referenced federal grant programs:

> (1) "local building, occupancy, and health and safety codes that may affect the availability of housing for minorities, families with children, and persons with disabilities;

> (2) Demolition and displacement decisions pertaining to assisted housing and the removal of slums and blight (e.g., relocation policies and practices affecting persons displaced by urban renewal, revitalization, and/or private commercialization or gentrification in low-income neighborhoods); and

> (3) Activities causing displacement (e.g., revitalization of neighborhoods and demolition of subsidized housing) which affect opportunities of minority households to select housing inside or outside areas of minority concentration or individuals with disabilities to select housing that is accessible and is in accessible locations.

65.     During 2002 through 2008, in Defendants' written submissions to the United States by way of certifications, Actions Plans and CAPERs and Consolidated Housing Plans, Defendants knowingly failed to include analysis of the subjects set forth immediately *supra*, that according to the HUD Guide must be analyzed in a legitimate "AI" as a condition of payment under the above-

referenced federal grant programs.

66.     During 2002 through 2008, in Defendants' written submissions to the United States by way of certifications, Actions Plans and CAPERs and Consolidated Housing Plans, and in Defendants' 2009 AI, Defendants knowingly failed to include any reference to evaluating housing needs for racial or ethnic minorities, or for persons who have suffered the effects of racial or ethnic discrimination or segregation as those important factors are affected by laws, regulations, administrative policies, procedures and practices of each Defendant City.

67.     Defendants, in said submissions, *supra*, knowingly failed to include the racial and ethnic analysis in conjunction with the required analysis set forth in paragraph 64, *supra*.

68.     Since completion of the 2001 AI, and continuing each year thereafter through present, Defendants have failed to update their "AIs" to include the required HUD Guide topics and analysis set forth *supra*, Defendants have failed to take appropriate actions to eliminate the public sector impediments they created and maintained, and Defendants have failed to create and maintain records and knowingly made false certifications and statements to the United States.

69.     Defendants are in continued violation of their annual HUD funding certifications and are thereby ineligible for continued federal grants.

70.     Defendants were bound at all times during the False Claims Act period by HUD's definition of a legitimate, legal "AI".

71. At all times during the False Claims Act period, Defendants have knowingly failed to conduct the "AI" as defined and required by HUD, other federal law and Defendants' funding obligations.

72. Defendants have knowingly failed to conduct the required "AIs" as defined by HUD for their annual grant submissions to HUD for 2012 and 2013.

73. Defendants, in requesting and receiving millions of dollars annually from the United States, and approximately $250 Million during the six year False Claims Act period, engaged in a course and pattern of knowingly fraudulent conduct during the period of at least February 18, 2005 through February 18, 2011, and to present, in submitting knowingly false claims for payment to or approval by the United States, by *inter alia*, knowingly falsely representing every year that they were in compliance with federal laws and regulations requiring Defendants to AFFH, which is the core prerequisite to eligibility for the CDBG and NSP funds, and other funds from the United States.

**Defendants Have Knowingly Failed to Update Their 2009 "AI"**
**Since the 9/10/2010 *Gallagher v. Magner Decision***

74. In September 2010, the 8th Circuit Court of Appeals in *Gallagher, et al. vs. Magner, City of St. Paul, et al.*, 619 F.3d 823 (8th Cir. 2010) (three consolidated fair housing lawsuits, *Steinhauser, et al.*, *Harrilal, et al.*, and *Gallagher, et al.*), determined that twelve St. Paul low-income housing providers had presented sufficient evidence for trial in their claim that St. Paul through its housing policies and practices had "disparately impacted" protected class

members and thereby violated the Fair Housing Act.

75.     In the *Gallagher, et al.* series of cases, St. Paul's local building, occupancy, and health and safety codes, and enforcement of same, were and have been challenged since May 2004 as negatively affecting the availability of housing for minorities, families with children and persons with disabilities and negatively impacting the plaintiff housing providers.

76.     St. Paul has refused to conduct legitimate AIs, including updating its 2001 AI, since the *Steinhauser, et al*. case was filed against the City in May 2004, and the *Harrilal* and *Gallagher* actions were filed in 2005.

77.     St. Paul knowingly failed to meet its duty to AFFH during the period of 2002 through present by failing to conduct legitimate AIs concerning its local building, occupancy, and health and safety codes and enforcement of same, failing to take any actions against impediments that should have been identified, and by refusing to create and maintain required "AI" records.

78.     The *Gallagher, et al.* series of cases continued in the federal court on appeal during 2009 through 2012, and during this period, Defendant St. Paul knowingly failed to conduct legitimate AIs concerning its local building, occupancy, and health and safety codes and enforcement of same.

79.     Despite notice to St. Paul prior to and during the False Claims Act period, of (a) multiple housing discrimination complaints concerning the City's public sector actions, (b) the 8th Circuit's decision in *Gallagher*, *et al.* of which it was a party litigant, and (c) other Minnesota Appellate Court decisions including

cases against the City, St. Paul has continued since 2002 through the False Claims Act period, on a on-going basis, to illegally apply its local building, occupancy, and health and safety codes to low-income housing, "protected class" members and housing providers in violation of its AFFH obligations, including by failing to conduct AIs as defined by HUD and required by federal law and the City's funding certificates.

80.     During the False Claims Act period, St. Paul knowingly failed to conduct a legitimate AI as defined by HUD because conducting legitimate AIs would implicate the City in the pending litigation against it.   The *Gallagher, et al.* series of cases are currently awaiting trial.

81.     Minneapolis ignored the housing discrimination litigation and related complaints against St. Paul during the False Claims Act period and complaints made to Minneapolis during the same period. Minneapolis knowingly failed to conduct legitimate AIs covering its building, occupancy, and health and safety codes that many low-income housing providers in Minneapolis were challenging during that time.

82.     Minneapolis has also ignored the 8th Circuit's decision in *Gallagher, et al.* and continued to knowingly fail to meet its AFFH obligations.

83.     Defendants' laws, regulations, policies and procedures related to rental housing and other low-income, privately owned housing stock, and enforcement of same during the False Claims Act period, have displaced significant numbers of "protected class" members and their families from

primarily older, single family and duplex homes in the Cities, made low-income housing unavailable and "disparately impacted" individuals and families considered "protected class" members.

### Defendants Fail To Follow City Codes

84.     Defendants have consistently failed during the False Claims Act period to follow their own City Codes during inspections and issuance of correction orders on low-income rental homes occupied by "protected class" members or on units that were available or should have been available to "protected class" members.

85.     During this relevant period, Defendants have frequently failed to "specify" the actual claimed code violation or describe with specificity the remedial action necessary to correct the violation claimed by City inspectors. Codes in both Cities require such specificity.

86.     As a result of Defendants' failure to follow the specificity requirement of their own codes, private low-income housing providers are unsure of what is being claimed as a violation by City inspectors.  Frequently, what one inspector claims is a code violation on one property is not claimed as a violation by another inspector at a second property.  Defendants fail to properly train their code inspectors which adds to the negative impact on housing providers and tenants alike.

87.     Defendants' "Public Sector" actions and failures toward low-income housing providers create numerous administrative burdens for the housing

providers and are thus, "impediments to fair housing" as defined by HUD.

88.     Defendants' actions and failures described herein also result in the burdens of City administrative appeals and court appearances for housing providers that are required to challenge intentional and/or reckless City conduct in order to protect properties, businesses and customer-tenants' housing.

89.     City "Public Sector" actions result in time consuming attempts to contact City inspectors who are difficult to contact, or who refuse to respond or communicate with owners, all resulting in added expense to housing providers from having to guess what action is exactly required by the inspectors in order to avoid heavy punitive actions by the City.  As a result, housing providers over-compensate to avoid heavy City penalties, fees and assessments but with the resulting undue cost burdens.

**Defendants Violate State Building Code**

90.     Defendants have at all times during the False Claims Act period violated the Minnesota State Building Code (Minn. Stat. 326.101-194) that applies state-wide and prohibits municipal code provisions and related policies that are different from or in addition to those code requirements set out in the State Code.

91.     One example of Defendants' long standing violation of the State Building Code during the entire False Claims Act period and continuing at present, is their illegal requirements that existing homes be brought up to "current codes" before occupancy can be continued.  Defendants call this requirement, "Code Compliance" or "Code Compliance Certification," which in both Cities

21

means the Cities illegally strip owners of older homes of "grandfathering" protections provided by the State Building Code.

92.    The State Building Code provides that older homes are subject to the building codes in force at the time they were built, not to the ever-expanding new code provisions adopted year after year.  The State Building Code was adopted by the State Legislature to promote uniformity and affordability in housing.

93.    Defendants' "Code Compliance" policies violate the uniformity and affordability policies behind the State Building Code and have the effect of acting as a disincentive to providers of low-income housing, negatively impacting the housing providers' "return on investment," that the HUD Guide requires Defendants consider in their Analysis of Impediments to Fair Housing Choice.

94.    Defendants' "Code Compliance" policies also cause and have caused during the False Claims Act period, displacement of low-income and "protected class" members from affordable housing.

95.    Defendants' Code Compliance polices have removed former affordable housing units from occupancy for extended periods of time and in many cases, permanently, while during the False Claims Act period, thousands of "protected class" members have been waiting for housing in these Cities.

**Additional "Public Sector" Actions of Defendants Denying "Protected Class"
Housing and In Violation of Defendants' AFFH Obligations**

96.    Defendants have since 2002, and through the entire False Claims Act period, added numerous regulatory burdens to low-income, privately-owned

"protected class" housing providers that have made housing unavailable as defined by Section 3604 of the Fair Housing Act, caused displacement of "protected class" members, negatively impacted housing choice and locational choice, negatively impacted the rate of return for private low-income housing investors and providers and acted in other ways as a disincentive to the privately-owned low-income housing market. Such "Public Sector" actions have continued to constitute "impediments to fair housing" as defined by HUD and Defendants' certifications.

### St. Paul Actions Constituting Impediments
### During False Claims Act Period

97.    Since 2002 and continuing to present, and at all times during the False Claims Act period, St. Paul has negatively impacted housing choice and locational choice and displaced "protected class" members from their existing housing, and violated its AFFH obligations and certifications, through City "Public Sector" actions, with such "Public Sector" actions, described *infra,* constituting "impediments to fair housing".

98.    St. Paul's laws, regulations, administrative policies, procedures and practices ("Public Sector actions"), as described immediately *infra*, have not been the subject of any legitimate "AI" by St. Paul as defined by HUD since 2001. Under HUD's definition of an "AI," these "Public Sector" actions should have been analyzed and appropriate actions taken to eliminate the impediments and records created and maintained concerning the AI actions.

99.    St. Paul's "Public Sector" action designates occupied homes as

"vacant buildings" that can no longer be occupied except by complying with expensive and in other ways onerous administrative requirements. In many cases, these targeted homes either meet the federal minimum housing standards ("HQS") under the federal Section 8 Housing Choice Voucher Program, or would meet such HQS standards with minimum actions by owners, if allowed by St. Paul.

100.   St. Paul's "Public Sector" action prohibits re-occupancy of units during a normal tenant turnover period. St. Paul designates low-income rental homes that are in a normal tenant turnover and cleanup period as "vacant" buildings subject to mandatory, cost-prohibitive renovation to current codes in violation of the State Building Code.

101.   St. Paul's "Public Sector" action requires oppressively expensive renovations of existing homes. The City, in violation of State Building Code, requires currently occupied and yet claimed by the City as "vacant" homes to meet "current building codes" under the Cities' "Code Compliance Certification Process"; through this policy the City illegally removes grandfathering protections under the State Building Code for existing structures.

102.   St. Paul's "Public Sector" action through its Egress Window Policy during the False Claims Act period required existing homes to increase the size of the egress windows to meet City code policies – such a policy violated the Minnesota State Building Code and case law construing that Code.  See Minnesota Appeals Courts decision in *BAM vs. City of St. Paul* (Mn.Ct.Apps. 2012).

103.   St. Paul's "Public Sector" action through its housing policies

forcibly convert claimed "vacant," formerly affordable rental homes to "homeowner occupied only" homes through redevelopment contracts and deed restrictions, which results in the reduction of low-income rental housing stock in the inner-city areas of St. Paul where there is high demand for "protected class" housing. St. Paul's actions have continued during the entire False Claims Act period while the City has had, and continues to have, an affordable, low-income rental housing crisis with thousands of "protected class" members and families on waiting lists.

104.   St. Paul's "Public Sector" action includes a policy of condemning safe, decent and sanitary housing stock without a legal basis under the Minnesota State Building Code or under the federal minimum housing standards, "HQS". These punitive City actions take affordable rental homes off-line for extended periods of time and result in unavailable housing even though such housing is "safe, decent and sanitary" under State law and the federal minimum HQS.

105.   St. Paul's "Public Sector" action applies hair-trigger condemnations, nuisance designations and demolitions on low-income rental properties, even though such properties are affordable, safe, decent and sanitary and occupied predominately by "protected class" members. St. Paul takes accelerated action to penalize owners and remove affordable housing stock owned by the private market where owners have made substantial investment in capital improvements and repairs to older buildings.

106.   St. Paul's "Public Sector" action orders demolition and assesses

fines and penalties and thereby make such housing unavailable where the owner could, without City interference, quickly make repairs required to the property by the State Building Code, Section 8 HQS, or the City's legitimate code provisions. See, e.g., *Bee Vue, et al. vs. City of Saint Paul*, Mn. Ct. Apps, April 13, 2010, No. A09-531.

107.    During the False Claims Act period, St. Paul has adopted and continued to implement its "Strategic Building Demolition And Securing Policy" with federal HUD funding from the Neighborhood Stabilization Program ("NSP I, II and III") that has been and continues to be applied to older affordable housing units. St. Paul acknowledges this Code program is:

> "*unlike any other demolition program in the country*" because it is part of a "*rigorous, comprehensive, strategic code enforcement effort designed to make property owners either bring their properties up to code or sell them to someone who is willing to invest the funds necessary to bring the property into full code compliance based upon a detailed code compliance inspection*."

108.    St. Paul has failed to acknowledge that the "*codes*' it speaks of in its "*rigorous*" NSP policy are in violation of the State Building Code, HQS policies, and its AFFH obligations, and that the City has failed to conduct a legitimate "AI" prior to adopting such policies, or at any time since adoption but has fraudulently certified that it has fully complied with its AFFH obligations.

109.    St. Paul has at all times knowingly failed to conduct any "AI"

concerning the "disparate impact" of applying such a "rigorous" NSP policy during the False Claims Act period to older housing stock occupied predominately by "protected class" members.

110. St. Paul's NSP efforts have negatively and disparately impacted affordable rental housing stock and disparately impacted "protected class" members.

111. St. Paul admits that it costs owners on average $30,000 in forced renovations in order to reoccupy a home.

112. St. Paul has reported during the False Claims Act period that on average 40 homes a month are being rehabilitated to this "*rigorous*" City Code under NSP and reoccupied, and 8-10 homes are being demolished.

113. Under the St. Paul NSP program, the City during the False Claims Act period has been involved with acquisition of at least 400 homes, of which 300 homes have been subject to rehabilitation under the "rigorous City Code standards" and 100 homes have been demolished.

114. St. Paul knowingly failed during the False Claims Act period to take any action to replace the demolished rental homes with affordable and available rental units for "protected class" families with children either displaced by City housing policies or looking for such housing in the City that used to be there.

115. During the False Claims Act period, St. Paul admitted that it suspected former "protected class" members no longer had access to the "renovated" properties under NSP, yet the City knowingly failed to conduct the

analysis of impediments required by the City's federal HUD funding certifications on this critical issue.

**Minneapolis Actions Constituting Impediments
During False Claims Act Period**

116.   Since 2002 and continuing to present, and at all times during the False Claims Act period, Minneapolis has negatively impacted housing choice and locational choice and displaced "protected class" members from their existing housing, and violated its AFFH obligations and certifications, through City "Public Sector" actions with such "Public Sector" actions, described *infra,* constituting "impediments to fair housing".

117.   Minneapolis' laws, regulations, administrative policies, procedures and practices ("Public Sector actions"), as described immediately *infra*, have not been the subject of any legitimate "AI" by Minneapolis as defined by HUD since 2001.   Under HUD's definition of an "AI," these "Public Sector" actions should have been analyzed and appropriate actions taken to eliminate the impediments and records created and maintained concerning the AI actions.

118.   Minneapolis has since 2001 added considerable additional layers of regulatory burdens to low-income, privately-owned protected class housing providers that have caused displacement of protected class members, interfered with the housing choice and locational choice of protected class members, "disparately impacted" protected class members, and negatively affected the return on investment of housing providers and acted in ways to remove incentives for

provision of privately-owned low-income rental housing in the City.

119.    Minneapolis' "Public Sector" actions include implementation of a rental licensing revocation ordinance that has been used by the City during the False Claims Act period in a punitive manner against low-income housing providers, resulting in displacement of a significant number of innocent "protected class' tenants from their homes without any legitimate justification.  This policy continues in the City.

120.    Minneapolis requires rental housing providers to acquire a separate license for each rental home.  If a housing provider loses just two licenses, the City revokes all remaining licenses which thereby forces the displacement of numerous other innocent tenants who live in "safe, decent and sanitary housing" by federal definition.  See Minneapolis Code of Ordinances, Title 12, Chapter 244, Article XVI.

121.    Under Minneapolis' rental licensing policy, innocent tenants are forced to move without any showing by the City of unsafe or unsanitary conditions or any other legitimate basis.

122.    Minneapolis' "Public Sector" action includes a policy of condemning safe, decent and sanitary housing stock without a legal basis under the Minnesota State Building Code or under the federal minimum housing standards, "HQS".

123.    Minneapolis, in cooperation with a private energy company, condemns homes without any legal basis or for simple, quickly correctable items.

In each case, Minneapolis immediately levies its vacant building fees on the housing provider and refuses to lift the condemnation orders even though licensed contractors quickly remedy any legitimate code issues.

124.   Minneapolis' "Public Sector" action includes repeated, retaliatory inspections on low-income rental units and buildings, frequently on a repeated, continual and unjustifiable basis, sometimes three or more times in one year with unannounced inspections by numerous City personnel.

125.   Minneapolis' "Public Sector" action includes policies of confiscatory administrative fees, penalties and assessments, including vacant building registration fees against low-income housing providers, directly causing providers to cut hours of their workers and leave homes sit vacant for years.

126.   Minneapolis' "Public Sector" action includes a policy of levying excessive City inspection fees, permit fees, fines and assessments, including for tenant caused damage and conduct, all on private housing providers and many times based on flawed or otherwise illegal orders.

127.   Minneapolis' "Public Sector" action includes a policy of applying hair-trigger demolitions on low-income rental properties even though such properties are affordable, safe, decent and sanitary and occupied predominately by "protected class" members.   Minneapolis takes accelerated action to penalize owners and remove affordable housing stock owned by the private market where owners have made substantial investment in capital improvements and repairs to older buildings.

128.    Minneapolis is quick to order demolition and assess fines and penalties and thereby make such housing unavailable where the owner could, without City interference, quickly make repairs required to the property by the State Building Code, Section 8 HQS, or the City's legitimate code provisions.

129.    These and other punitive City actions, *supra,* take affordable rental homes off-line for extended periods of time and result in unavailable housing even though such housing is "safe, decent and sanitary" under State law and the federal minimum HQS.  These City policies, *supra,* deny housing to low-income persons and to "protected class" members.

### Defendants' "Public Sector" Policies and Actions Act As Disincentive to Private Housing Providers of Low-Income Housing

130.    Defendants' oppressive laws, regulations, policies and practices have acted and continue to act as a significant disincentive to private owners to continue providing low-income rental housing in these cities and/or to enter the market and/or to expand the number of low-income housing units in these cities, in order to meet the high demand for such housing.

131.    Defendants' "Public Sector" actions negatively affect the "return on investment" to the private low-income housing market providing critically needed affordable housing in both cities.

132.    HUD requires Defendants to include analysis of the effect of Public Sector actions on such incentives and return on investment in Defendants' "AIs".  Defendants have during the entire False Claims Act period knowingly omitted this

31

required analysis, failed to take appropriate actions to eliminate the public sector impediments they created and maintained, as described *supra*, and failed to create and maintain records as required by their certifications and AFFH, and thus knowingly made falsely certifications and statements to the United States.

### St. Paul and Minneapolis – Forced Gentrification

133.   Defendants' "Public Sector" actions, including housing laws, regulations, policies and practices, have reduced and continue to reduce the affordable housing stock that is primarily used by "protected class" members in the inner-city areas of these Cities. Defendants during the entire False Claims Act period have forcibly gentrified and reduced the housing available for members of minority communities, demolished affordable housing, failed to replace such housing and displaced "protected class" members from City development zones.

134.   Defendants' actions have resulted in the construction of a limited number of replacement residential units for the hundreds of housing units demolished, with such new replacement units frequently called "mixed income units".

135.   Defendants' have promoted deed restrictions on vacant properties subject to development, thereby prohibiting rentals for "protected class" and low-income and moderate low-income persons in the Cities.

136.   Defendants' have promoted expansive commercial developments overlapping the former affordable housing footprint in inner city areas of Minneapolis and St. Paul, resulting in the rise in property values and related loss

of affordability of housing for the low, very low and moderate income persons in those areas.

137.  During the False Claims Act period, Defendants have fully understood that the majority of residential occupants in City development and targeted areas are 'protected class" members who will continue to bear the brunt of the negative, "disparate impacts" of Defendants' policies.

138.  Defendants have not conducted, and knowingly failed to conduct, at any time from 2002, through and after the False Claims Act period, an analysis of gentrification in each city and whether any such gentrification, including by City policies, was acting as an impediment to fair housing as defined by HUD and federal law.

**St. Paul and Minneapolis' Public Sector Actions Perpetuate Segregation**

139.  Defendants' "Public Sector" actions have during the entire False Claims Act period perpetuated segregation by forcibly pushing concentrations of minority individuals and families farther from the newly developed inner-City commercial corridors, all the while maintaining the segregation but simply transferring such segregation farther from the downtown areas of St. Paul and Minneapolis.

140.  Defendants have not conducted, and knowingly failed to conduct, at any time from 2002, through and after the False Claims Act period, an analysis of segregation in each city and whether any such segregation, including by City policies, was acting as an impediment to fair housing as defined by HUD and

federal law.

141.    Due to the "Public Sector" policies and actions of Minneapolis described *supra* during the entire False Claims Act period, Minneapolis knowingly falsely certified to the United States in its Local Grantee Certifications of April 11, 2005, April 2006, April 13, 2007, April 15, 2008, December 1, 2008, April 15, 2009, June 5, 2009, April 15, 2010 and February 16, 2011, and in other certifications made during said period, and in its annual Action Plans and annual CAPERs, and Consolidated Housing Plan submissions every five years ("City HUD submissions"), namely for 2005, and for 2010, that the City was in compliance with its AFFH obligations.

142.    During the False Claims Act period, Minneapolis knowingly falsely certified through its "City HUD submissions," *supra,* that the City was in "*Compliance With Anti-discrimination laws*" [and that] - *The grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and implementing regulations.*"

143.    Due to the "Public Sector" policies and actions of St. Paul described *supra* during the entire False Claims Act period, St. Paul knowingly falsely certified to the United States in its Local Grantee Certifications of April 2005, April 14, 2006, April 14, 2007, April 16, 2008, April 16, 2009, and in May 2010 for the City's 2010 HUD Consolidated Plan, and in other certification made during said period, and in its annual Action Plans and annual CAPERs, and Consolidated

Housing Plan submissions every five years ("City HUD submissions"), namely for

2005, and for 2010, that the City was in compliance with its AFFH obligations.

144.    During the False Claims Act period, St. Paul knowingly falsely

certified through its "City HUD submissions," *supra,* that the City was in

"*Compliance With Anti-discrimination laws*" [and that] - *The grant will be

conducted and administered in conformity with title VI of the Civil Rights Act of

1964 (42 USC 2000d), the Fair Housing Act (42 USC 3601-3619), and

implementing regulations.*"

145.    Defendants during the False Claims Act period knew of each others'

knowing failures to AFFH and knowingly failure to meet their individual

obligations required by their certifications to the United States.

146.    Defendants also knew of the illegal housing policies planned and

implemented in each of their Cities, as described *supra*, that were also in violation

of each of the Defendants' AFFH duties and which should have been the subject

of legitimate "AIs," as defined by HUD, and appropriate actions to eliminate such

impediments and the subject of proper record creation and maintenance.

147.    Defendants acted in concert in implementation of such illegal

housing policies and in agreeing not to conduct legitimate "AIs" of their individual

"Public Sector" actions, as fully described *supra*.

148.    Defendants    through    their    interactions    and    communications,

including through meetings under the umbrella of FHIC and other inter-city

working groups, coordinated their illegal housing policies and fraudulent actions

and false certifications and false record keeping and submissions to the United States.

149.   During 2005, Defendants agreed to not conduct an updated "AI" for each of their 2005 Consolidated Housing Plans that were being prepared for submission to HUD for 2005-2009.   Defendants made such agreement in order to avoid disclosure of their illegal housing policies and false certifications and in order to further such illegal conduct and continue to obtain further federal funds.

150.   Defendants falsely stated to HUD in 2005 that no new impediments to fair housing choice had been identified so no updated "AI" would have to be performed. See Washington County Consolidated Housing Plan, 2005 submission to HUD.

151.   At all times during the False Claims Act period, Defendants coordinated their efforts to hide their actual "Public Sector" impediments from written submissions to the public and to HUD, impediments that already existed in each of their Cities related to their illegal low-income housing policies.

152.   Defendants agreed to not identify their individual "Public Sector" impediments, as defined by HUD and federal law, or take any action to eliminate those impediments, or create and maintain any records regarding those actions, in order to continue to successfully apply for and receive federal funding while continuing their illegal and fraudulent conduct.

153.   Defendants continued their coordinated efforts to keep the lid on their illegal actions and continued false certifications at all times during the False

Claims Act period, including during the 2009 "AI" process and at all times to present.

154.    Defendants through their coordinated actions, jointly and knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval in connection with the submission of their requests for federal housing and community development grants and funding.

155.    Defendants through their coordinated actions, jointly and knowingly made, used, and caused to be made and used, false records and statements material to the false or fraudulent claims for federal housing and community development grants and funding.

156.    Other third parties acted in concert with Defendants to assist Defendants in their illegal housing policies and false certifications during the False Claims Act period. The identity of those co-conspirators is unknown to Plaintiff-Relators at this time, but may include other members of FHIC and the 2009 "AI" contractor, WES.

157.    Defendants each knowingly failed to create and maintain records reflecting the "AI" analysis and actions as required by their certifications and Defendants coordinated their knowingly failures to do so in order to further their false and fraudulent conduct in wrongfully obtaining continued grant and other funds from the United States.

## COUNT I

### Violations of the False Claims Act
### 31 U.S.C. § 3729 (a)(1)(A)
### Presenting False Claims for Payment

158.   Plaintiff-Relators incorporate by reference paragraphs 1 through 157 above as if fully set forth herein.

159.   Plaintiff-Relators seek relief on behalf of the United States from Minneapolis and from St. Paul under Section 3729(a)(1)(A) of the False Claims Act.

160.   As set out above, Defendants knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval in connection with the submission of their requests for federal housing and community development grants and other related funding.

161.   The United States paid to Defendants housing and community development grants and other related funding because of such false or fraudulent claims Defendants knowingly presented, or caused to be presented to the United States.

162.   Defendants, in performing all of the acts described herein, have defrauded the United States by violating 31 U.S.C. § 3729(a)(1)(A), to the damage of the United States Treasury, by causing the United States to pay out money it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to false claims for payment that Defendants presented or caused to be presented to

the United States.

163.   Defendants' violations of 31 U.S.C. § 3729(a)(1)(A) are continuing and ongoing and also pre-date the False Claims Act period.

164.   As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent hundreds of millions of dollars over the False Act period.

165.   By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

166.   Damages to the United States include, but are not limited to, the full amount it has paid on all such fraudulent claims. Defendants are liable to the United States for three times the full amount of these damages, plus interest.

167.   Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of $5,000 to $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

168.   Defendants are jointly and severally liable for all damages.

## COUNT II

**Violations of the False Claims Act**
**31 U.S.C. § 3729 (a)(1)(B)**
**Use of False Certifications and Statements**

169.   Plaintiff-Relators incorporates by reference paragraphs 1 through 168 above as if fully set forth herein.

170.   Plaintiffs-Relators seek relief on behalf of the United States from

Minneapolis and from St. Paul under Section 3729(a)(1)(B) of the False Claims Act.

171.   As set out above, Defendants knowingly made, used, and caused to be made and used, false records and statements material to the false or fraudulent claims for federal housing and community development grants and other related funding.

172.   Defendants knowingly made false statements and false certifications in order to obtain payment of federal housing and community development grants and other related funding, with the knowledge that these false statements and certifications would be material to the United States' decision to pay Defendants.

173. Defendants' violations of 31 U.S.C. § 3729(a)(1)(B) are continuing and ongoing and also pre-date the False Claims Act period.

174.   As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent hundreds of millions of dollars over the False Claims Act period.

175.   By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

176.   Damages to the United States include, but are not limited to, the full amount it has paid on all such fraudulent claims. Defendants are liable to the United States for three times the full amount of these damages, plus interest.

177.   Defendants are also liable to the United States on each and every

such fraudulent claim for a civil fine under the False Claims Act of $5,000.00 to $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

178.   Defendants are jointly and severally liable for all damages.

## COUNT III

### Violations of the False Claims Act
### 31 U.S.C. § 3729 (a)(1)(C)
### Conspiracy To Violate False Claims Act

179.   Plaintiff-Relators incorporates by reference paragraphs 1 through 178 above as if fully set forth herein.

180.   Plaintiffs-Realtors seek relief on behalf of the United States from Minneapolis and St. Paul under Section 3729(a)(1)(C) of the False Claims Act.

181.   Defendants conspired with one another, and possibly with certain unknown members of FHIC, and possibly with WES, to commit the violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B), described in Counts I-II.

182.   Defendants' violations of 31 U.S.C. § 3729(a)(1)(C) are continuing and ongoing and also pre-date the False Claims Act period.

183.   Defendants, in performing all the acts described herein have defrauded the United States of America by conspiring to violate 31 U.S.C. §§ 3729(a)(1)(A) and (B), in contravention of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C), to the damage of the treasury of the United States, by causing the United States to pay out money it was not obligated to pay. Defendants, in

carrying out these wrongful acts, have engaged in a protracted course and pattern of fraudulent conduct that was material to false claims for payment that Defendants presented or caused to be presented to the United States.

184.   As a direct result and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent hundreds of millions of dollars over the False Claims Act period.

185.   Damages to the United States include, but are not limited to, the full amount it has paid on all such fraudulent claims. Defendants are liable to the United States for three times the full amount of these damages, plus interest on all amounts.

186.   Defendants are also liable to the United States on each and every such fraudulent claim for a civil fine under the False Claims Act of $5,000.00 to $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

187.   Defendants are jointly and severally liable for all damages under this Count for conspiracy to violate the False Claims Act.

## DEMAND FOR JUDGMENT

Plaintiff-Relators respectfully request judgment in favor of the United States, and against the City of Minneapolis and against the City of St. Paul as follows:

(a)   That the United States be awarded treble damages sustained by the

United States because of the false claims of <u>Minneapolis</u> alleged in the Complaint, as provided by the False Claims Act, 31 U.S.C. §§ 3729 *et seq.;*

(b)     That the United States be awarded treble damages sustained by the United States because of the false claims of <u>St. Paul</u> alleged in the Complaint, as provided by the False Claims Act, 31 U.S.C. §§ 3729 *et seq.;*

(c)     Because both Defendants are responsible for submitting false claims, using false records or statements to get such claims paid, submitting false certifications, failing to disclose the falsity of their claims and conspiring to submit false claims, both Defendants are jointly and severally liable for the full amount of damages and civil or criminal penalties awarded in this case;

(d)     That civil penalties of $10,000 be imposed for each and every false claim that each Defendant presented to the United States and that they be held jointly and severally liable for same, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990;

(e)     That pre-judgment and post-judgment interest be awarded against Defendants in favor of the United States and Plaintiff-Relators;

(f)     That reasonable attorney's fees, costs, expenses, with interest, and expert fees, which the Plaintiff-Relators necessarily incurred in commencing and prosecuting this case, be awarded against Defendants;

(g)     That the Plaintiff-Relators be awarded the maximum amount of proceeds allowed to each of them under the False Claims Act as the Court decides is reasonable, which shall not be less than 15% nor more than 30% of the proceeds

of the action or settlement of the claims or alternative remedies under the False Claims Act, 31 U.S.C. § 3730(c)(5), (d);

(h)     That Plaintiff-Relators be awarded the maximum amount of proceeds allowed to each of them under the False Claims Act as the Court decides is reasonable, which shall not be less than 15% nor more than 30% of the proceeds of the action or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(i)     That Plaintiff-Relators be granted a jury trial; and

(j)     That the Court grant all other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff-Relators, on behalf of themselves and the United States, demand a jury trial.

**SHOEMAKER & SHOEMAKER, P.L.L.C.**

Dated: October 2, 2013        By: s/ John  R. Shoemaker
                             John R. Shoemaker (Attorney Lic. #161561)
                             Paul F. Shoemaker (Attorney Lic. #178226)
                             Hyland Bank Building, Suite 410
                             5270 West 84th Street
                             Bloomington, Minnesota 55437
                             (952) 224-4600
                             john@shoemakerlaw.com

                             Attorneys for Plaintiff-Relators
                             Andrew Ellis and Harriet Ellis