# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

**United States of America, ex rel., Andrew Ellis and Harriet Ellis,**

**COURT FILE NO. 11-CV-00416 (PJS/TNL)**

**Plaintiff-Relators,**

**vs.**

**City of Minneapolis, a municipal corporation, and City of Saint Paul, a municipal corporation,**

**DEFENDANT CITY OF MINNEAPOLIS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

**Defendants.**

---

## INTRODUCTION

Relators' *qui tam* suit under the False Claims Act, 31 U.S.C. §§ 3729–3730 (FCA) asserts that the Defendants  fraudulently obtained funds from the United States Government by falsely representing compliance with federal laws and regulations requiring Defendants to affirmatively further fair housing.  The FCA imposes liability on persons responsible for the Government paying false or fraudulent claims.

Defendant City of Minneapolis ("Minneapolis") respectfully submits this memorandum in support of its motion to dismiss.  First, Relators' claim that Minneapolis failed to conduct "legitimate AIs" in an appropriate interval fails because federal law does not specify what is required in an AI and how often an AI must be conducted.  Therefore, Minneapolis conducted legitimate AIs in an

appropriate interval. Second, Relators' Complaint is not sufficiently pled: it is vague such that it fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6); it fails to plead fraud with particularity under Federal Rule of Civil Procedure 9; and it fails to sufficiently plead scienter. Finally, this Court lacks subject matter jurisdiction over Relators' claims because they cannot overcome the public disclosure bar.

## FACTS

### I.   THE RELATORS

Relators Andrew and Harriet Ellis ("Relators") bring a *qui tam* action on behalf of the United States alleging the City of Minneapolis ("Minneapolis") made false claims to obtain federal funding for housing and community development. Compl. at ¶ 36. Relators are property owners who rent their properties in Minneapolis. Compl. at ¶ 7. At one point Andrew Ellis ("Andrew") was employed as a housing inspector for Minneapolis. Compl. at ¶ 10.

### II.   ALLEGATIONS OF FRAUD AND FALSE CLAIMS

#### A.   Relators Allege that Minneapolis Failed to Conduct "Legitimate" Analyses of Impediments.

Relators allege that Minneapolis violated the FCA by falsely certifying via Local Grant Certifications, CDBG Certifications, and CAPERs that it was affirmatively furthering fair housing (AFFH). Compl. ¶¶ at 28, 33–34. Relators

further contend that Minneapolis failed to AFFH because AFFH requires the jurisdiction to "conduct an analysis of impediments (AI) to fair housing choice." Compl. at ¶ 40, citing 24 C.F.R. § 91.425(a)(1)(i).  Relators argue that Minneapolis failed to AFFH by failing to prepare an AI from 2002 to 2008.  Compl. at ¶¶ 54–55.  Relators also allege Minneapolis did not conduct a legitimate AI because it did not include in its AI local building, occupancy and health and safety codes. *Id*. at 56-57, 64.  Relators state Minneapolis submitted false claims by knowingly falsely representing every year that they were in compliance with federal laws and regulations requiring [Minneapolis] to AFFH . . .." Compl. at ¶ 73.

**B.     Relators Fail to Allege Any Representative Examples of Minneapolis Increasing Impediments to Fair Housing with Particularity.**

Relators claim that "Minneapolis has negatively impacted housing choice and locational choice and displaced 'protected class' members from their existing housing, and violated its AFFH obligations and certifications, through City 'Public Sector' actions with such 'Public Sector' actions . . . constituting 'impediments to fair housing'" since 2002.  Compl. at ¶ 116.

Relators assert that Minneapolis' actions including "implementation of a rental licensing revocation ordinance" that has been used "in a punitive manner against low-income housing providers," which has resulted in the "displacement of a significant number of innocent 'protected class' tenants from their homes

without any legitimate justification."   Compl. at ¶ 119.   Additionally, Relators claim that Minneapolis has a policy of cooperating with a "private energy company" to condemn "safe, decent and sanitary housing stock without a legal basis." Compl. at ¶¶ 122–23.

Relators also claim that Minneapolis' actions include "repeated, retaliatory inspections on low-income rental units and buildings." Compl. ¶¶ 124–26.

Relators allege that Minneapolis has a policy of "applying hair-trigger demolitions on low-income rental properties even though such properties are affordable, safe, decent and sanitary and occupied predominately by 'protected class' members."   Compl. at ¶ 127.   Relators claim that "Minneapolis takes accelerated action to penalize owners and remove affordable housing stock owned by the private market where owners have made substantial investment in capital improvements and repairs to older buildings." *Id.*

## III.   SOURCES OF ALLEGATIONS

### A.   Information Disclosed in Previous Federal Hearings.

In November 2010, Leroy Smithrud filed *Smithrud v. City of Minneapolis*, 10-CV-4451 (JNE/JSM).  In his complaint, Smithrud alleged that

> The City, despite its annual certifications filed under its legal duties associated with the Federal Fair Housing's "Analysis of Impediments" ("AI"), stated in essence under oath, that the City:
> A. Never considered the disparate impacts it was causing;
> B.  Swore under oath that it was considering such impacts;

> C. Swore under oath that there were no such disparate impacts and that the City's own violations of the State Building Code were either excused as attempts to provide safe housing or were not material as impediments having any disparate impacts

*Smithrud*, 10-CV-4441 (JNE/JSM), Doc. 1 (Compl. at ¶ 37). Smithrud continued that Minneapolis "falsely sought and received . . . from 2005–2010 millions of Dollars in HUD CDBG funds" that Minneapolis would not have received "if the AI's (sic) were true and correct, not false, and when [Minneapolis] knew it had not provided nor been supplied with any AI between 2001 to 2009." *Id.* at ¶ 38. Smithrud also asserted that Minneapolis "knowingly and intentionally allowed for the demolition of the property at DuPont" despite authority that prohibited Minneapolis from "changing or deviating from the State Building Code's applicable provisions as stated by subject matter and in amendments to the Code." *Id.* at ¶ 40. Smithrud alleged that the demolition of his property was caused by Minneapolis' illegal policies and procedures. *Id*. at ¶ 46. Smithrud stated that Minneapolis has an affirmative duty to further federal fair housing and to consider the impact decisions can make on protected classes and older, grandfathered-in housing stock. *Id.* at ¶ 52.

## B.   Information Obtained from Other Individuals.

This *qui tam* suit was originally brought by Relators and Michael Blodgett. *See* Doc. 172 (Court Order of September 25, 2013) at 7 (dismissing Blodgett from

the suit).  In their original Verified Complaint, the Relators stated that Blodgett obtained information from alleged building expert Don Hedquist, which Hedquist has submitted in hearings and court proceedings.  Doc. 1 (Original Verified Compl.) at ¶ 33.  Blodgett also obtained information from Denise Beigbeiter at the Fair Housing Implementation Council regarding the significance of no new Analysis of Impediment since 2001.  *Id.* at ¶ 23.  Beigbeiter coordinated and prepared CAPER, CONPLAN and other annual Federal reports to HUD.  *Id.*  Blodgett also allegedly obtained information from Minneapolis employees regarding Minneapolis employees alleged refusal to honor Federal Fair Housing laws or subject matter preemption of the State Building Code.  *Id.* at ¶ 28.  Blodgett asserted that a state employee informed him that the absence of any new AI could be or was a badge of fraud and could raise concerns about the validity of sworn submissions to HUD.  Doc. 1 at ¶ 22.

Blodgett helped attorney John Shoemaker prepare for the Eighth Circuit appeal of *Gallagher v. City of St. Paul*, 619 F.3d 823 (8th Cir. 2010), by drafting a portion of the brief focusing on disparate impact.  *Id.* at ¶¶ 34–35.  That information was published when Shoemaker utilized it in the oral argument hearing at the Eighth Circuit.  *Id.* at ¶ 36.

Relators alleged that the 2009 AI explicitly stated that Minneapolis had not kept records in any year sufficient to comply with their ministerial duties under

the 2001 AI owed to HUD.  Compl. ¶ 83.  Relators also admitted that the 2001 and 2009 AIs explicitly referenced local codes and heightened code compliance as impediments to the supply of safe, affordable housing.  Compl. ¶ 84.

C.     **Information from News Media.**

Information regarding Minneapolis' demolition of structurally sound rental properties has been published in the weblog "Landlord Politics." The weblog published an article regarding the demolition of Leroy Smithrud's rental property. Declaration of Tracey N. Fussy, Ex. 4 (Landlord Politics publications – "The Protest Demonstration at Minneapolis City Hall on Friday, August 15, 2008"). Landlord Politics also requested that property owners inform attorney Ken Hertz of instances of condemnation and violations of the Code that came as a result of their tenants' errors.  Fussy Dec., Ex. 5 (Landlord Publications – "Legal Issues"). Also, the Site Directory of the published articles on Landlord Politics includes numerous articles regarding affordable housing, condemnation and demolition of rental property pre-dating this suit.  *Id.* at Ex. 6 ("Site Directory") at 2, 4, 9, 13, 16, 17 and 18.

D.     **Relators' Confidential Disclosure Statement Contains Nothing More than Public Documents and Unsupported, Non-Specific Conclusions of Fraudulent Conduct.**

Relators state, without providing any specific information, that if any public disclosures have occurred, they have provided an informational statement

to the United States Attorney's Office that contains information materially different than any information publicly disclosed. Compl. at ¶4; *see also* Fussy Dec., Ex. 7 (Confidential Disclosure Statement ("CDS")). Relators do not state what that "materially different information" is in their Complaint nor is it clear from the Confidential Disclosure Statement. Yang, former Relator Blodgett's attorney, states that the document attached to her email is in fact the accurate Confidential Disclosure Statement. Fussy Dec., Ex. 8 (Email from Yang dated October 30, 2012).

Paragraphs 1–44 of the Confidential Disclosure Statement cite as Exhibits: case law; statutes and Codes; copies of Minneapolis' CAPERs and CONPLANs; copies of media reports; and, Minneapolis' 2001 and 2009 AIs. Fussy Dec., Ex. 7 at 1–44.

Paragraphs 45 through 62 contain selected quotes from the 2006 CAPER which was approved by HUD. *Id.* at ¶¶ 45–63. Paragraphs 63 through 77 similarly contain quotations from seemingly various public documents regarding basic public information. *Id.* at ¶¶ 63–77. Paragraph 69 appears to come from an AI. *Id.* at ¶ 69.

Paragraphs 79 and 80 allege Minneapolis made false "annual sworn certifications" to HUD. *Id.* at ¶¶ 79–80. Paragraphs 81 through 89 make unsupported, non-specific conclusions of fraudulent conduct without providing

8

any such examples of such fraudulent conduct.  *Id.* at ¶¶ 81–89.  Paragraph 90 notes an email/letter contained within a 2006 Consolidated plan.  *Id.* at ¶ 90. Paragraphs 91 through 100 documents information contained in: the 2007 CAPERS, CHAS and CONPLAN, documents submitted to HUD by Minneapolis, the 2000 Census, geographic breakdown of individuals in Minneapolis by income, the 2008 Minneapolis HUD Consolidated Plan, and a notation that no new AI was completed from 2001–2009.  *Id.* at ¶¶ 91–100.

Paragraph 101 contains a conclusion, without support, that "the City" knew or should have known it was creating a disparate impact.  *Id.* at ¶ 101. Paragraphs 102 through 107 states what Minneapolis should have known. *Id.* at ¶¶ 102–107.

Paragraphs 108 through 110 quote from the 2009 AI and the unsupported, non-specific conclusion that Minneapolis did not maintain such records as required by HUD from 2001 to 2010.  *Id.*  at ¶¶ 108–110..  Paragraphs 110 through 116 appear to quote from the 2009 AI.  *Id.* at ¶¶ 110–116  Paragraph 117 states that "Plaintiffs' rental affordable housing, including the four-plex at all times material had complete kitchens and complete plumbing facilities."  *Id.* at ¶ 117. Paragraphs 118 through 135 provide more quotes from the 2009 AI.  *Id.* at ¶¶ 118–135.  Paragraph 136 states, without support or by way of any particular example, that Minneapolis has caused disparate impact by violating its duties to

affirmatively further fair housing, failing to prepare a new AI between 2001 and 2009, and making misrepresentations in its annual sworn certifications.  *Id*. at ¶ 136.

## IV.   MINNEAPOLIS PUBLISHES ITS CONSOLIDATED PLAN, CONSOLIDATED ANNUAL PERFORMANCE REPORT, AND ANALYSIS OF IMPEDIMENTS.

Matthew Bower is the Manager of Resource Coordination for Grants & Special Projects for the City of Minneapolis.  *See* Affidavit of Matthew Bower at ¶ 1.   In that capacity, he coordinates Minneapolis' application and receipt for certain monies from the United States government, including from HUD.  Bower Aff., at ¶ 2.

Minneapolis prepares a Consolidated Plan ("CONPLAN") and a Consolidated Annual Performance Report ("CAPER") annually.  *Id*. at ¶ 3.  These documents address Minneapolis's housing and community development and public service needs, and performance, in compliance with HUD entitlement formula grants received by the City of Minneapolis: Community Development Block Grant ("CDBG"), Emergency Shelter Grant ("ESG"), HOME Investment Partnerships ("HOME"), American Dream Downpayment Initiative ("ADDI"), and Housing Opportunities for Persons with AIDS ("HOPWA").  *Id*.

For several years, Minneapolis has published its CONPLANs, CAPERS, Analysis of Impediments and other documents on its public website,

http://www.minneapolismn.gov/grants/grants_consolidated-plan.  *Id.* at ¶ 3;

Bower Aff., Ex. 1.  Since March 2010, the 2009 Analysis of Impediments has been

publicly posted on the City of Minneapolis website.  *Id.* at ¶ 5.  Prior to March

2010, the Minneapolis's Analysis of Impediments was publicly posted on the

website of the Metropolitan Council.  *Id.* ; see also Fussy Dec., Ex. 9 (screenshot of

Met Council website).

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure state that "lack of subject-matter

jurisdiction," and "failure to state a claim upon which relief can be granted" are

defenses which may be made by motion at the option of the pleader.  Fed. R. Civ.

P. 12(b)(1), 12(b)(6).  Dismissal under such bases is to be made on the basis of the

pleadings, *Huelsman v. Civic Ctr. Corp.*, 873 F.2d. 1171, 1174 (8th Cir. 1989)), and

"serves to eliminate actions which are fatally flawed in their legal premises and

destined to fail, thereby sparing litigants the burden of unnecessary pretrial and

trial activity."  *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir. 2001).

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to file a

motion to dismiss for "lack of subject-matter jurisdiction." It is the plaintiff's

burden to establish that jurisdiction exists.  *Osborn v. United States*, 918 F.2d 724,

730 (8th Cir. 1990).  If the motion to dismiss under Rule 12(b)(1) is based on a

deficiency in the pleadings, the "standard of review is the same standard [courts]

11

apply in Rule 12(b)(6) cases." *Stally v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) (citing *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697–98 (8th Cir. 2003). Under this standard, the Court "accept[s] as true all factual allegations in the complaint, giving no effect to conclusory allegations of law. The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims . . ., rather than facts that are merely consistent with such a right." *Stally*, 509 F.3d at 521 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 545.

Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.  As the United States Supreme Court has reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  *Twombly*, 550 U.S. at 556.

## ARGUMENT

## I.   RELATORS' ALLEGATION THAT MINNEAPOLIS FAILED TO CONDUCT "LEGITIMATE" ANALYSIS OF IMPEDIMENTS IS WITHOUT MERIT.

### A.   The Fair Housing Act and Code of Federal Regulations Do Not Mandate What Must Be Included in an AI.

Plaintiff alleges Minneapolis defrauded the Government by failing to include in its AI laws, regulations, local building, occupancy, health and safety codes, and demolition decisions.  Compl. at ¶¶56–59.  Plaintiff's allegations do not support a FCA claim because there are no regulations or requirements that Minneapolis include such elements in its AI.  Neither the Fair Housing Act nor the Code of Federal Regulations dictates what must be included in an AI.  As a grantee of fair housing grants, Minneapolis is required by HUD regulations to prepare AIs.   24 C.F.R. § 91.425(a)(1).   However, "HUD has not issued

regulations specifying how often grantees should update their AIs or the specific elements that should be included in them." Fussy Dec., Ex. 3 (Government Accountability Office Report).  It does not impose requirements on what specifically an AI must include, and therefore cannot support Relators' contention that Minneapolis failed to do conduct a legitimate AI.

Section 91.225(a)(1) of the Code states simply that:

Each jurisdiction is required to submit a certification that it will affirmatively further fair housing, which means that it will conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard.

*Id.*  In July 2013, HUD, in recognition of the lack of regulations regarding AIs, proposed a rule to establish that AIs include certain requirements.  Fussy Dec., Ex. 3. Therefore, no legal requirements currently exist for what must be included in an AI.

### B.    HUD's Fair Housing Planning Guide Only Suggests What Assessments an AI May Include.

While the Guide is regarded as persuasive authority, it does not require that the AI include certain analyses or assessments.  *See, e.g., U.S. ex rel. Anti-Discrimination Ctr. Of Metro New York v. Westchester Cnty., New York*, 495 F. Supp. 2d 375, 387 (S.D.N.Y. 2007) (noting that the guide should be persuasive in determining whether a jurisdiction must consider racial impediments); *U.S. ex*

*rel. Washington v. City of New Orleans*, CIV.A. 09-7244, 2012 WL 956497 at *3 (E.D.

La. Mar. 19, 2012) (noting that the Guide did not mandate an annual submission

of an AI). Instead, commensurate with its labeling as a Guide, it merely suggests

certain reviews and assessments that an AI should include in order to be

accepted by the reviewing authority. The Guide states that "the AI is a review of

impediments to fair housing choice in the public and private sector" and that

"[t]he AI involves:

> A comprehensive review of a State or Entitlement jurisdiction's
> laws, regulations, and administrative policies, procedures, and
> practices; An assessment of how those laws, etc. affect the location,
> availability, and accessibility of housing; An assessment of
> conditions, both public and private, affecting fair housing choice for
> all protected classes; An assessment of the availability of affordable,
> accessible housing in a range of unit sizes."

Fussy Dec., Ex. 1 (Fair Housing Planning Guide at 2-7).

The Guide further defines "impediments to fair housing choice" as "[a]ny

actions, omissions, or decisions taken because of race, color, religion, sex,

disability, familial status, or national origin which restrict housing choices or the

availability of housing choice," as well as "[a]ny actions, omissions, or decisions

which have the effect of restricting housing choices or the availability of housing

choices on the basis of race, color, religion, sex, disability, familial status, or

national origin." *Id.* at 2-8.

In describing what an AI "involves," the Guide does not use language such as "shall," or "must."   In other areas, the Guide does use this binding language.   For instance, the Guide states that "State-funded jurisdictions shall undertake FHP to develop proposed actions having measurable AFFH results at their local level."   *Id*. at 3-5.  The Guide also states that "[a]ll documentation must be available for public review."   *Id*. at 2-26.  These statements echo the law as written in the Code.  *See* 24 C.F.R. § 570.487 (requiring a State to ensure that a jurisdiction it is funding is affirmatively furthering fair housing); *id*. at § 91.5 (requiring certification documents to be kept open to the public).  In contrast, as noted above, there is no language in the Code that requires an AI to consist of certain reviews or assessments.   Correspondingly, no language is found in the Guide that requires an AI to consist of certain reviews or assessments.

### C.    The Code of Federal Regulations Does Not Dictate How Often a Frequency by which a Jurisdiction Must Update its AI.

Plaintiffs allege Minneapolis defrauded the government by failing to conduct a "required" AI from 2002-2009.   Compl. at ¶¶54–59.  This allegation fails to support Plaintiff's FCA because no regulations require an annual AI. Under Title 24 of the Code, a jurisdiction receiving a Community Development Block Grant (CDGB) is required to submit a Consolidated Plan 45 days before the start of its "program year."   24 C.F.R. § 91.15(a)(1).  Once a program year is established, the jurisdiction may either shorten or lengthen its program year to

change the beginning date of the following program year so long as it provides

notification to HUD.  *Id.*  While the Code clearly outlines when a Consolidated

Plan must be submitted, it does not give any similar direction for when an AI

must be updated.  Section 91.15(b) requires certifications to be submitted on an

annual basis, but no section requires a jurisdiction to file an AI—much less an

updated one—with each certification it forwards to HUD.  Instead, the

certification serves to verify that the jurisdiction is affirmatively furthering fair

housing, which itself requires only that the jurisdiction "will conduct an

analysis."  *Id.* at § 91.225.  At least one court has confirmed that the Code does

not mandate an annual submission of an updated AI.  In *Washington,* the plaintiff

alleged that New Orleans defrauded the federal government in part by failing to

submit an AI for an entire decade.  2012 WL 956497 at *1.  The court noted that it

could not "locate any legal authority mandating that a grant applicant or grantee

file an AI annually," and granted the City's motion to dismiss the complaint.  *Id.*

at *1, 3.

## II.   RELATORS' ALLEGATIONS OF INCREASING IMPEDIMENTS TO FAIR HOUSING FAILS TO MEET THE PLEADING STANDARDS REQUIRED BY THE FEDERAL RULES OF CIVIL PROCEDURE

Relators' Complaint should also be dismissed because it fails to satisfy the

pleading standards in the Federal Rules of Civil Procedure.

### A.    Federal Rule of Civil Procedure 12.

A complaint alleging causes of action under the False Claim Act ("FCA") must satisfy two pleading requirements.  First, the complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss for failure to state a claim must be granted where the complaint does not allege "enough facts to state a claim to relief that is plausible on its face" rather than merely "conceivable."  *Twombly*, 550 U.S. 570.  When ruling on a motion to dismiss for failure to state a claim, the court is required to presume all factual allegations to be true, and to make all reasonable inferences from the allegations in favor of the claimant.  *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994).

However, a pleading that is "a formulaic recitation of the elements of the cause of action" or offers "labels and conclusions" will not survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.  Nor will a complaint offering "naked assertion[s] 'devoid of' further factual enhancement."'  *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557). Federal Rule of Civil Procedure 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (citations omitted).  To survive, the complaint must state sufficient factual matter to "state

18

a claim to relief that is plausible on its face." *Id.* (*citing Twombly*, 550 U.S. at 557).

A claim has plausibility "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (*quoting Twombly*, 550 U.S. at 556).

Clarifying the "plausibility standard" first announced in *Twombly*, the *Iqbal*

Supreme Court concluded that "where the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the complaint has

alleged - but it has not [shown] - that the pleader is entitled to relief." *Id.*

(internal quotes and citations omitted). Stated differently, where a complaint

pleads facts that are "merely consistent with" a defendant's liability, it "stops

short of the line between possibility and plausibility of entitlement to relief." *Id.*

(*quoting Twombly*, 550 U.S. at 557).

An FCA claim must establish that a defendant:

(A)    Knowingly presents, or caused to be presented, a false or fraudulent
       claim for payment or approval;
(B)    Knowingly makes, uses, or causes to be used, a false record or
       statement material to a false or fraudulent claim;
(C)    Conspires to commit a violation of subparagraphs (A), (B), (D), (E),
       (F), or (G)…

31 U.S.C. §3729(a)(1)(A)(B) and (C).

Accordingly, "[w]ithout sufficient allegations of materially false claims, an

FCA complaint fails to state a claim on which relief may be granted." *U.S. ex rel.*

*Vigil v. Nelnet, Inc.*, 639 F.3d 791, 796 (8th Cir. 2011) (*citing Mikes v. Straus*, 274

F.3d 687, 697 (2d Cir. 2000) (the FCA "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions"); *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 886 (8th Cir. 2003), cert. denied, 540 U.S. 875 (2003) "([T]he falsehood in the claim must be material to the payment decision")).   At a minimum the FCA requires proof of an objective falsehood." *U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 Fed. App'x 980, 982–83 (10th Cir. 2005) (*citing Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1477–78 (9th Cir. 1996)); *see also United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008) (claims under the FCA "surely cannot be construed to include a[n] . . . action that is devoid of any objective falsehood").

Here, Relators' Complaint fails to provide any specific facts to support Minneapolis knowingly presented false claims. Instead, the Complaint is based on legal conclusions and false requirements.   Relators argue that Minneapolis failed to AFFH by failing to conduct an AI from 2002–2008, and by not including in its AI as to its laws, regulations, local building, health and safety codes and demolitions of slums and blights.   Compl. ¶¶ 56–58.   However, Relators fail to demonstrate a single instance in which an alleged failure to include those elements resulted in a reduction of occupied, or occupiable CDBG funded housing.   Relators failed to allege that Minneapolis knew it was required to

include any specific element, or update with any specific regularity without any requirement in the Code or regulations.  Moreover, there is no requirement that Minneapolis include those elements in its AI.

Relators allege that Minneapolis and St. Paul's Codes have "removed former affordable housing units from occupancy for extended periods of time and in many cases permanently.  Compl. at ¶ 95.  Relators do not provide even one specific example of a low-income provider or occupied or occupiable housing unit being affected by any of the regulatory burdens, policies, or actions they allege are used against low-income housing providers.  Nor do Relators allege that Minneapolis failed to replace any such property.  Instead, Relators argue, despite being an original source, it needs discovery to investigate in order to have the facts needed to support an FCA claim.  Compl. at ¶ 31.  *Twombly* does not require Minneapolis to engage in full discovery so that a Relator may one day establish a plausible claim.

Relators allege Minneapolis' laws, regulations, administrative policies, procedures and practices ("Public Sector actions") have not been the subject of any legitimate "AI" by Minneapolis as defined by HUD since 2001.  Relators also claim Minneapolis has since 2001 added "considerable additional layers of regulatory burdens to low-income," privately-owned protected class housing providers that have caused displacement of protected class members, interfered

with the housing choice and locational choice of protected class members, "disparately impacted" protected class members, and negatively affected the "return on investment" of housing providers and acted in ways to remove incentives for provision of privately-owned low-income rental housing in the City.  Compl. at ¶¶ 116–17.  Relators do not state with any specificity, or even one example, a violation of any subject matter pre-emption.  Additionally, with one exception, Relators do not state what code standard or policy Minneapolis enacted or enforced with any specificity.

Relators claim that Minneapolis' actions including "implementation of a rental licensing revocation ordinance" that has been used "in a punitive manner against low-income housing providers," which has resulted in the "displacement of a significant number of innocent 'protected class' tenants from their homes without any legitimate justification."  Compl. at ¶ 119.  Relators do not state with any specificity any such incident occurring, where such information demonstrates that Minneapolis knowingly disregarded pre-textual enforcement of the rental revocation ordinance, who or how many members of the "protected class" were displaced, or how Relators are the original source of such information.

Additionally, Relators claim that Minneapolis has a policy of cooperating with a "private energy company" to condemn "safe, decent and sanitary housing

stock without a legal basis" and refuse to "lift the condemnation orders even though licensed contractors quickly remedy any legitimate code issues."  Compl. at ¶¶ 122–23.  As with their other allegations, Relators fail to state with any specificity any such incident occurring; where such information demonstrates that Minneapolis knowingly disregarded pre-textual enforcement of the building ordinance, what Relators mean by "safe, decent and sanitary housing stock," or how Relators are the original source of such information.

Relators also claim that Minneapolis' actions include "repeated, retaliatory inspections on low-income rental units and buildings," "levying confiscatory administrative fees, penalties and assessments," and "levying excessive City inspection fees, permit fees, fines and assessments, including for tenant caused damage and conduct, all on private housing providers and many times based on flawed or otherwise illegal orders." Compl. at ¶¶ 124–26.  Here, Relators fail to identify with any specificity any such incident occurring and to whom it affected, that Minneapolis knowingly disregarded its housing policies and procedures, or how the actions were "retaliatory" or "excessive."  Id.

Finally, Relators allege that Minneapolis has a policy of "applying hair-trigger demolitions on low-income rental properties even though such properties are affordable, safe, decent and sanitary and occupied predominately by 'protected class' members."  Compl. at ¶ 127.  Relators claim that "Minneapolis

takes accelerated action to penalize owners and remove affordable housing stock owned by the private market where owners have made substantial investment in capital improvements and repairs to older buildings." *Id.* Additionally, Relators argue that "Minneapolis is quick to order demolition and assess fines and penalties and thereby make such housing unavailable where the owner could, without City interference, quickly make repairs required to the property by the State Building Code, Section 8 HQS, or Minneapolis's legitimate code provisions." Compl. at ¶ 128. As with their other allegations, Relators do not state with any specificity any such incident occurring, where such information demonstrates that Minneapolis knowingly disregarded pre-textual enforcement of the building code, or how Relators are the original source of such information.

Relators' Second Amended Complaint also fails when compared to another case where a qui tam relator asserted a FCA suit for false certifications for HUD funds. In *U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester County, New York*, 495 F. Supp. 2d 375 (S.D.N.Y. 2007), the complaint alleged that the county violated the FCA by submitting false certifications to obtain HUD funds. *Id.* at 387. The complaint also explained that these certifications were knowingly false because when Westchester County failed to consider race when analyzing housing opportunities, it was not furthering fair housing as required under the applicable statutes. *Id.* at 387. The Complaint

alleged that Westchester's employees acknowledged to the relator that its demographic analysis for the purpose of identifying impediments to fair housing did not encompass race, but only examined housing needs based on income. *Id*. Westchester admitted that it does not take race into account as an impediment to fair housing. *Id*. According to the complaint, Westchester "did not engage in any independent analysis or exploration of impediments," and "refused to identify or analyze [community resistance to integration on the basis of race and national origin] as an impediment."

The Court denied Westchester's motion to dismiss. It concluded that allegations that Westchester certified that it was affirmatively furthering fair housing in compliance with the Fair Housing Act and the Civil Rights Act of 1964 (which seek to prohibit discrimination on the basis of race), but also utterly failed to take race into account in furthering fair housing, sufficiently stated a claim under the FCA:

> . . . Westchester's argument that it had no duty to consider race or race discrimination when identifying impediments to fair housing choice must fail. At a minimum, when a grantee certifies that the grant will be "conducted and administered" in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and certifies that it "will affirmatively further fair housing," the grantee must consider the existence and impact of race discrimination on housing opportunities and choice in its jurisdiction. In identifying impediments to fair housing choice, it must consider impediments erected by race discrimination, and if such impediments exist, it must take appropriate action to overcome the effects of those impediments.

> The complaint alleges that Westchester violated the FCA when it submitted a false certification to obtain federal funds. It alleges that Westchester did not consider the existence and impact of race discrimination on housing opportunities and choice but nonetheless certified that it would administer its grant in conformity with the two governing statutes and would affirmatively further fair housing. This is sufficient to state a claim.

*Westchester*, 495 F. Supp. 2d at 387.

Here, unlike the *Westchester* complaint, Relators only provide legal conclusions and general statements of fraud and conspiracy. *See* Compl. ¶ 2. There is no smoking gun of knowing violations alleged like the admission by Westchester officials.

## B.    Federal Rule of Civil Procedure 9(b).

Because FCA claims are grounded in fraud, Rule 9(b)'s heightened pleading standard requires that the alleged violations of the FCA be plead "with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  A party must state with particularity the circumstances constituting fraud. *See U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.,* 441 F.3d 552, 555 (8th Cir. 2006), cert. denied, 549 U.S. 881 (2006) (*quoting Nelnet, Inc.,* 639 F.3d at 794).  If the Complaint alleges a "systematic practice of submitting fraudulent claims, the FCA complaint 'must provide some representative examples of [the] alleged fraudulent conduct,' specifying 'the time, place, and content of the defendant's false representations, as well as details of the defendant's acts, including when

the acts occurred, who engaged in them, and what was obtained as a result."' *U.S. ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009) (*quoting Joshi*, 441 F.3d at 556–57); *accord U. S ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496, 506 (6th Cir. 2008).

The particularity standard is a higher degree of notice than what is required for other claims. *Costner*, 317 F.3d at 888. Rule 9(b)'s particularity requirement is "intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *Id.* (citations omitted); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (stating the purpose of Rule 9(b) is to "alert[ ] defendants to the precise misconduct with which they are charged and protect[ ] defendants against spurious charges . . .") (internal quotations and citations omitted).

Relators' Complaint fails to satisfy Rule 9(b)'s heighted pleading requirement. Never do the Relators provide the requisite "who, what, where, when, and how." *Joshi*, 441 F.3d at 556 (citations omitted). If the FCA complaint alleges a "systematic practice of submitting fraudulent claims, the complaint 'must provide some representative examples of [the] alleged fraudulent conduct,' specifying 'the time, place, and content of the defendant's false representations, as well as details of the defendant's acts, including when the acts occurred, who engaged in them, and what was obtained as a result. *U.S. ex rel*

*Roop v. Hypoguard USA, Inc., et al.*, 559 818, 822 (8th Cir. 2009).   A relator must also pled how he learned of the false representations.   The Complaint contains only conclusory allegations that the City "knowingly" or "acted with deliberate indifference and/or reckless disregard for the truth or falsity" by

falsely representing every year through the Local Grantee Certifications, Actions Plans and CAPER filings and other statements and submissions . . . that [Minneapolis was] in compliance with federal laws and regulations requiring Defendants to [affirmatively further fair housing], which is a core prerequisite to eligibility the CDBG and NSP funds, and other funds from the United States. Compl. at ¶¶ 34-37.  But "conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002) (citations omitted). Moreover, the Complaint is silent as to how Relator knows these alleged false representations were made and whether these representations were material to the Government's payment decision.  *Vigil*, 639 F.3d at 796.  Because Relators have failed to sufficiently plead their FCA claims there Complaint is deficient under Rule 9(b), and should be dismissed.

### C.   Relators Have Not Sufficiently Pled Scienter.

Even if Relators had alleged a specific, false claim with the requisite particularity, his complaint would fail for an independent reason: Relators have

failed to allege sufficient facts to plausibly suggest that any Defendant knowingly made any false claim. The FCA prohibits only "knowingly" making false claims to the government. *Roop*, 559 F.3d at 822. Consequently, "'innocent mistakes, mere negligent misrepresentations and differences in interpretations' will not suffice to create liability." *U.S. ex rel. Onnen v. Sioux Falls Independent School Dist. No. 49–5*, 2011 WL 4433163, *4 (D.S.D. Sept. 21, 2011) (*quoting United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1176 (9th Cir. 2006)). Therefore, in order to state a claim under the FCA, a relator must allege facts sufficient to show that the defendant acted with the requisite scienter. While Rule 9(b)'s particularity requirement does not apply to averments of "intent, knowledge, and other conditions of a person's mind," allegations of scienter must nevertheless meet the essential pleading requirements of Rule 8. That is, they must be supported by "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Vigil*, 639 F.3d at 796 (quoting *Iqbal*, 556 U.S. at 578). In order to meet this standard, a complaint must plead factual details showing the plaintiff's right to relief. "'[N]aked assertions' devoid of factual enhancement will not suffice" to state a claim. *Hamilton v. Palm*, 621 F.3d 816, 817–18 (8th Cir. 2010).

Relators have not alleged any facts—let alone sufficiently particular facts— to support a plausible inference that the City knowingly submitted a false claim

to the government.   The FCA is not concerned with accidents or mistakes; it applies only to "intentional, palpable lie[s]."   *Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).

### III.   THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS MATTER BECAUSE RELATORS CANNOT OVERCOME THE PUBLIC DISCLOSURE BAR.

Even if this Court finds that Relators' allegations have merit and meet the pleading standards, Relators' Complaint must still be dismissed under Federal Rule of Civil Procedure 12(b)(1).   The FCA's public disclosure bar deprives this Court of subject matter jurisdiction where, as here, the lawsuit is based on "allegations or transactions" that have been "publicly disclosed," and the relator is not "an original source of the information." 31 U.S.C. § 3730(e)(4). Accordingly, the threshold question in a FCA case is whether the statute bars jurisdiction.   *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467 (2007) (noting that the statute is "jurisdictional").   Relators, as the parties invoking federal jurisdiction, bear the burden of establishing this Court's subject matter jurisdiction.   *Hays v. Hoffman*, 325 F.3d 982, 987 (8th Cir. 2003*) (citing Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994)).

The public disclosure bar relates to the purpose of the act, to encourage individuals who are either close observers or involved in the fraudulent activity to come forward, and is not intended to create windfalls for people with

secondhand knowledge of the wrongdoing.  *Hays*, 325 F.3d at 986–87.   In the Eighth Circuit, the public disclosure bar requires a three-tiered inquiry: (1) the Court must first determine whether there has been a prior "public disclosure"; (2) if so, the Court must determine whether the allegations in the *qui tam* suit are "based upon" the public disclosure. If the Court answers both questions affirmatively, then (3) the Court must determine whether the relator is an "original source" of each public disclosure on which the allegations are based. *United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003); *Hays*, 325 F.3d at 987.

As a threshold matter, this Court must determine which version of the FCA public disclosure bar applies here, because the statute's public disclosure bar language was amended by the Patient Protection and Affordable Care Act of 2010, Pub.L. 111–148, 124 Stat. 119 (effective July 22, 2010).   Those amendments, however, do not apply retroactively.  *See Graham Cnty. Soil and Water Conservation Dist. v. United States ex. rel. Wilson*, 559 U.S. 280, 283 n. 1 (noting the "legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a *qui tam* suit").

The jurisdictional bar of the FCA in place before the 2010 amendments read as  follows:

(4) (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing the action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A) and (B) (2008). The amended public disclosure

provision reads:

(4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions,

and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(A) and (B) (2010). Regardless of the changes, Relators cannot overcome the public disclosure bar under either version of the statute.

### A. The Pre-Amendment Version of the Statute Applies to the Majority of the Alleged "False Claims Period" Because the Complaint Defines the "False Claims Period" as 2005 to 2011.

The pre-amendment version of the public disclosure bar applies to the majority of the Alleged "False Claims Period" because the statute was amended in 2010, and the Relators identify the False Claims Period as 2005 to 2011. *See* Relators' Second Amend. Compl. (Doc. 173) at ¶ 1. Because the 2010 amendments do not apply retroactively, *Graham Cnty.*, 559 U.S. at 283 n. 1, the previous version of the statute applies to any alleged false claims made before March 23, 2010, and the amended version to any false claims made thereafter. *See, e.g., U.S. ex rel. Osheroff v. Humana, Inc.*, 2012 WL 4479072, *4, n. 8 (S.D. Fla. Sept. 28, 2012) (discussing the applicability of the 2010 amendments).

Relators cannot satisfy the pre-2010 version of the public disclosure bar. The FCA was intended to encourage private enforcement suits by legitimate whistleblowers while barring suits by opportunistic *qui tam* plaintiffs who base their claims on matters that have been publicly disclosed by others. *See generally Minn. Ass'n of Nurse Anesthetists, United States ex rel. v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1040–43 (8th Cir. 2002).

1.    There was a Prior "Public Disclosure."

Under the FCA, a "public disclosure" occurs if the allegation of fraud originates in a criminal, civil, or administrative hearing; a federal or state congressional, administrative or government report, hearing, audit, statement, or investigation; or the "news media."  31 U.S.C. § 3730(e)(4)(A)(i)–(iii) (2008).  The jurisdictional bar to an FCA claim arises "only when the essential elements comprising the fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud." *U.S. ex rel Hixson v. Health Mgmt. Sys.*, 613 F.3d 1186, 1188 (8th Cir. 2010) (quotations omitted).  Stated differently, to raise the bar, public disclosures must reveal "both the true state of facts and that the defendant represented the facts to be something other than what they were." *Nurse Anesthetists*, 276 F.3d at 1044.  A prior lawsuit is considered a "civil . . . hearing" and therefore the same allegations in a prior lawsuit constitute a prior public disclosure for a FCA claim.  *See U.S. ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 513 (6th Cir. 2009) (noting that a filed complaint was "clearly a 'public' disclosure").

The Eighth Circuit recently affirmed a district court's dismissal of a relator's FCA claim because the relator was not an original source of fraud allegations that were based on publicly disclosed information.  *U.S. ex rel Newell v. City of St. Paul*, 2013 WL 4529353, *1, (8th Cir. Aug. 28, 2013).  In that case, the

34

relator brought a complaint with HUD alleging that St. Paul falsely certified compliance with Section 3 of the Housing and Urban Development Act of 1968 and its applicable regulations.  *Id.*  While the HUD complaint was pending, the relator filed a *qui tam* action under the FCA.  *Id.*  The issue was whether both the true state of facts (St. Paul's non-compliance) and the misrepresentation of facts (the City certifying compliance to HUD) were publicly disclosed before the relator brought his *qui tam* action.  *Id.* at *2.  The Eighth Circuit found that the relator's FCA allegation was publicly disclosed when he obtained the St. Paul's compliance documents from HUD under the Freedom of Information Act (FOIA) and when he publicized an internal memorandum at a public City Council hearing.  *Id.* at 3 (citing *Schindler Elevator Corp. v. U.S. ex rel Kirk,* 131 S.Ct. 1885, 1896 (noting that agency responses to FOIA requests by a relator are "reports within the meaning of the public disclosure bar").

Here, the Relators' allegations of fraud are identical to those asserted in *Smithrud* in 2010.   Smithrud alleged that "The City, despite its annual certifications filed under its legal duties associated with the Federal Fair Housing's "Analysis of Impediments" ("AI"), stated in essence under oath, that the City:

    A. Never considered the disparate impacts it was causing;
    B. Swore under oath that it was considering such impacts;
    C. Swore under oath that there were no such disparate impacts and
    that the City's own violations of the State Building Code were either

excused as attempts to provide safe housing or were not material as impediments having any disparate impacts

*Smithrud* Compl. at ¶ 37.  Smithrud continued that Minneapolis "falsely sought and received . . . from 2005–2010 millions of Dollars in HUD CDBG funds" that Minneapolis would not have received "if the AI's (sic) were true and correct, not false, and when [Minneapolis] knew it had not provided nor been supplied with any AI between 2001 to 2009." *Id.* at ¶ 38.  Smithrud also asserted that Minneapolis "knowingly and intentionally allowed for the demolition of the property at DuPont" despite authority that prohibited Minneapolis from "changing or deviating from the State Building Code's applicable provisions as stated by subject matter and in amendments to the Code." *Id.* at ¶ 40.  Smithrud alleged that the demolition of his property was caused by the City's illegal policies and procedures. *Id.* at ¶ 46.  Smithrud stated that Minneapolis has an affirmative duty to further federal fair housing and to consider the impact decisions can make on protected classes and older, grandfathered-in housing stock. *Id.* at ¶52.

In addition, the allegations in this lawsuit are based upon documents that have been publicly available on the City's website or the Met Council's website. The "allegation" that the CAPERS, CONPLANS and AIs do not contain particular information would be equally known to anyone.  Allegations of fraud are publicly disclosed when they are placed in the "public domain." *See, e.g.,*

36

*Graham Cnty.*, 559 U.S. at 287–89 (broadening what activities are included as public disclosures under the term "administrative"); *United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990) (discussing what constitutes public disclosure). This requirement precludes "'*qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator. . ..'" *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993) (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Insurance Co.*, 944 F.2d 1149, 1155–56 (3d Cir. 1991)).

2. <u>The Allegations in the *Qui Tam* Suit are "Based Upon" the Public Disclosure.</u>

In *Newell*, the Eighth Circuit rejected the relator's argument that his fraud allegations were not "based upon" the FOIA request and an internal memorandum that he publicized. *Newell*, 2013 WL 4529353 at *3. The relator argued that he was aware of St. Paul's noncompliance before the internal memorandum was released, the FOIA responses 'only furthered [his] existing independent knowledge of' St. Paul's violations, and he did not assert a claim of fraud in the previous suit. *Id.* The court noted that a complaint is "based upon" the public disclosure "whenever the allegations in the suit and in the disclosure are the same, regardless of where the relator obtained his information." *Id.* (citing *Nurse Anesthetists*, 276 F.3d at 1045 (quotations omitted)). Therefore, the

37

court held that whether the relator obtained the publicly disclosed information independent of these sources went to "whether he was an original source, not to whether his *qui tam* claims were based on that information." *Newell*, 2013 WL 4529353 at *3.

Here, it is clear that the allegations in the Complaint are the same as those in *Smithrud* and in the publicly disclosed documents. Therefore, as in *Newell*, Relators' claims are without merit to the extent they argue their FCA allegations are not based upon the *Smithrud* and the publicly disclosed documents.

3.     Relators are not the "Original Source" of the Public Disclosure
       on which the Allegations are Based

Even if the false claim allegations were publicly disclosed, a *qui tam* claim is not barred by § 3730(e)(4)(A) to the extent Relators are the original source of the publicly disclosed information. Prior to the amendment, an "original source" was defined as an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action . . . based on the information." 31 U.S.C. § 3730(e)(4)(B). "That means direct and independent knowledge of the information on which his fraud allegations are based, not the information on which the publicly-disclosed allegations were based." *Newell*, *Newell*, 2013 WL 4529353 at *4. "Independent knowledge" is "knowledge not derived from the public disclosure." *Nurse Anesthetists*, 276 F.3d at 1048. "Direct

knowledge" is first-hand knowledge; "a person who obtains secondhand information from an individual who has direct knowledge does not himself possess direct knowledge and therefore is not an original source under the [FCA]." *Newell*, 2013 WL 4529353 at *4 (citations omitted).  "A whistleblower sounds the alarm; he does not echo it."  *Hagood*, 81 F.3d at 1475 (quotation omitted).

In *Newell*, the Eighth Circuit held that the relator failed to establish that he had direct and independent knowledge of the information underlying his fraud allegations.  *Newell*, 2013 WL 4529353 at *4.  The court noted that most of that relator's information was derived from the publicly disclosed information and discussions with current and former St. Paul employees.  The court also found that the relator's previous experience attempting to secure Section 3-covered work and his interest in the subject matter did not qualify him as an original source for the purposes of the public disclosure bar.  *Id.* (citing *In re Natural Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009) ("The fact that a relator has background information or unique expertise allowing him to understand the significance of publicly dislosed allegations and transactions is also insufficient); *Hays*, 325 F.3d at 990 (rejecting a catalyst theory)); *accord U.S. ex rel. Ondis v. City of Woonsocke*t, 587 F.3d 49, 59 (1st Cir. 2009).

As noted above, *Smithrud* and the City's own documents are the original sources of the allegations here.  In addition, the Original Verified Complaint lists Don Hedquist and certain state or FHIC employees as sources of former relator Blodgett's "suspicions."  Articles on the weblog landlordpolitics.com raised the same issues for years.  Neither Relators' experiences as landlords nor Relator Andrew Ellis's experience as a city inspector qualify them as an original source for the purposes of the public disclosure bar.  The Complaint asserts no specific facts known by any of the Relators that show direct and independent knowledge of the allegations in this case.

**B.      Relators Also Cannot Satisfy the Amended Public Disclosure Bar.**

1.      <u>There was a Prior "Public Disclosure."</u>

Relators also cannot overcome the public disclosure bar under the amended public disclosure provision for the alleged "False Claims Period" of March 23, 2010 to 2011.  Section 3730(e)(4)(A)(i)–(iii) (2010) explicitly requires the dismissal of a claim if it is based on substantially the same allegations that were publicly disclosed in either a hearing in which the "Government" is a party, some other Federal "hearing," or in the "news media."  Relators' allegations have previously been publicly disclosed in each such context.  In *Smithrud*, the plaintiff alleged the same essential allegations as the Relators here—that the City provided false information to HUD regarding AIs and AFFH for the purpose of

obtaining federal fair housing funds.  *Smithrud* satisfies the public disclosure requirement as involving both a "Government" party and a Federal "hearing" under the amended statute.

Furthermore, as discussed above, the allegations in this lawsuit are based upon documents that have been publicly available on the City's website or the Met Council's website. Therefore, the "allegation" that the CAPERS, CONPLANS and AI's do not contain particular information would be equally known to anyone.  "[A]llegations of fraud are publicly disclosed when they are placed in the "public domain."  *Dick,* 912 F.2d at 18.  The information was equally available to all, therefore it fails.  *Kreindler,* 985 F.2d at 1158.

> 2.   The Allegations in the *Qui Tam* Suit are "Based Upon" the Public Disclosure.

A complaint is "based upon" the public disclosure "whenever the allegations in the suit and in the disclosure are the same, regardless of where the relator obtained his information." *Nurse Anesthetists,* 276 F.3d at 1045-47 (quotation omitted); *accord Newell*, 2013 WL 4529353 at *3.  Again, it is clear that the allegations in the Complaint are the same as those in *Smithrud* and in the publicly-available documents.

> 3.   Relators are not the "Original Source" of the Public Disclosure on which the Allegations are Based.

Under the amended statute, an "original source" is defined as an individual who"[1] prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). *Smithrud*, Hedquist and some state employees are the original sources of the "allegations of fraud."

Relators can satisfy neither of these definitions of an original source. Like the relator in *Newell*, the Relators do not identify any fact, observation or information independently known or offered by Relators which supports or serves as the basis for this lawsuit. *Newell*, 2013 WL 4529353 at *4. The Relators did not disclose the actual allegations to the Government before the public disclosure alleged above, nor do their disclosures materially add to the publicly disclosed allegations or transactions. As such, the Relators are not the original source, and this action is barred.

## CONCLUSION

For the foregoing reasons, Minneapolis respectfully requests this Court grants its motion in its entirety.

Dated: October 16, 2013                    SUSAN L. SEGAL
                                          Minneapolis City Attorney

By:

_____s/ Tracey Fussy_____
TRACEY N. FUSSY (0311807)
SARA J. LATHROP (310232)
Assistant City Attorneys
350 South Fifth Street, Suite 210
Minneapolis, MN  55415
612-673-2254
Attorneys for Defendant City of
Minneapolis