# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### Civil Action No. 11-cv-00416 (PJS/TNL)

United States of America, ex rel.
Andrew  Ellis, *et al.*,

        Relators,            **REPORT & RECOMMENDATION**

      v.

City of Minneapolis, *et al.*,

        Defendants.

---

Ann M. Bildsten, **United States Attorney's Office**, 300 S. 4th Street Suite 600, Minneapolis, Minnesota 55415, for the Government;

Paul F. Shoemaker and John R. Shoemaker, **Shoemaker & Shoemaker, PLLC**, Highland Bank Building, Suite 410, 5270 West 84th Street, Bloomington, Minnesota 55437, for Relators;

Tracey N. Fussy and Sara J. Lathrop, **Assistant City Attorneys**, 350 South Fifth Street, Suite 210, Minneapolis, MN 55415, for Defendant City of Minneapolis; and

Judith A. Hanson, **Assistant City Attorney** and Portia Hampton-Flowers, **Deputy City Attorney**, 750 City Hall and Courthouse 15 West Kellogg Boulevard, Saint Paul, MN 55102, for Defendant City of St. Paul.

---

## I.  INTRODUCTION

This matter is before the Court, Magistrate Judge Tony N. Leung, on Defendant City of Saint Paul's ("St. Paul") Motion to Dismiss or Alternatively for Summary Judgment (ECF No. 174) and Defendant City of Minneapolis's ("Minneapolis") Motion to Dismiss (ECF No. 182). These actions have been referred to the undersigned magistrate judge for report and recommendation to the Honorable Patrick J. Schiltz, United States District Court Judge for the District of Minnesota, under 28 U.S.C. § 636 and Local Rule 72.2(b). Based upon the files, records and proceedings herein, this Court will recommend that the motions be granted.

## II. BACKGROUND

### A. Procedural Summary

On February 18, 2011, Relators Andrew Ellis and Harriet Ellis ("Relators"), along with former Relator Michael W. Blodgett, jointly filed this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, against St. Paul, Minneapolis, the Metropolitan Council, and various John and Jane Does. (ECF No. 1.)

In March of 2012, Blodgett filed a Motion to Amend the Complaint before the issuance of the summons in this matter. (ECF No. 14.) In June of 2012, the United States Government declined to intervene. (ECF No. 15.) Summonses were issued in July of 2012. In August of 2012, each Defendant filed a Motion to Dismiss or Alternatively for Summary Judgment. (ECF Nos. 19, 21, 23.) On August 21, 2012, Blodgett's Motion to Amend the Complaint was denied without prejudice because it was not signed by Andrew or Harriet Ellis, did not comply with Local Rule 7.1, and violated Federal Rule 8(d)(1). (ECF No. 25.) Following the Court's denial of Blodgett's Motion to Amend, each Defendant filed a letter with the Court withdrawing its motion to dismiss because they had only been served with the original Complaint. (ECF Nos. 28, 29, 30.)

In September of 2012, Relators filed proof of service of the Summonses on each Defendant. (ECF Nos. 36, 37, 38.) Through a series of filings in September and October, Blodgett moved the Court for leave to file a Second Amended Complaint and to dismiss Harriet and Andrew Ellis as relators. (ECF Nos. 34, 53, 57.) In October, each Defendant filed another Motion to Dismiss or Alternatively for Summary Judgment. (ECF Nos. 39, 41, 47.)

On December 21, 2012, the Court denied Blodgett's Motion to Amend and Defendants' various motions. The Court warned, however, that it would dismiss the action if Relators failed

to submit an amended complaint that complied with Local and Federal Rules by January 31, 2013. (ECF No. 125.)

On January 31, 2013, without first seeking leave of the Court, Relators and Blodgett filed separate amended complaints. (ECF Nos. 127, 129.) The Court struck both amended complaints and gave the Relators one last chance to file jointly an amended complaint or a motion to sever by February 28, 2013. (ECF No. 136.)

On February 28, 2013, Blodgett filed a Motion to Sever Relators from the case. (ECF No. 137.) In response, Relators requested the following: (1) either (a) Blodgett's Motion to Sever be considered a dispositive motion and briefed as such according to the Local Rules, or (b) a one-week extension to file an opposing brief and accompanying affidavits; (2) the Court consider appropriate sanctions against Blodgett and his counsel for violating Local Rule 1.3 and Rule 11; and (3) leave to move for dismissal of Blodgett as a co-relator. (Letter 4-5, ECF No. 147.) The Court denied Relators' request to treat Blodgett's motion as dispositive, but allowed Relators time to file a response to Blodgett's motion and granted Relators' request to file a motion to sever Blodgett. (ECF No. 153.)

The Court heard oral argument on Blodgett's Motion to Sever on April 18, 2013, (*see* ECF. No. 156), and on July 12, 2013, the undersigned denied the motion (ECF No. 157). Blodgett objected to the Order. (ECF No. 160.) Judge Schiltz overruled the objection and dismissed Blodgett from the case. (ECF No. 172.)

On October 2, 2013, Relators filed a Second Amended Complaint ("SAC") against Minneapolis and St. Paul. (ECF No. 173.) As a result, Defendants Metropolitan Council and John and Jane Does were terminated from the proceeding. In October of 2013, St. Paul filed a Motion to Dismiss or Alternatively for Summary Judgment (ECF No. 174) and Minneapolis filed

a Motion to Dismiss (ECF No. 182). The undersigned heard oral argument on the motions. (*See* ECF No. 215.)

### B.  Summary of Relators' Claims

Relators brought three claims against the Defendants under the FCA.  Count I alleges that the Defendants "knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval in connection with the submission of their requests for federal housing and community development grants and other related funding" in violation of 31 U.S.C. § 3729(a)(1)(A). (SAC ¶ 160, ECF No. 173.) Count II alleges that the Defendants "knowingly made, used, and caused to be made and used, false records and statements material to the false or fraudulent claims for federal housing and community development grants and other related funding" in violation of 31 U.S.C. § 3729(a)(1)(B). (*Id.* ¶ 171.) Lastly, Count III alleges that the Defendants conspired to violate 31 U.S.C. § 3729(a)(1)(C) in violation of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B). (*Id.* ¶ 181.)

In order to receive federal housing and community development-related funding from the Department of Housing and Urban Development ("HUD"), grantees must comply with HUD's detailed regulatory requirements. These requirements differ depending on the type of grant, but can include items such as a consolidated plan, annual action plan, annual performance reports, and an analysis of impediments. *See* 24 C.F.R. §§ 91.5, 91.220, 91.225(a)(1), 91.520.

When a grantee submits an application, plan, report, or analysis to HUD, they must certify that, among other things, "the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 [42 U.S.C. § 200a *et seq.*] and the Fair Housing Act [42 U.S.C. § 3601 *et seq.*], and the grantee will affirmatively further fair housing." 42 U.S.C. § 5304(b)(2) (alterations in original). In its regulations, HUD defines the duty to affirmatively further fair

housing as requiring the grantee to "conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225(a)(1). The heart of Relators' claims is that the Defendants falsely certified to HUD on an annual basis that they were fulfilling these three obligations in order to receive federal housing funds. (*See* SAC ¶ 35.)

## III. DISCUSSION

### A. Motions to Dismiss

Both Defendants have moved to dismiss Relators' Second Amended Complaint. St. Paul argues that because Relators' claims are based on the same underlying facts as an earlier action and Relators are not the original source of the publicly disclosed information, this Court does not have subject matter jurisdiction. St. Paul also asserts that the Second Amended Complaint fails to state a claim for which relief may be granted and fails to plead fraud with particularity.

For its part, Minneapolis argues that Relators' claims fail because the federal regulations do not mandate what an analysis of impediments must contain. Minneapolis also argues that the Second Amended Complaint fails to meet the general pleading standard under Rule 8(a)(2) and the particularity requirement under Rule 9(b). Lastly, Minneapolis argues that this Court lacks subject matter jurisdiction because the claims were publicly disclosed and Relators are not the original source of the information.

### B. Standard of Review

St. Paul and Minneapolis have moved to dismiss this case under Federal Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. Because Defendants' challenges to this Court's jurisdiction do not address "the factual truthfulness" of

Relators' allegations, *Sierra Club v. Clinton*, 689 F. Supp. 2d 1147, 1154 (D. Minn. 2010) (citation omitted), the challenges are facial. Accordingly, the "standard of review is the same standard [that courts] apply in Rule 12(b)(6) cases." *See Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). Therefore, regardless of whether this Court analyzes the Defendants' motions to dismiss under Federal Rule 12(b)(1) or Rule 12(b)(6), the Court will assume all facts in the pleadings are true and view them in the light most favorable to the non-moving party. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). The Court will give "no effect," however, "to conclusory allegations of law." *Stalley*, 509 F.3d at 521. "A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)." *United States ex rel. Newell v. City of Saint Paul, Minn.*, Civ. No. 09-1177 (DWF/TNL), 2012 WL 2979061, *3 (D. Minn. July 20, 2012), *aff'd* 728 F.3d 791 (8th Cir. 2013), *cert. denied*, 134 S. Ct. 1284 (2014).

It is the relators' burden to "assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right." *Stalley*, 509 F.3d at 521 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *see also Newell*, 728 F.3d at 795. Moreover, because the FCA is an anti-fraud statute, the complaint must comply with the particularity requirement in Rule 9(b). *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). Rule 9(b) requires the pleader to provide facts such "as the time, place and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Id.* In other words, "the complaint must identify the 'who, what, where, when and how' of the alleged fraud." *Id.*

(quoting *United States ex rel. Costner v. USR Consultants, Inc.*, 317 F.3d 883, 888 (8th Cir. 2003)). The Court will address the jurisdictional question first. *E.g.*, *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567-68 (E.D.N.Y. 2011).

### C. The Court Does Not Have Subject Matter Jurisdiction Over Counts I and II Alleged Against St. Paul and Minneapolis

The FCA authorizes private citizens to bring claims on behalf of the United States against those who have committed fraud against the federal government. 31 U.S.C. § 3730(b). In return for exposing the fraud, the citizen receives a portion of the proceeds from the action. 31 U.S.C. § 3730(d).  Certain provisions within the FCA limit courts' subject matter jurisdiction over FCA claims.  Pursuant to 31 U.S.C. § 3730(b)(5), courts do not have jurisdiction over a *qui tam* action that is "based on the facts underlying [a] pending action." And pursuant to § 3730(e)(4)(A), courts lack jurisdiction over *qui tam* suits based upon "allegations or transactions" that have been publicly disclosed, unless the relator is the "original source of the information." This jurisdictional scheme "is designed to promote private citizen involvement in exposing fraud against the government, while at the same time prevent parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud." *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1511 (8th Cir. 1994).

### 1. The Applicable Public-Disclosure Statute

Relators assert that the Defendants submitted false claims at various times between February 18, 2005, and February 18, 2011. (SAC ¶ 14, ECF No. 173.) The FCA, however, divests courts of jurisdiction over any action where substantially the same transactions as alleged in the action were publicly disclosed. 31 U.S.C. § 3730(e)(4). This public-disclosure bar was amended on March of 23, 2010, and the amendments became effective on July 22, 2010. Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119 (2010) (codified as amended 31 U.S.C. § 3730(e)(4)).

Consequently, to analyze the Defendants' arguments that public disclosure of the underlying transactions divests this Court of jurisdiction over Relators' claims, the Court must determine which version of the public-disclosure bar applies to which claim.

Relators argue that the amended public-disclosure bar applies to all of their claims because "the Court must consider the FCA statute as it existed at the time this action was initiated on February 18, 2011, almost eleven months after the statutory amendment." (Relators' Mem. in Opp'n to Minneapolis 22, ECF No. 202; Relators' Mem. in Opp'n to St. Paul 36, ECF No. 207.) Defendants argue that the amendment is not retroactive and, therefore, the pre-amendment public-disclosure bar applies to all of the allegedly false claims made or submitted for payment before July 22, 2010.

There is a well-founded "presumption against retroactive legislation." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997). "The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal. Accordingly, [courts] apply this time-honored presumption unless Congress has clearly manifested its intent to the contrary." *Id.* (internal quotations omitted). When amending the public-disclosure bar, Congress "ma[de] no mention of retroactivity." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010). The Court, therefore, will apply the pre-amendment version of the public-disclosure bar to the allegedly false certifications submitted before the effective date of the statute—July 22, 2010—and the amended version of the public-disclosure bar to certifications submitted thereafter. *See United States ex rel. Lockey v. City of Dallas, Tex.*, Civ. No. 3:11-CV-354-O, 2013 WL 268371 (N.D. Tex. Jan. 23, 2013).

In the Second Amended Complaint, Relators broadly allege that Defendants submitted false claims for payment between February 18, 2005, and February 18, 2011. (SAC ¶ 14, ECF No. 173.) Specifically, they allege that St. Paul submitted false documents to the United States on April 11, 2005, April 14, 2006, April 14, 2007, April 16, 2008, April 16, 2009, and April 16, 2010. (SAC ¶ 30.) Relators do not allege that St. Paul submitted false certifications after the amended public-disclosure bar took effect. Because Relators fail to allege that St. Paul submitted false claims after July 22, 2010, the pre-amendment public-disclosure bar applies to Relators' claims against St. Paul.

With respect to their claims against Minneapolis, however, Relators specifically allege that Minneapolis submitted false documents on April 11, 2005, in April of 2006, on April 13, 2007, April 15, 2008, December 1, 2008, April 15, 2009, June 5, 2009, April 15, 2010, and February 16, 2011.  (SAC ¶¶ 28, 141, ECF 173)  Accordingly, the amended public-disclosure bar applies to Relators' claim against Minneapolis based on the document submitted on February 16, 2011 ("2011 claim"), and the pre-amendment public-disclosure bar applies to the rest.

### 2. The Pre-Amendment Allegations Against St. Paul and Minneapolis Were Publicly Disclosed

The pre-amendment public-disclosure bar provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006).  When faced with a public-disclosure question, courts must ask: (1) whether the allegations were publicly disclosed before the current *qui tam* action was brought; (2) if so, whether the current *qui tam* action is based upon the previous public

disclosure; and (3) if so, whether the relator in the current *qui tam* action is the original source of the information.  *United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003).

An FCA claim is barred "when the essential elements comprising the fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud." *Newell*, 728 F.3d at 796 (quotation omitted). In other words, the public disclosure "must reveal both the true state of facts and that the defendant represented the facts to be something other than what they were."  *Id*.  Under the pre-amendment public-disclosure bar, documents were publicly disclosed when they were filed in prior actions with the court.  *See* 31 U.S.C. § 3730(e)(4)(A) (2006).

According to the Second Amended Complaint, between February 18, 2005, and February 18, 2011, each Defendant obtained $125 million in Community Development Block Grant funding, Neighborhood Stabilization Program funding, and related federal funding by certifying to the federal government that they were affirmatively furthering fair housing.  (SAC ¶¶ 18-19, 35-36, 73,141, 143.)  The duty to affirmatively further fair housing requires grant recipients to (1) conduct an analysis of impediments, (2) take actions to eliminate the impediments that exist, and (3) create or maintain records reflecting the analysis or actions taken. 24 C.F.R. § 91.225(a)(1).  Relators allege that the certifications were fraudulent because the Defendants were not actually affirmatively furthering fair housing.  (SAC ¶¶ 40, 54.)

Throughout the Second Amended Complaint, Relators allege that the Defendants failed to fulfill the second and third requirements. (*Id.* ¶¶ 54, 68, 77.) The main allegation, however, is that the Defendants misrepresented the extent of their compliance by failing to conduct analyses of impediments that comply with HUD's Fair Housing Planning Guide ("the Guide"). Relying on the Guide, the Relators allege that a "legitimate" analysis of impediments must include a

review of the jurisdiction's own Public-Sector Actions[1] to determine how they affect the availability, location, and accessibility of housing for protected classes. (*Id.* ¶ 41.)

The Second Amended Complaint provides generalized examples of Public-Sector Actions that St. Paul and Minneapolis failed to include in their analysis of impediments including: deciding to demolish housing, specifically the "Strategic Demolition and Securing Policy" (*id.* ¶¶ 58, 107, 128); imposing administrative burdens (*id.* ¶¶ 87,118); failing to follow city code inspection regulations (*id.* ¶¶ 85-86); failing to comply with the state building codes by requiring existing homes to comply with current housing codes (*id.* ¶ 91); deciding to designate occupied homes as vacant buildings (*id.* ¶ 99); converting vacant rental homes into "homeowner occupied only homes" (*id.* ¶ 103); using rental licensing revocation ordinances in a punitive manner against low-income housing providers (*id.* ¶ 119); condemning "safe, decent and sanitary housing stock" (*id.* ¶ 122); cooperating with a local power company to condemn housing with easily correctable code violations (*id.* ¶ 123); completing unannounced and unjustified inspections (*id.* ¶ 124); levying excessive inspection fees (*id.* ¶ 125); applying "hair-trigger" demolitions (*id.* ¶ 127); promoting deed restrictions on vacant properties subject to development (*id.* ¶ 135); and promoting expansive commercial developments in areas where affordable housing is located (*id.* ¶ 136).

### a. The Allegations Against St. Paul Were Publicly Disclosed In *McRath v. City of St. Paul*

After careful review, the Court determines that the "allegations or transactions" on which Relators base their claims against St. Paul were publicly disclosed in a previous action. Michael and Jerin McRath filed suit against St. Paul for violating the Fair Housing Act,

---

[1] Relators define "Public Sector [A]ctions" as "laws, regulations, administrative policies, procedures and practices." (SAC ¶ 98.)

failing to affirmatively further fair housing, failing to conduct an analysis of impediments to fair housing, failing to take appropriate action to eliminate public sector impediments to fair housing, and failing to create and maintain records accessible to the public. *See* Compl. and Demand for Jury Trial at 46, *McRath v. City of St. Paul* , Civ. No. 10-cv-01965 (D. Minn. filed May 4, 2010), ECF No. 1.

Although the McRaths did not bring their claims under the FCA, their complaint revealed the "essential elements" of St. Paul's alleged fraudulent behavior. The *McRath* complaint asserted the true state of the facts as follows:

> As part of the 'AFFH Certifications,' the City expressly certifies each year that the City will (a) conduct an analysis of impediments . . . to fair housing choice, (b) take appropriate 'actions to eliminate' the identified impediments to fair housing choice and (c) maintain records of the [analysis of impediments] and actions taken.

*Id.* ¶ 107. The *McRath* complaint then alleged the following misrepresentation of facts:

> [T]he city continues to refuse to comply with its AFFH obligations, the City fails to conduct a valid [analysis of impediments] on the City's application of its building codes and related policies, procedures, and practices to 'protected class' housing in the City, the City fails to take appropriate actions to remove public sector impediments to fair housing in the City, and the City fails to create and maintain appropriate records as required by its CDBG certifications and federal statutes and regulations.

(*Id.* ¶ 243.)

To establish a standard of conduct, the McRaths cited the same language from the Guide that Relators rely on in the Second Amended Complaint. (*Id.* ¶ 117.) Based on this language, the McRaths alleged that St. Paul had an obligation to include an analysis of its own building codes, regulations, policies, and practices in the analysis of impediments in order to fulfill their duty to affirmatively further fair housing. (*Id.* ¶¶ 116, 243.) The McRaths further alleged that St. Paul

had an obligation to analyze its procedures and practices related to "Vacant Buildings, Condemnations, Nuisances, removal of Certificate of Occupancy, Code Compliance certification requirements, [and] Demolitions. . . ." (*Id.* ¶ 221) (internal quotation marks omitted). These are the same general codes, regulations, practices, and policies that Relators assert St. Paul failed to include in an analysis of impediments in order to fulfill their duty to affirmatively further fair housing. (*Compare id.* ¶¶ 18, 22, 24, 48, *with* SAC ¶¶ 58, 85-86, 91, 99, 103, 107, 135, 136.) The time period in which the complained-of conduct occurred is also similar in both complaints. The *McRath* complaint alleged that St. Paul failed to fulfill its duty to affirmatively further fair housing from 1996 to May 4, 2010. (Compl., Civ. No. 10-cv-01965 ¶¶43-45, ECF No. 1.) In the proposed Second Amended Complaint, Relators allege that specific St. Paul certifications were fraudulent between February 18, 2005 and April 16, 2010. (SAC ¶ 30.) In addition, the *McRath* complaint alleged that St. Paul collected nearly $100 million dollars in Community Development Block Grant Funding by misrepresenting that it was conducting analysis of impediments as required by HUD (Compl., Civ. No. 10-cv-01965 ¶¶ 45-46, ECF No. 1), and Relators allege that St. Paul acquired $75 million in Community Development Block Grant Funding (SAC ¶ 19). The Second Amended Complaint asserts almost exactly the same allegations concerning the same transactions that the McRaths asserted approximately ten months earlier.

In light of the foregoing, the Court determines that the *McRath* complaint alleged the same fraudulent claim period and the same funding resulting from fraudulent claims as the Second Amended Complaint. Consequently, the true state of the facts and the alleged misrepresentations contained in Counts I and II against St. Paul were publicly disclosed before Relators filed the instant action. Even though the McRaths did not bring their suit under the FCA, their complaint revealed the "essential elements comprising the fraudulent transaction" and

raised "a reasonable inference of fraud," which fulfills the purpose of the FCA *qui tam* provision.

*See Newell*, 728 F.3d at 796.

### b. The Pre-Amendment Claims Against Minneapolis Were Publicly Disclosed in *Smithrud v. City of Minneapolis*

The allegations or transactions that Relators use to support Count I and Count II against Minneapolis were also publicly disclosed in an earlier case. The complaint in *Smithrud v. City of Minneapolis*, No. 10-cv-04451 (D. Minn. filed Nov. 3, 2010), asserted three claims against Minneapolis, all of which Smithrud alleged arose out of violations of "federal fair housing."[2] (Verified Compl. and Demand for Jury Trial 13-19, Civ. No. 10-cv-04451 (filed D. Minn. Nov. 3, 2010), ECF No. 1.)  In his complaint, Smithrud alleged:

> The City, despite its annual certifications filed under its legal duties associated with the required Federal Fair Housing's 'Analysis of Impediments' ('AI'), stated in essence under oath, that the City:
>
> A. Never considered the disparate impacts it was causing;
> B. Swore under oath it was considering such impacts;
> C. Swore under oath that there were no such disparate impacts and that the City's own violations of the State Building Code were either excused as attempts to provide safe housing or were not material as impediments having any disparate impacts.
>
> The City then falsely sought and received, and then expended each year from 2005-2010 millions of dollars in HUD CDBG funds to which the City was not legally entitled and would not have received, if the AI's were true and correct, not false, and when the City knew it had not provided nor been supplied with any AI between 2001 to 2009.

(*Id.* ¶ 37-38.) The *Smithrud* complaint also provided that "[t]he City has an affirmative duty to further federal fair housing and to factor in federal fair housing law with its other municipal

---

[2] The three counts were titled "Violation of the State Building Code As Violation of Federal Fair Housing," "Retaliation or Interference with Contract As Violation of Federal Fair Housing," and "Fraud on the Court by the City Attorney . . . and as Retaliation or Interference with Contract As Violation of Federal Fair Housing."

decisions as to adverse impacts on protected class members or older, grand-fathered-in housing stock." (*Id.* ¶ 52.)

Unlike the *McRath* complaint, the *Smithrud* complaint did not disclose all the general "Public Sector Actions" that the Second Amended Complaint alleges; however, the *Smithrud* complaint did publicly disclose the "essential elements" of the fraud. The heart of the fraud claims in the Second Amended Complaint is that Minneapolis fraudulently certified that it was fulfilling its duty to affirmatively further fair housing in order to obtain funding from the federal government. The *Smithrud* complaint publicly disclosed this information by pleading the true state of the facts—that Minneapolis was certifying that it was affirmatively furthering fair housing—and the misrepresentation—that Minneapolis was not actually affirmatively furthering fair housing. The allegations within the *Smithrud* complaint—filed on November 3, 2010—were sufficient to reveal the "essential elements comprising the fraudulent transaction" and raise "a reasonable inference" that Minneapolis may have been committing fraud through the HUD certifications. *Newell*, 728 F.3d at 796. Accordingly, the allegations and transactions within the Second Amended Complaint supporting Counts I and II against Minneapolis were publicly disclosed.

### 3. The Pre-Amendment Allegations Against St. Paul and Minneapolis are "Based Upon" the Public Disclosures

"A *qui tam* action is 'based upon' public disclosures when the allegations in the action and those in the public disclosures are substantially similar, regardless of whether the relator may have had independent knowledge of the fraud."  *Id.* at 797.  As set forth above, Relators made nearly the same allegations against St. Paul as the McRaths—both alleged that St. Paul knowingly and falsely certified to HUD that they were affirmatively furthering fair housing to receive federal funding; both relied on the language from the Guide to allege that St. Paul had an

obligation to perform an analysis of impediments on their laws, regulations, administrative policies, procedures, and practices; the periods of time in which both Relators and the McRaths alleged that St. Paul committed fraud overlap; and the type and amount of funding that St. Paul obtained as a result of the alleged frauds is very similar. In short, Relators' allegations against St. Paul are "substantially similar" to the publicly-disclosed allegations that the McRaths alleged against St. Paul, and therefore, the Court determines that the Relators' allegations in the instant matter are based upon publicly-disclosed information.

Relators' allegations against Minneapolis are also "substantially similar" to the allegations in *Smithrud*. As discussed above, the *Smithrud* complaint does not contain a list of all the same Public Sector Actions, but the core elements of the fraudulent allegations are present. Relators allege that Minneapolis failed to affirmatively further fair housing by failing to fulfill the three duties that comprise the obligation. The *Smithrud* complaint provided that Minneapolis knew of its obligation to affirmatively further fair housing, it failed to fulfill that duty, and it obtained HUD Community Development Block Grants by falsely certifying that it did fulfill that duty. In addition, both complaints rely on certifications that were submitted between 2005 and 2011 for Community Development Block Grants from HUD. Because Relators' allegations against Minneapolis are substantially similar to the allegations against Minneapolis in the *Smithrud* complaint, this Court determines that Relators' claims are based upon the publicly-disclosed allegations.

### 4. Relators are Not the Original Source of the Pre-Amendment Allegations Against St. Paul or Minneapolis

Because the allegations were publicly disclosed before they initiated the instant action, Relators must be the original source of the information for this Court to have jurisdiction over their claims. 31 U.S.C. § 3730(e)(4)(A). To qualify as an original source, their "knowledge of the

information must be (1) direct, (2) independent, and (3) [Relators] must have voluntarily provided the information to the Government before filing suit." *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1042-43 (8th Cir. 2002).

First, Relators must have "direct knowledge" of the true state of the facts; if they do not, the inquiry ends there. "Direct knowledge" is firsthand knowledge and is marked by the absence of an intervening party. *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995). "[A] person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the [FCA]." *Id.*

Based on the Second Amended Complaint, Relators have not established that they have direct knowledge. The only statement in the Second Amended Complaint regarding the origin of the Relators' information reads, "Relators are original sources of the allegations set forth herein." (SAC ¶ 8.) This conclusory allegation does not fulfill Relators' pleading burden. Relators also pleaded that they own low-income housing in Minneapolis and that Mr. Ellis was a Minneapolis housing inspector in the past. (SAC ¶ 7.) The Second Amended Complaint fails, however, to explain how these experiences translate into direct knowledge of their claims regarding St. Paul's and Minneapolis's truthfulness on their HUD certifications.

Relators argue that the knowledge they received from former relator Blodgett is sufficient to constitute direct knowledge. According to the affidavits submitted by Mr. Ellis, Relators' knowledge of the false certifications submitted by St. Paul and Minneapolis was based on information that they paid former relator Blodgett to investigate (which Blodgett gathered by reviewing public records and interviewing third parties) and information they themselves gathered from secondhand sources. (Aff. Andrew Ellis ¶¶ 12, 14-17, 22-26, 28, 31-81.)

However, "[k]nowledge that is based on research into public records, review of publicly disclosed materials, or some combination of these techniques is not direct." *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 59 (1st Cir. 2009); *see also Barth*, 44 F.3d at 703 (collateral research and investigations do not form direct knowledge). Accordingly, Relators' argument that the knowledge they acquired from Blodgett satisfies the direct-knowledge requirement fails.

Mr. Ellis's experience and background also do not satisfy the direct-knowledge requirement. In his affidavit, Mr. Ellis stated that after Blodgett informed him that federal law required the Defendants to affirmatively further fair housing it was clear to Mr. Ellis that Minneapolis was not following the federal requirements. Having an interest, experience, or background that allows one to grasp the importance of secondhand information, however, does not transform secondhand information into direct knowledge. *Newell*, 728 F.3d at 798. Despite Mr. Ellis's experience as a rental property owner and his ability to recognize the importance of the information that he collected from secondhand sources, he did not have "direct" knowledge of the information that he acquired from outside sources.

Relators' allegations against St. Paul and Minneapolis are based upon secondhand information that they or Blodgett gathered. They do not have "direct" knowledge of the true state of the facts. Relators are not the original source of the allegations that were publicly disclosed in *McRath* and *Smithrud*. Therefore, pursuant to § 3730(e)(4), the Court lacks subject matter jurisdiction over Count I and Count II alleged against both St. Paul and Minneapolis.

18

### 5. The February 16, 2011 Certification Submitted by Minneapolis was Not Publicly Disclosed

The Second Amended Complaint alleges that Minneapolis submitted a fraudulent certification to HUD on February 16, 2011, (SAC ¶ 28), which is after the effective date of the amended public-disclosure bar.  The amended public-disclosure bar provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—(i) in a Federal criminal, civil, or administrative hearing *in which the Government or its agent is a party*; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added). As is relevant to the instant proceeding, allegations and transactions are "publicly disclosed" through a hearing only where the government or its agent is a party to the action. *Id.*

The 2011 claim against Minneapolis was not publicly disclosed due to the substantive changes in the public-disclosure statute. The federal government was not a party to the *Smithrud* action and therefore, the allegations in the *Smithrud* complaint did not publicly disclose the 2011 claim. Accordingly, the Court has jurisdiction over Relators' claim that on February 16, 2011, the Minneapolis "knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval" and "knowingly made, used, and caused to be made and used, false records and statements material to the false or fraudulent claims for federal housing and community development grants and other related funding."  (SAC ¶¶ 160, 171, ECF No. 173.)

### D.  Second Amended Complaint Fails to Plead With Particularity

Because the Court has jurisdiction over Relators' 2011 claim alleged against Minneapolis and the conspiracy claim, it will consider the Defendants' arguments that the Second Amended Complaint fails to plead the claims with particularity as required by Rule 9(b). As an anti-fraud statute, the FCA requires the complaint to comply with the particularity requirement of Rule 9(b).  *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006); *Kinney*, 327 F.3d at 674. Under Rule 9(b), "the circumstances constituting fraud . . . shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The particularity requirement "demands a higher degree of notice than that required for other claims" in order "to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *Costner*, 317 F.3d at 888.

#### 1.  Relators Fail to Plead Counts I and II Against Minneapolis with Particularity

The Court notes that even if the Counts I and II against Minneapolis had not been publicly disclosed, Relators' failure to plead the alleged FCA violations with particularity would require the Court to recommend that those claims be dismissed. The Second Amended Complaint alleges that from April 11, 2005 to February 16, 2011, Minneapolis annually violated the FCA by submitting false claims to HUD in order to receive federal funding.  (SAC ¶ 141.) To impose liability under the FCA, Relators must show that Minneapolis "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty., N.Y.*, 495 F. Supp. 2d 375, 384 (S.D.N.Y. 2007) (quoting *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001)).  Because the Second Amended Complaint alleges a "systematic practice of submitting fraudulent claims," their complaint "must provide *some* representative examples of the alleged fraudulent conduct specifying the time, place and content

of [Minneapolis]'s false representations, as well as the details of [Minneapolis]'s fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009) (quoting *Joshi*, 441 F.3d at 556-57) (emphasis in original) (internal quotation marks omitted)).  In other words, "the complaint must identify the 'who, what, where, when and how' of the alleged fraud." *Joshi*, 441 F.3d at 556 (quoting *Costner*, 317 F.3d at 888).

In *United States ex rel. Joshi v. St. Luke's Hospital*, Dr. Joshi, an anesthesiologist, brought a *qui tam* action against St. Luke's Hospital and Dr. Bashiti, another anesthesiologist at the hospital. 441 F.3d at 554. Dr. Joshi alleged that St. Luke's requested and received Medicaid/Medicare reimbursement from the government for anesthesia services performed by Dr. Bashiti even though Dr. Bashiti had not actually supervised or directed the work of certified registered nurse anesthetists ("CRNAs") for which St. Luke's received reimbursement. *Id.* In addition, the relator alleged that St. Luke's knowingly submitted false claims to the government for services not performed and supplies that were not used on the patients eligible for Medicaid/Medicare. *Id.* The Eighth Circuit concluded that Dr. Joshi failed to allege with specificity the particular circumstances of the alleged fraudulent conduct. *Id.* at 556. The court explained:

> Absent from the complaint are any mention of (1) the particular CRNAs who allegedly performed patient care and administered anesthesia services unsupervised, (2) when Dr. Bashiti falsely claimed to have supervised or directed CRNAs, (3) who was involved in the fraudulent billing aspect of the conspiracy, (4) what services were provided and to which patients the services were provided, (5) what the content was of the fraudulent claims, (6) what supplies or prescriptions were fraudulently billed and to which patients the supplies or prescriptions were provided, (7) what dates the defendants allegedly submitted the false claims to the government, (8) what monies were fraudulently obtained as a result of any transaction, or (9) how Dr. Joshi, an anesthesiologist,

> learned of the alleged fraudulent claims and their submission for payment. Simply put, the complaint fails to identify specifically the "who, what, where, when, and how" of the alleged fraud.

*Id.* Even though Dr. Joshi set forth an overall general scheme through which the hospital and Dr. Bashiti may have committed fraud against the Government, the detail Dr. Joshi provided was not enough to fulfill the particularity requirement.

Applying the same standard to the instant matter, the Court determines that Relators successfully plead the first two elements of their claims—that (1) a claim was made (2) to the United States—with particularity. Specifically, the Second Amended Complaint asserts that City Coordinators John Moir and Steven Bosacker signed and submitted Local Grantee Certifications to the United States on April 11, 2005, April 13, 2007, April 15, 2008, December 1, 2008, April 15, 2009, June 5, 2009, April 15, 2010, and February 16, 2011, that and Minneapolis received $125 million in various federal funding in exchange for those certifications. (SAC ¶¶ 17, 28, 35.) These allegations specifically state when the certifications were submitted, who signed and submitted the certifications, and the money they obtained as a result.

With respect to the remaining elements, however, Relators fail to plead with particularity. The Second Amended Complaint alleges only "conclusory and generalized allegations" without providing specifics.  For example, the Second Amended Complaint alleges that Minneapolis did not conduct a legitimate analysis of impediments—and consequently was not affirmatively furthering fair housing—because it did not subject its local building, occupancy, safety, and health codes (as well as its laws, regulations, demolition decisions, and removal decisions) to an analysis of impediments. (SAC ¶¶ 56-58.) The Second Amended Complaint fails, however, to provide any specific examples of (1) how these laws, policies, codes, and procedures impede access to fair housing, (2) when these laws, policies, codes, and procedures have specifically

impeded access to fair housing, (3) whose access to fair housing was impeded by these laws, policies, codes, and procedures, or (4) any individual instance of a person being denied access to fair housing as a direct result of these laws, policies, codes and procedures.

By way of another example, the Second Amended Complaint alleges that Minneapolis has "removed former affordable housing units from occupancy for extended periods of time and in many cases, permanently." (SAC ¶ 95.) But it fails to give an example of one affordable housing unit or one low-income housing provider whose unit was "removed from occupancy for extended periods" by Minneapolis's specific policies, actions, or regulations. The Second Amended Complaint also alleges that Minneapolis has failed to fulfill its obligation to affirmatively further fair housing because it has not subjected its Public Sector Actions to a "legitimate" analysis of impediments. (SAC ¶ 117.) But Relators fail to identify (1) specific Public Sector Actions that should have been subject to the analysis of impediments, (2) who was specifically carrying out the Public Sector Actions, (3) where and when they were carried out, and (4) who decided not to subject the Public Sector Actions to "legitimate" analyses of impediments.

The Second Amended Complaint further alleges that Minneapolis has added layers of regulatory burdens on low-income housing providers including a rental licensing revocation ordinance, and provides one example of a city ordinance that allegedly contains a licensing regulation that has the effect of displacing tenants who live in "safe, decent, and sanitary housing." (SAC ¶¶ 118-20.) Aside from providing the ordinance, however, the Second Amended Complaint fails to provide specific examples of (1) when the licensing ordinance displaced tenants, (2) any tenants that were displaced as a result of the complained-of ordinance, and (3) what Minneapolis obtained as a result of implementing the ordinance.

The Second Amended Complaint also alleges that Minneapolis cooperates with a "private energy company" to condemn safe housing even though "licensed contractors quickly remedy any legitimate code issues." (SAC ¶ 123.) The Second Amended Complaint fails to specify (1) the name of the energy company, (2) when these condemnations took place, (3) who was affected by the implementation of such a condemnation, (4) how Minneapolis and this unnamed company determine which housing to condemn, or (5) an example of a housing unit that was condemned in this way.

The Second Amended Complaint alleges that Minneapolis completed "retaliatory inspections on low-income rental units and buildings," levied "confiscatory administrative fees, penalties and assessments," and levied "excessive City inspection fees, permit fees, fines and assessments." (SAC ¶¶ 124-126.) Like the other allegations, the Second Amended Complaint fails to set forth: (1) when these inspections, fees, fines, and assessments occurred; (2) where they occurred; (3) who carried them out; or (4) an example of someone they specifically affected.

Lastly, the Second Amended Complaint alleges that Minneapolis demolishes "affordable, safe, decent and sanitary" low-income rental properties based on "hair-trigger" decisions. (SAC ¶ 127.) According to the allegations, Minneapolis quickly orders demolition and fines, which makes housing unavailable even though the owner could quickly repair the property. (SAC ¶ 128.) Again, the Second Amended Complaint fails to provide (1) when such hair-trigger decisions regarding demolitions, fines, and fees occurred; (2) who made any such decisions; (3) an example of Minneapolis's hair-trigger decisions; or (4) any specific property that was ordered for demolition instead of allowing its owner to make the required repairs. Instead, Relators make the conclusory and generalized statement that Minneapolis makes these types of

decisions. In short, none of the allegations against Minneapolis is sufficient to meet Rule 9(b)'s particularity requirement.

Relators argue that the Rule 9(b) particularity requirement should be relaxed "when an FCA action involves a complex scheme of fraud over an extended period of time." (Relators' Mem. Opp'n to Minneapolis 49, ECF No. 202) (internal quotation marks omitted). The Eighth Circuit, however, considered and rejected this argument in *Joshi* because a more lenient version of Rule 9(b) is at odds with both the Federal Rules and the FCA. *Joshi*, 441 F.3d at 560. The *Joshi* court reiterated that the *qui tam* provision in the FCA is "'intended to encourage individuals who are either close observers or involved in the fraudulent activity to come forward, and it is not intended to create windfalls for people with secondhand knowledge of the wrongdoing.'" *Id.* at 561 (quoting *Kinney*, 327 F.3d at 674). As such, the court reasoned, the need for a more lenient pleading standard conflicts with a relator's allegation that he is an original source of the information. *Id.* at 560. Consequently, Relators must plead each element of their FCA claim with particularity.

Like the relator in *Joshi*, Relators have a "difficult burden" to allege sufficient facts to satisfy the particularity requirement. Nonetheless, they must meet the Rule 9(b)'s standard in order give Minneapolis sufficient notice of the alleged fraudulent scheme. The Second Amended Complaint, however, outlines a general scheme by which Minneapolis could have obtained HUD funding through fraudulent means. It does not identify the who, what, where, when and how of Relators' claims. Because Relators did not plead Counts I and II with particularity as required by Rule 9(b), the Court will recommend that those claims be dismissed.

### 2.  Relators Failed to Plead Count III Against St. Paul and Minneapolis with Particularity

Count III of the Second Amended Complaint alleges that St. Paul and Minneapolis violated 31 U.S.C. § 3729(a)(1)(C) by conspiring to violate 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). To state a conspiracy claim, Relators must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by HUD and (2) at least one act performed in furtherance of that agreement." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). As set forth above, the FCA is an anti-fraud statute that is subject to the particularity requirement of Rule 9(b), *Joshi*, 441 F.3d at 556, and that requirement applies equally to the FCA's conspiracy provision. *E.g.*, *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009).

After careful review, the Court determines that Relators fail to plead with particularity the existence of an unlawful agreement between St. Paul and Minneapolis. The most detailed fact in the Second Amended Complaint supporting the conspiracy claims is that the Defendants "coordinated their illegal housing policies and fraudulent actions and false certifications and false record keeping and submissions to the United States" at "FHIC and other inter-city working groups." (SAC ¶ 148.) This allegation is insufficient to provide the "who, what, where, when, how" required by Rule 9(b). *See Joshi*, 441 F.3d at 556. The Second Amended Complaint does not set forth who specifically entered into the unlawful agreement on behalf of Minneapolis and St. Paul, what the unlawful agreement consisted of, where the "FHIC" and "inter-city working group" meetings took place, when the unlawful agreement was formed, and how the unlawful agreement was formed and executed. Therefore, the Court will recommend that Count III be dismissed for failing to plead the elements of an FCA conspiracy claim under 31 U.S.C. § 3729(a)(1)(C) with particularity.

## IV.  RECOMMENDATION

Based on the foregoing, the record, and memoranda, **IT IS HEREBY RECOMMENDED** that Defendant St. Paul's Motion to Dismiss or Alternatively for Summary Judgment (ECF No. 174) be **GRANTED** in its entirety and Defendant Minneapolis's (ECF No. 182) Motion to Dismiss be **GRANTED** in its entirety, and this action be **DISMISSED WITH PREJUDICE**.

Dated: July 24, 2014

s/ Tony N. Leung
Tony N. Leung
United States Magistrate Judge
For the District of Minnesota

*United States of America, ex rel. Andrew Ellis et al. v. City of Minneapolis et al.*
File No. 11-cv-00416 (PJS/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. The Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **August 8, 2014.**